CW 530

FILED

JUN 1 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name Porras                    Neville
3    (Last)              (First)              (Initial)

   Prison Number  E37606        C.T.F.
4
   Institutional Address  P.O. Box 689 – Y337, Soledad, CA 93960-0689
5

6  ============================================================================

7              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**

   CW

8  Neville Porras                              )
   (Enter the full name of plaintiff in this action.)   )
9                                              )
                                               )      CV  08      3006
10                vs.                          )
                                               )      Case No.
11 Ben Curry, Warden                           )      (To be provided by the Clerk of the Court)
                                               )
12 _____          )      **PETITION FOR A WRIT**
                                               )      **OF HABEAS CORPUS**
13 _____          )
                                               )      E-filing
14 _____          )
   (Enter the full name of respondent(s) or jailor in this action)                    (PR)
15 ============================================================================

16            **Read Comments Carefully Before Filling In**

17 **When and Where to File**

18        You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as the

22 loss of good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located.  If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution in

28 which you are confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g. detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

    1.  What sentence are you challenging in this petition

           (a)  Name and location of court that imposed sentence (for example, Alameda County Superior Court, Oakland):

           <u>Superior Court of California</u>    <u>San Joaquin, California</u>

                (Court)                (Location)

           (b) Case number, if known   <u>43369</u>

           (c) Date and terms of sentence   <u>16 years to life</u>

           (d) Are you now in custody serving this time? (Custody meaning being in jail, on parole or probation, etc.)     Yes <u>X</u>     No _____

           Where?

           Name of institution:   <u>Correctional Training Facility</u>

           Address:   <u>P.O. Bo x 686, Soledad, CA 93960-0686</u>

    2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>P.C. 187, second degree murder</u>

3. Did you have any of the following?

    Arraignment:                               Yes __X___        No _____

    Preliminary Hearing:                 Yes __X___        No _____

    Motion to Suppress:                 Yes _____        No _X___

4. How did you plead?

    Guilty_____      Not Guilty _X___     Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _X___      Judge alone _____   Judge alone on transcript_____

6. Did you testify at your trial?             Yes _____        No _X___

7. Did you have an attorney at the following proceedings:

| | | | | |
|---|---|---|---|---|
| (a) | Arraignment | Yes _X___ | No _____ |
| (b) | Preliminary hearing | Yes _X___ | No _____ |
| (c) | Time of plea | Yes _____ | No _X___ |
| (d) | Trial | Yes _X___ | No _____ |
| (e) | Sentencing | Yes _____ | No _____ |
| (f) | Appeal | Yes _X___ | No _____ |
| (g) | Other post-conviction proceeding | Yes _____ | No _X___ |

8. Did you appeal your conviction?         Yes _X___        No _____

    (a)      If you did, to what court(s) did you appeal?

             Court of Appeal            Yes _X___        No _____

             Year: _UNK_        Result: _Denied_____

             Supreme Court of California    Yes _____        No _X___

             Any other court            Yes _____        No _X___

    (b)      If you appealed, were the grounds the same as those you are raising in this

1    Petition?                                                    Yes _____    No _X_____

2    Was there an opinion?                            Yes _____    No _X_____

3    (c)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                                   Yes _____    No _____

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, application or motions with

9    respect to this conviction in any court, state of federal?        Yes _____    No _X_____

10    [Note; if you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: United States Northern District Court _____

19    II.    Type of Proceeding:  Habeas corpus _____

20    Grounds raised (Be brief but specific):

21    a. Similar to enclosed _____

22    b._____

23    c._____

24    d._____

25    Result: Pending _____ Date of Result: N/A _____

26    II.    Name of Court:  N/A _____

27    Type of Proceeding: _____

28    Grounds raised (Be brief but specific):

1        a._____

2        b._____

3        c._____

4        d._____

5        Result:_____Date of Result:_____

6    III.    Name of Court: N/A_____

7        Type of Proceeding: _____

8        Grounds raised (Be brief but specific):

9        a._____

10       b._____

11       c._____

12       d._____

13       Result:_____Date of Result:_____

14   IV.    Name of Court: N/A_____

15       Type of Proceeding: _____

16       Grounds raised (Be brief but specific):

17       a._____

18       b._____

19       c._____

20       d._____

21       Result:_____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                Yes _X___        No _____

24       Name and location of court: United States Northern District Court_____

25   B.  GROUNDS FOR RELIEF

26       State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27   support each claim.  For example, what right or privilege were you denied?  What happened?  Who

28   made the error?  Avoid legal arguments with numerous case citations.  Attached extra paper if you

PET. FOR WRIT OF HAB. CORPUS                    - 5 -

1  need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); **McCleaskey v. Zant**,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5      Claim One: <u>See attached</u> _____

6  _____

7      Supporting Facts: _____

8  _____

9  _____

10 _____

11     Claim Two: _____

12 _____

13     Supporting Facts: _____

14 _____

15 _____

16 _____

17     Claim Three: _____

18 _____

19     Supporting Facts: _____

20 _____

21 _____

22 _____

23     If any of these grounds were not previously presented to any other court, state briefly which

24 grounds were not presented and why:

25 _____

26 _____

27 _____

28 _____

1    List, by name and citation only, any cases that you think are close factually to yours so that
2  they are an example of the error you believe occurred in your case. Do not discuss the holding or
3  reasoning of these cases:

4    _____

5    _____

6    _____

7  Do you have an attorney for this petition?          Yes _____    No _X_____

8  If you do, give the name and address of your attorney:

9    _____

10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled

11  in this proceeding. I verify under the penalty of perjury that the foregoing is true and correct.

12

13  Executed on _6-9-08_____          _Neville Porras_____

14              Date                        Signature of Petitioner

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

STATEMENT OF THE CASE

2       Petitioner was convicted in 1989, in case number 43369, in the Superior Court in and for the

3   County of San Joaquin, California, to the crime of second-degree murder, in violation of Penal Code

4   section 187. Petitioner was 19 years of age at the time of the crime and received a 16 years to life

5   sentence.

6       Petitioner was received in the Department of Corrections on December 1, 1989. The life

7   term began on that date and Petitioner has a minimum eligibility release date of May 6, 1999.

8       Petitioner appeared before the Board of Parole Hearings for his 5th parole suitability hearing

9   on August 15, 2006. The decision to deny him parole became final and appealable on December 13,

10  2006. (See Exhibit A, at p. 64.)

11      Petitioner filed a like petition for writ of habeas corpus in the San Joaquin County Superior

12  Court, which was denied on July 9, 2007.

13      Petitioner filed a like petition in the California Court of Appeals in August 2007. However,

14  Petitioner did not receive said denial until September 5, 2007. Petitioner filed his petition for writ of

15  habeas corpus on October 6, 2007, with the California Supreme Court, which was denied on May 28,

16  2008; therefore, the writ is timely.

17

STATEMENT OF THE FACTS

18      Petitioner submits, for the limited purpose of this habeas proceeding , the  summary of facts

19  outlined on page 12 of Exhibit 1 and as such, incorporates by reference as though fully set forth in

20  those facts/factual summary.

21

STATE COURT STANDARD OF REVIEW

22      As a recent California Court upheld in In re Lawrence 2007 WL 1475283 (Cal.App.2d) the

23  (under review) standard of review in State Courts under the California due process clause and

24  statutory provisions, set forth standard and criteria that limits the Parole Board and Governor's

25  review of parole decisions and gives rise to a protected liberty interest (see In re Rosenkrantz (2002)

26  29 Cal.4th 616, 657). It is true however, that this same decision took away much of the Court's

27  ordinary power in parole review decisions. None the less, the Supreme Court stated:

28          "[w]e conclude that the judicial branch is authorized to review the

7

1   factual basis of the Board denying parole in order to ensure that the
    decision comports with the requirements of due process of law."

2

3   Expanding on this, the Court in <u>In re Dannenberg</u> (2005) 34 Cal.4th 1061 acknowledged that

4   the overriding concern in the guiding statutory and regulatory sections was the responsibility to

5   ensure public safety.  In <u>Dannenberg</u> the Court cited Penal Code § 3041(a) and reiterated that:

6   "In stating the Board "shall normally" set a parole release date when a
    prisoner approaches her minimum parole eligibility release date did not
7   mean generally or usually or in most cases.  Instead the Board can and
    should first consider under section 3041(b) whether a prisoner's
8   commitment crime and/or other past crimes require further delay in
    setting a release date because of public safety."
9

10  The  High Court suggested the "some evidence" standard must tend to prove the existence of

11  some factor which is relevant to the ultimate finding the statute requires before parole can be denied

12  – release of the prisoner on parole would create an unreasonable risk to public safety.  In a similar

13  view the <u>Rosenkrantz</u>, <u>supra</u>, Court held:

14  "The governing statute provides that the Board must grant parole unless it
    determines that public safety requires a lengthier period of incarceration
15  for the individuals because of the gravity of the offense underlying the
    conviction."
16

17  In clarifying this rational, the <u>Dannenberg</u> Court emphasized that the gravity of the current or

18  past conviction offense or offenses must demonstrate that the prisoner remains [at present time] a

19  danger to public safety.  (See <u>Dannenberg</u> 34 Cal.4th at p. 1098.)

20  As the <u>Lawrence</u>, <u>supra</u>, Court stated:

21  "Returning to the statutory test, only evidence bearing on the likelihood
    of recidivism and only to the extent it reveals an "unreasonable risk" of
22  same is relevant to the decision whether to grant or deny parole."

23  Similarly, the Court of Appeals in the 2005 decision of <u>In re Deluna</u> 126 Cal.App.4th 585,

24  591, pointed out that:

25  "A parole release decision authorizes the Board (and Governor) only to
    identify and weigh the factors relevant to predicting … whether the
26  inmate will be able to live in society without committing additional
    antisocial acts."
27

28  The same court (<u>Id.</u>) concluded that the factors relevant to <u>that</u> decision are not spelled out in

1  statutes enacted by the legislator, but in regulations promulgated by corrections administrators. (See

2  Cal. Code Regs., tit. 15 § 2402 (c)(1) and Cal. Code Regs., tit. 15 § 2402 (c)(2) – (6) and (D).

3      As stated in In re Lee (2006) 143 Cal.App.4th 1400, 1408:

4          "The test is not whether some evidence supports the reason the Governor
           cites for denying parole, but whether some evidence a parolee's release
5          unreasonably endangers public safety."

6      In the case at bench, there is not one scintilla of evidence in the record which rationally

7  relates (when attached to the commitment offense) to the appropriate and controlling standards or the

8  due process clause of the California constitution which demonstrates that Petitioner will either be a

9  danger to public safety (see Rosenkrantz, supra; Dannenberg, supra) or that can reasonably identify

10 and/or help weigh factors relevant to predicting whether Petitioner will be able to live in society

11 without committing antisocial acts bearing on the likelihood or recidivism to the extent it reveals an

12 "unreasonable risk" of same. (Lawrence, supra; Deluna, supra; Lee, supra.)

13                    FEDERAL STANDARD OF REVIEW

14     The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") circumscribes a

15 federal habeas court's review of a state court decision. Lockyer v. Andrede 538 U.S. 63, 70 123

16 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); Wiggins v. Smith 539 U.S. 510, 520, 123 S.Ct. 2527,

17 2534 156 L.Ed.2d 471 (2003) as amended by AEDPA, 28 USC § 2254(d), provides:

18     An application for writ of habeas corpus should not be granted with respect to any claims

19 adjudicated on the merits in a state court proceeding unless the adjudication resulted in a decision

20 that was contrary to, or involved an unreasonable application of clearly established federal law as

21 determined by the Supreme Court of the United States, or resulted in a decision that was based on an

22 unreasonable determination of the facts in light of the evidence presented in the state [court]

23 proceedings.

24     While 2254(d)'s 'clearly established' phrase refers to holdings, as opposed to dicta of [the

25 Supreme] Court holding/precedent, Ninth Circuit precedent may be persuasive authority for

26 purposes of determining, for instance, whether a decision is an unrealistic application of law or

27 determining what is 'clearly established' Sims v. Rowland 414 F.3d 1148, 1151 (9th Cir.); Robinson

28 v. Ignacio 360 F.3d 1044, 1057 (9th Cir. 204) – or – when there is no clearly established federal law

9

1   'specifically' on point to an issue raised the Ninth Circuit has 'clearly' held in <u>Hart v. Massanari</u> 226

2   F.3d 1155 (9th Cir. 2001). That the <u>first decision</u> of a three-judge panel binds not only other Circuit

3   Panels, but all encompassing District Courts and "sets the law" for all lower courts and all future

4   Circuit Panels as well – until the issue is overruled by the court itself, sitting en banc or by the

5   Supreme Court or unless congress changes the law.

6       The California Supreme Court reaches 'the merits' of the claims raised when it denies the

7   petition without comment or citation, <u>Gaston v. Palmer</u> 417 F.3d 1030, 1038 (9th Cir. 2005)

8   amended by 447 F.3d 1165 (9th Cir. 2006) cert. denied and the federal court looks through the

9   record to the last reasoned opinion, <u>Medley v. Runnell</u> 506 F.3d 857, 826 (9th Cir. 2002) or, to the

10  extent the claims have not been addressed by any reasonable opinion.

11      The court will conduct an independent review of the record to determine if the court erred in

12  its application of controlling federal law, <u>Delgado v. Lewis</u> 223 F.3d 976, 982 (9th Cir. 2000);

13  <u>Brown v. Orivoski</u> 503 F.3d 1006, 1010-1011 (9th Cir. 2007).

14      <u>First</u>: The last reasoned decision in this case was conducted by the San Joaquin County

15  Superior Court. In that review the court failed in reviewing several of Petitioner's assertions and

16  therefore 'erred' in its application of controlling federal law. For instance, the court did not review

17  Petitioner's claim that the Board denied Petitioner due process of law when they failed to considered

18  <u>all</u> relevant and reliable evidence available to the Board at the time of the decision, to wit,

19  Petitioner's status as a minor. (Ground one.)

20      <u>Second</u>: The decision under review failed to consider and therefore erred in the proper

21  application of appropriate federal law; Petitioner's assertion that the denial of parole for the fifth

22  time denied Petitioner his constitutionally protected liberty interest in parole. (Ground two.)

23      <u>Third</u>: The decision under review failed to consider and therefore erred in the proper

24  application of appropriate law federal law; Petitioner's assertion that the denial denied Petitioner a

25  suitability determination where the 'facts' found <u>supported</u> the 'conclusion' that Petitioner posed a

26  current risk of danger to public safety.

27      Lastly, while that court did conclude that the Board was correct in utilizing the commitment

28  offense (<u>Rosenkrantz</u>), the court failed to consider, and therefore erred, in the proper application of

1   appropriate federal law. Petitioner's assertion that the Board denied Petitioner due process by

2   relying on past alcohol use as a substantial factor in egregiousness while failing to cite to facts

3   substantiating the concern that Petitioner still suffers from the disease to the extent it renders him a

4   danger to public safety at this time <u>or</u> that reasonably relates to the belief that Petitioner is in/or

5   maybe in danger of resuming his alcohol consumption upon release. <u>Or</u> how, not withstanding the

6   alcohol, Petitioner's crime factors themselves after 17 years of incarceration and five suitability

7   hearings reasonably substantiated the Board's conclusion that those factors are sufficient to predict

8   present dangerousness.

9        The court, simply put, failed to address any of Petitioner's specific claims and cited, in rote,

10  boilerplate reasons to affirm the Board's decision. Therefore, this court should conduct an

11  independent review of the record in this case.

12                          GROUNDS FOR RELIEF

13                                  1.

14      PETITIONER IS BEING DENIED HIS FIFTH AND FOURTEENTH
        AMENDMENT PROTECTIONS AGAINST THE ARBITRARY
15      AND CAPRICIOUS DENIAL OF PAROLE IN THE BOARD'S
        FAILURE TO CONSIDER ALL RELEVANT AND RELIABLE
16      EVIDENCE AVAILABLE TO THEM AT THE TIME OF HIS
        HEARING, TO WIT PETITIONER'S STATUS AS A MINOR AT
17      THE TIME OF THE CRIME. (<u>Rosenkrantz v. Marshall</u>; <u>Roper v.</u>
        <u>Simmons</u>.)
18
                                    2.
19
        PETITIONER IS BEING DENIED HIS FIFTH AND FOURTEENTH
20      AMENDMENT PROTECTIONS AGAINST THE ARBITRARY
        AND CAPRICIOUS DENIAL OF HIS LIBERTY INTEREST
21      (WHICH ATTACHED TO PETITIONER UPON CONVICTION)
        WITHOUT THE DUE PROCESS OF LAW BY THE BOARD OF
22      PAROLE HEARINGS. (<u>McQuillion v. Duncan</u>; <u>Greenholz v.</u>
        <u>Nebraska</u>; <u>Allen v. Board of Pardons</u>.)
23
                                    3.
24
        PETITIONER WAS DENIED DUE PROCESS OF THE LAW
25      WHERE THE BOARD FAILED TO BASE ITS DECISION TO
        DENY ON RELEVANT AND RELIABLE EVIDENCE. RATHER,
26      THE BOARD RELIED UPON FACTORS OF THE COMMITMENT
        OFFENSE TO DENY PAROLE POSSESSING NO INDICIA OF
27      RELIABILITY RELATING TO THE ISSUE OF PRESENT
        DANGEROUSNESS. (<u>Superintendent v. Hill</u>; <u>In re Lee</u>; <u>In re Elkins</u>;
28      <u>In re Weider</u>.)

4.

PETITIONER HAS BEEN DENIED DUE PROCESS OF LAW BY
THE BOARD'S RELIANCE OF THE IMMUTABLE FACTORS OF
THE COMMITMENT OFFENSE, FOR THE FIFTH TIME, TO
DENY PAROLE WHEN SAID FACTORS DO NOT RISE TO THE
LEVEL OF EGREGIOUSNESS AND CALLOUSNESS
CONTEMPLATED BY LAW AND LEGAL PRECEDENT. (Irons v.
Warden; Bair v. Folsom; In re Lee; In re Scott.)

INTRODUCTION

Merely to pick pieces of evidence and create one's own story sufficient to justify an action is
not "some evidence" reasonable related to the circumstances sufficient to deny parole for the fifth
time. Superintendent v. Hill require more. The Hill requirement mandated that the evidence relied
upon possesses not only an "indicia of reliability" but, that it "reasonably related to the
circumstances so as to constitute some evidence that the crime was 'particularly egregious.'" (i.e.
reasonably sufficient to support the decision made.) Hill 472 U.S. 445-446 (1985). Accordingly, to
recite evidence sufficient under different circumstances to support the present decision does not
constitute some evidence. The decision of the Board is unreasonable in light of the evidence
supporting suitability. Furthermore, since the evidence does not support the decision, the finding
possess no indicia of reliability, it is arbitrary, capricious, and denies Petitioner his constitutionally
protected liberty interest in parole.

Many courts have recognized that they must conduct an independent review of the record to
determine whether the Board's decision to deny parole, or a State Court's decision upholding the
Board's decision, constitutes an objectively unreasonable application of federal law. Only by this
examination may the Court determine whether the Board's (or State Court's) decision was in fact
"reasonable" or "objectively reasonable," Delgado v. Lewis 223 F.3d 976.

It is not enough to merely state that a Court independently reviewed the record, it must apply
Hill's "some evidence" test to the facts of the case. While Petitioner, for instance, has no prior
record for violence (see Cal Code Regs, tit., 15 § 2402 (d)) should this Court find (as the Board did
here) that Petitioner's minor violations committed as a juvenile, constitute evidence of an unstable
social factor [combined with use of alcohol] and the gravity of his conviction offense somehow
constitute "some evidence" sufficient to deny parole, this Court should legally and factually analyze

1  the content of the record and explain how the evidence can satisfy the <u>Hill</u> standard or why it

2  doesn't, how this conviction constitutes "some evidence" that Petitioner is a current danger to

3  society 18 years and five suitability hearings later, how this offense can be deemed particularly

4  "heinous, atrocious or cruel" relative to other second-degree murders, and finally, how the Board's

5  decision is not arbitrary based on the evidence.

6      Being mindful that a mere conviction for second-degree murder does not in and of itself

7  constitute "some evidence" of unsuitability for parole or constitute evidence of <u>present</u>

8  dangerousness.  A murder must have been committed in a manner that is "heinous, atrocious or

9  cruel" for it to be evidence in and of itself to constitute unsuitability.  (Cal. Code Regs. tit., 15 §

10  2402 (c)(1);  <u>In re Smith</u> 114 Cal.App.4th 343, 366 (2003); <u>In re Rosenkrantz</u> 29 Cal.4th 616, 683

11  (2003); <u>In re Scott</u> 119 Cal.App.4th 871 891 (2004).)  Moreover, where, as here, the gravity of the

12  offense is the primary basis for the determination of unsuitability, that gravity must also demonstrate

13  that at the time of the hearing in question the inmate continued to pose a present danger to society by

14  posing a risk of recidivism due to antisocial acts.  Penal Code § 3041 (a) and (b); <u>In re Dannenberg</u>

15  34 Cal.4th 1096; <u>In re Elkins</u> 50 Cal.Rptr.3d 503; <u>In re Lee</u> 49 Cal.Rptr.3d 931.  It is only evidence

16  which would tend to support such a finding that would constitute some evidence.  <u>In re Lawrence</u>,

17  <u>supra</u>.

18      An independent review of the record shows that the only factor that could arguably provide a

19  basis for a finding that Petitioner's  crime was particularly grave and that Petitioner may pose a

20  present danger is his alcohol use before or during the commission of the crime.  This finding is

21  governed by regulations.  The controlling regulations specifically identified five factors to be

22  considered in the determination, for instance: (a) the offense was carried out in a manner which

23  demonstrates an exceptionally callous disregard for human suffering; (b) multiple victims were

24  attacked; (c) the offense was carried out in a dispassionate and calculated manner, such as execution

25  style murder; (d) the victim was abused, defiled, or mutilated during or after the offense; (e) the

26  motive was inexplicable or very trivial in relationship to the offense.  (Cal Code Regs. tit., 15 § 2402

27  (c)(a)(A)(E).)  The Board found that alcohol was "something pertinent to your situation" (Exhibit 1

28  at p. 62) and concluded that "Prior criminal conduct of apparent violations relating to alcohol and

13

1  prior property crimes" (Exhibit 1 p.p 23-27, 29 and 59), based thereon the finding that the offense

2  demonstrated a "callous disregard for human suffering." That the "motive for the crime was

3  inexplicable" and tat Petitioner failed to profit from society's previous attempts to correct

4  criminality, the Board seemingly used the alcohol factor (although not specifically) to reach the

5  conclusion that they reached regarding suitability. This conclusion is wholly unsupported by the

6  record or some evidence, rendering this finding arbitrary. (Id. at § II B (2) infra.) Similarly, a

7  conclusion that a crime committed by a then active abuser under the influence of alcohol almost 19

8  years ago (an entire generation earlier) in and of itself demonstrate that an individual currently poses

9  a threat to public safety would be without support in the evidence and "otherwise arbitrary."

10        Petitioner's use of alcohol is the sole factor pointed to by the Respondent in an effort to

11  substantiate its claim of "callous disregard for human suffering," or that the crime's "motive was

12  inexplicable." Respondent pointed to no evidence in the record other than repeated references to

13  alcohol to substantiate a finding the crime was especially grave or that Petitioner currently posses an

14  unreasonable risk of danger to society – nor could they. The particular facts of this case, both pre

15  and post conviction, do not remotely approach the examples offered in the Regulations of Conduct

16  which constitutes an "exceptionally callous disregard for human suffering." The examples, as

17  outlined in In re Scott 119 Cal.App.4th at 892 (quoting Cal. Codes Regs., tit. 15 § 2282) clearly

18  states:

19          "[T]orture, as where the [v]ictim was subjected to the prolonged infliction
            of physical pain through the use of non-deadly force prior to the act
20          resulting in death and severe trauma, as where [d]eath resulted from
            severe trauma inflicted with deadly intent; e.g. beating, clubbing,
21          stabbing, strangulation, suffocation, burning, multiple wounds inflicted
            with a weapon not resulting in immediate death or actions calculated to
22          induce terror in the victim."

23        The type of criminal conduct that is sufficiently callous to meet this high standard is shown

24  in In re Van Houten (2004) 116 Cal.App.4th 339.

25        Another California Court recently explained, in rejecting a determination that an inmate

26  committed a crime with callous disregard for the victim's suffering stated:

27          "There is no evidence that [the inmate] acted with cold calculation,
            dispassion; or that he tormented, terrorized, or injured [the victim] before
28          deciding to shoot her; or that he gratuitously increased or unnecessarily

1      prolonged her pain or suffering. Was the crime callous? Yes. However,
       are the facts of the crime evidence that [the inmate] acxted with
2      exceptional callous disregard for [the victim's] suffering, or do the facts
       distinguish this crime from other second-degree murders as exceptionally
3      callous? No. In re Smith 114 Cal.App.4th 367.

4          This exact same analysis is applicable here. The manner in which Petitioner committed this

5    offense (under the influence) does not then or now, reflect calculation or dispassion. Rather, a

6    manifestation which clearly impacted his under developed judgment. The addiction, or use, does not

7    relieve Petitioner of responsibility, rather pin points the inability to classify this crime as one of

8    "cold calculation or dispassion." If indeed an act committed as a result of addiction can be called

9    callous rather than compulsive it still doesn't render the offense remotely more callous than other

10   similar crimes. Clearly, even had the addiction or use of alcohol at the time of the offense been

11   sufficient to warrant the classification of egregiousness, it would not constitute "some evidence"

12   today that Petitioner currently posse a danger to public safety. Penal Code § 3041 and Cal. Code

13   Regs., tit. 15 § 2402 and 2402 (a) cannot be denied or set aside unless the record shows that

14   Petitioner currently is such a danger. (In re Dannenberg 34 Cal.4th at 1071 and 1080.)

15         In assessing "present dangerousness" alcoholism is analogous to a mental disorder. To

16   determine and demonstrate that an individual who committed a crime due to such a disorder

17   constitutes a present danger, one cannot merely state that Petitioner suffered a disorder at the time of

18   the offense. Rather, it must be shown that at the time of the suitability hearing that inmate still

19   suffered from the disorder, to the extent he remains a present danger and his addiction is active at the

20   time of the hearing.

21         There is not a scintilla of evidence in the record that suggest Petitioner's addiction is active

22   or that he is likely to resume such activities if released.

23         The Supreme Court has recognized the requirements of due process vary with the private and

24   governmental interests at stake and the circumstances of the alleged deprivation. However, to ensure

25   that a State created parole scheme serves the public interest in the purpose of rehabilitation and

26   deterrence, the Parole Board and the Courts must be cognizant not only of the factors required by the

27   State statue to be considered, but also the concepts embodied in the Constitution requiring due

28   process. Biggs, supra, 334 F.3d at 916; Morrissy v. Brewer 408 U.S. 471, 481, 92 at 2593, 33

1  L.Ed.2d 484 (1972) and <u>Greenholtz v. Nebraska</u> 442 U.S. at 7-8.  Such considerations were sorely

2  lacking in the arbitrary and capricious denial of parole by the Board of Parole Hearings on August

3  15, 2006.

## MEMORANDUM OF POINTS AND AUTHORITIES

### GROUNDS FOR RELIEF

1.

PETITIONER IS BEING DENIED HIS FIFTH AND FOURTEENTH
AMENDMENT PROTECTIONS AGAINST THE ARBITRARY AND
CAPRICIOUS DENIAL OF PAROLE IN THE BOARD'S FAILURE
TO CONSIDER ALL RELEVANT AND RELIABLE EVIDENCE
AVAILABLE TO THEM AT THE TIME OF HIS HEARING, TO WIT
PETITIONER'S STATUS AS A MINOR AT THE TIME OF THE
CRIME.

11      In 1989, Petitioner was convicted of second-degree murder in violation of Penal Code § 187.

12  He was sentenced to 15 years to life and that life term began on December 1, 1989.

13      Petitioner was 19 years old and not only under the influence of alcohol, but that alcohol has a

14  significant impact on his thought and actions.  Petitioner was an abuser and/or addict of alcohol.

15  (See Exhibit 1 at pp. 1-16.)

16      Petitioner had suffered significant stress even at this young age and had for the most of his

17  life from his peers (growing up in his neighborhood) constant and relentless bullying of Petitioner.

18  (See Exhibit 2, support letter from Petitioner's mother at p. 28.)

19      Add to those explosive circumstances Petitioner's adolescence and you have a cocktail of

20  destruction based on immaturity, bad judgment and childlike responses.  Petitioner was an

21  adolescent who had continually suffered abuse at the hands of his peers over his entire life.  He was

22  drunk and he, his brother and friends were arguing with neighbors.  After his brother left, Petitioner

23  believed he had heard his little brother scream for help.  Petitioner, in his adolescent, alcohol

24  induced state and fearing for his brother's safety, went to help.  Is this reasonable, rational?  To the

25  Petitioner it once was.

26      Here therefore, the generally unreliability of predicting violence is exacerbated by several

27  facts, including Petitioner's age at the time of the offense, the passage of nearly 19 years since the

28  offense was committed, and the fact that all other evidence in the record clearly shows Petitioner's

1  suitability for parole.

2      The reliability of the facts of his crime when used as predictor for dangerousness is also

3  diminished by Petitioner's age at the time of the crime. Here, Petitioner was only 19 years old.

4  Petitioner was an adolescent at the time he committed his crime.

5          See Rosenkrantz v. Marshall 444 F.Supp.2d 1063 (C.D. 2006).  Quoting
           Cornelia Pechman, Linda Levine, Sandra Laughlin and Frances Leslie
6          from "Impulsive and Self-Conscious Adolescence" vulnerability to
           advertising and promotion, 24 J. Publish Policy and Marketing 1 (Fall
7          2005.)  [Explaining that the conventional view is that "adolescence is
           roughly synonymous with teenager, or ages 13-19," but that "many
8          scholars argue that adolescence begins at approximately age 10 and does
           not end until early 20's."]
9

10     In evaluating adolescent behavior in relationship to the predictability of dangerousness, one

11  cannot overlook a passage from Elizabeth Cauffman and Laurence Steinberg on "Maturity of

12  Judgment in Adolescence; why adolescence may be less culpable than adults," 18 Behavior Sciences

13  and L. 741, 742, 756 (2000) where they cite:

14         "Reviewing literature demonstrating that violent act committed by an
           adolescent possess less risk of future danger than does the commission of
15         such an act by an adult.  This is because adolescents are more prone to act
           impulsively than adults, and also because the proclivity to commit violent
16         acts decreases with age and the passage of time."

17     Compared to Erica Beecher, Mona and Edgar Garcia, Hill's "Danger at the Edge of Chaos;

18  Predicting Violent Behavior in a Post – Daubert World," at 24  Cardozo L.R.ev 1845 1889 (2003)

19  where they proclaim:

20         "The decrease in violence and criminal activity with age is well –
           established principle of criminology."
21

22     See also, Robert J. Simpson and John H. Laub's "Understanding Desistance from Crime; 28

23  Crime and Justice 1, 46-48 (2001) where they conclude:

24         "Reviewing literature reflecting the robust finding that crime peaks in late
           adolescence and declines for most persons sharply during developmental
25         transition to adulthood."

26     Perhaps the foregoing answers the questions that Petitioner simply has never been able to

27  answer when asked by anyone, especially Board members. (See Exhibit I at p. 49, discussing why

28  Petitioner picked up a knife to take to this fight.)

1        Q: "And just the last question, why did you choose to pick it up and take
           it to this fight? Why did you think you needed it?

2        A: "I have no idea why, I just picked it up. I never thought about why I
           did it. I just picked it up.

3

4      As the Supreme Court recognized in <u>Rosenkrantz v. Marshall</u> 444 F.Supp.2d 1063, the

5  predictive value of the conduct of such a young person is diminished and renders the irresponsible

6  behavior less reprehensible.

7        "The susceptibility of juveniles to immature and irresponsible behavior
        means" their irresponsible conduct is not as "morally reprehensible as

8        that of an adult." <u>Thompson v. Oklahoma</u> 487 U.S. 815, 835, 108 S.Ct.
        2687, 101 L.Ed.2d 702 (1988) (Plurality Opinion). Their own

9        vulnerability and comparative lack of control over their immediate
        surroundings means juveniles have a greater claim than adults to be

10       forgiven for failing to escape negative influences in their whole
        environment. See <u>Staford v. Kentucky</u> 492 U.S. 361, 395 109 S.Ct. 2969,

11      their identity means it is less supportable to conclude that even a heinous
        crime committed by a juvenile is evidence of irretrievably depraved

12      character. From a moral standpoint it would be misguided to equate the
        failings of a minor with those of an adult, for a greater probability exists

13      that a minor's character deficiencies will be reformed indeed. "'[T]he
        relevance of youth as a mitigating factor derives from the fact that the

14      signature qualities of youth are transient; as individuals mature, the
        impetuousness and recklessness that may dominate in younger years

15      subside." <u>Jackson v. Texas</u> 509 U.S. 350, 368, 113 S.Ct. 2658, 125
        L.Ed.2d 290, (1993); <u>Roper v. Simmons</u> 543 U.S. 551, 561-562, 125

16      S.Ct. 1183, 161 L.Ed.2d 1 (2005); see also, <u>Thompson v/ Oklahoma</u> 487
        U.S. 815, 835, 108, S.Ct. 2687, 101 L.Ed.2d 702 (1988) (Stevens, J.

17      Plurality Opinion) ("[Less culpability should attach to a crime committed
        by a juvenile than to a comparative crime committed by an adult. The

18      basis of this conclusion is too obvious to require extensive explanation.
        Inexperience. Less intelligence and less education make a teenager less

19      able to evaluate the consequences of his or her conduct while at the same
        time he or she is more apt to be motivated by mere emotion or peer

20      pressure than as an adult."]"

21      For all those reasons, in the circumstances of Petitioner's case, the facts surrounding

22  Petitioner's crime no longer amount to "some evidence" supporting the conclusion that Petitioner

23  would pose an unreasonable risk of danger if released on parole.

24                                          2.

25      RESPONDENT DEPRIVED PETITIONER DUE PROCESS OF LAW
      WHERE RESPONDENT DEPRIVED PETITIONER HIS RIGHT TO

26      THE LIBERTY INTEREST CREATED IN PENAL CODE § 3041 (B).

27      The due process clause of the Fourteenth Amendment prohibits a State action that deprives a

28  person of life, liberty, or property, without due process.

1    However, a petition alleging such a violation must establish that he/she: (a) had such a

2  protection; (b) that Petitioner was deprived such a protection; and (c) that the procedure which led to

3  the deprivation was Constitutionally insufficient, <u>Kentucky Department of Corrections v. Thompson</u>

4  490 U.S. 459-460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); <u>McQuillion v. Duncan</u> 306 F.3d 895,

5  900 (9th Cir. 2002).

2A – B

7    In 1979 the Supreme Court held and reiterated in 1987, that a "state statutory scheme, if it

8  uses mandatory language, creates a presumption that parole release will be granted when or unless

9  certain designated findings are made, and thereby, gives rise to a Constitutionally Liberty interest."

10  <u>McQuillion v. Duncan</u>, <u>supra</u>, 306 F.3d at 109 (citing <u>Greenholtz v. Nebraska Penal Institution</u> 442

11  U.S. 1, 7, 99 (S.Ct. 2100, 60 L.Ed.2d 668 (1979) and <u>Allen v. Board of Pardons</u> 482 U.S. 369, 373

12  S.Ct. 2415, 96 L.Ed.2d 303 (1987)).

13    Recently, our Ninth Circuit has held that California's parole scheme created such a liberty

14  interest because Penal Code § 3041 uses mandatory language and is similar to the Nebraska and

15  Montana statute addressed in <u>Greenholtz</u>; <u>Allen</u>; and <u>McQuillion</u>, <u>supra</u>.

16    Not only did the Ninth Circuit hold that Penal Code section 3041 "create in every inmate a

17  cognizable liberty interest in parole which is protected by the procedural safeguard of the due

18  process clause," but further held that, "the interest arises upon the incarceration of the inmate," and

19  not at parole eligibility.  <u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910, 914-915.

20    It is true that post-McQuillion the California Supreme Court had occasion to visit and decide

21  in <u>In re Dannenberg</u> that a prisoner serving a "life" term (or term to life) did not have a liberty

22  interest in the expectation that the Board of Prison Terms (now the Board of Parole Hearings) will

23  engage in a "uniform term" analysis under Penal Code Section 3041 (a) if it determines that public

24  safety concerns warrant denial of parole under Penal Code Section 3041 (b).  That Court did not,

25  however, hold that there is no protected liberty interest in parole whatsoever.

26    Indeed, California Court's have post-<u>Dannenberg</u>, continued to analyze claims regarding the

27  denial of liberty.  For instance, although de-certified for publication, see <u>In re Shaputis</u> 135

28  Cal.App.4th 217, 224, 231, Cal.Rptr.3d (citing Dannenberg); <u>In re Scott</u> 133 Cal.App.4[th] 573, 34

1   Cal.Rptr.3d 905 (2005); In re Lee 49 Cal.Rptr.3d 931; In re Elkins 50 Cal.Rptr.3d 503, Federal

2   Courts post-Dannenberg have also uniformly (save one court decision in the Eastern District, Sass v.

3   California Board of Prison Terms (E.D. Cal. 2005) 376 F.Supp.2d 975, 982) held to the Ninth

4   Circuit's reasoning in McQuillion, supra.  Even the Eastern District, in its very next parole decision

5   review, seemingly reversed itself in Bair v. Folsom State Prison (E.D. 2005) 2005 WL 2219220 fn.

6   3, Report and Recommendations, adopted by (E.D. Cal.) 2005 WL 3081 634 fn. 1.)  Because the

7   Ninth Circuit analyzed the liberty interest which arose from California's parole scheme under Penal

8   Code § 3041 (b) and the Dannenberg decision rest specifically on 3041 (a), Dannenberg does not

9   undermine the Ninth Circuit decision.  Therefore, the Ninth Circuit's McQuillion v. Duncan decision

10  holding that the mandatory language of 3041 (b) creates a liberty interest in parole remains

11  precedent [see Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063; Blankenship v. Kane

12  2006 WL * 3 (N.D. Cal. 2006); Machado v. Kane 2005 WL 3299885 * 2 (N.D. Cal. 2005); Murillo

13  v. Perez 20058 WL 2592420 * 3 nt 1 (C.D. Cal. 2005); Saifullah v. Carey 2005 WL 1555389 * (E.D.

14  Cal. 2005.)].

15                                          2C

16              PROCEDURE WHICH LED TO DEPRIVATION OF LIBERTY

17          It is well a established principle that due process requires a prisoner must be provided notice

18  of the hearing; an opportunity to be heard and a statement of reasons for the denial of parole.

19          Petitioner agrees that he was provided each of these protections.  However, the United States

20  Supreme Court, and others, have continuously held:

21              "In a variety of contexts, the court has recognized that a governmental
            decision resulting in a loss of important liberty interest violates due
22          process if the decision is not supported by any evidence." Superintendent
            v. Hill 472 U.S. at 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985);
23          Rosenkrantz v. Marshall 444 F.Supp.2d 1063 (C.D. Cal. 2006) fn. 13;
            Rosas v. Nielson 428 F.3d 1232 (9th Cir. 2005) (Per Curian).
24

25  The Court further found:

26              "Although '[T]he some evidence standard is minimally stringent' Powell
            v. Gomez 33 F.3d 39, 40, the evidence underlying the [Governor's]
27          decision must have some indicia of reliability." Hill, supra, 472 U.S. at
            455-456, 105 S.Ct. at 2774; see also, Sanchez v. Kane (C.D. Cal. 2006)
28          444 F.Supp.2d 1049.

1    As an additional matter, the Hill Court concluded the decision to deny parole must not be

2    "otherwise arbitrary," as well. Hill, supra, 457.

3    Clearly then, Hill, supra, requires much more than notice, opportunity and the statement of

4    reasons. It also requires: (a) evidence which supports the decision. (b) The evidence must be

5    reliably related to the issue of present dangerousness (Cal. Code Respondent., tit. 15 § 2402 (a); In re

6    Scott, supra, 133 Cal.App.4th 593, 595, 34 Cal.Rptr.3d 905; In re Elkins 50 Cal.Rptr.3d 503; In re

7    Lee 49 Cal.Rptr.3d 931. (c) The evidence must be truthful. (d) The decision cannot be arbitrary or

8    capricious. Sanchez v. Kane, supra, (C.D. Cal. 2006) 444 F.Supp.2d.

9    Here, the decision of the Board comports to none of these mandates. For instance, after five

10   suitability hearings and 17 years in prison the record is void of ant evidence to support the decision.

11   The Board found and relied on primarily on the immutable circumstances of the offense to deny

12   parole (see Exhibit 1 at p. 59). The Board found the crime exhibited an "exceptionally callous

13   disregard for human suffering;" that the crime's motive "was inexplicable." However, keeping in

14   mind Petitioner was an adolescent and had been drinking at the time of the crime, and believed he

15   acted in defense of his brother, the events surrounding the crime (at the time) were neither

16   "exceptionally callous;" indifferent to the feelings of others or lacking in emotional sympathy. An

17   almost casual glance at the evidence shows this case is overflowing in all aspects with each and

18   every emotion depicted above. True, the measure of atrociousness is not general notions of common

19   decency or social norms, for by that yard stick all murders are atrocious, (see In re Scott, supra, 119

20   Cal.App.4th at 891, 15 Cal.Rptr.3d 32, "all Second-degree murders by definition involve some

21   callousness") yet there is no evidence that Petitioner directed any overt anger toward the victim in

22   this case, which did not stem from the circumstances surrounding that exact and clearly spontaneous

23   event. The quarrel earlier that evening was over and all had parted ways. The earlier event, the

24   record reflects, was far from a motivating factor in the murder of the victim, there was no

25   premeditation or egregious torture. Indeed, even the acquiring of a knife from the front yard upon

26   hearing his brother scream for help was not an unconscious act, but fueled by sensitivity and fear for

27   his brother. Petitioner did not seek out or purposely direct any action toward him at all, not

28   withstanding his brother's scream and upon searching for his brother, locating the victim in the

1  vicinity throwing rocks and breaking glass windows. (Exhibit 1, p. 43.) It was an unreasonable

2  conclusion on Petitioner's part to connect his brother's screams, the victim breaking windows in the

3  near vicinity, or even perhaps the events of earlier that evening, to the victim being the reason for the

4  Petitioner's brother's screams. Yet, these "unreasonable" conclusions do make this crime egregious

5  or exceptionally callous, to be sure, such is not the yard stick to measure this case by. The inquiry is

6  whether, among murders, was the murder committed by Petitioner especially callous or particularly

7  heinous, atrocious or cruel. (In re Ramirez (2001) 94 Cal.App.4th 549, 570, 114 Cal.Rptr.2d 381; In

8  re Dannenberg (2005) 34 Cal.App.4th 1061, 1082-83, 1100, 23 Cal.Rptr.3d 417, 104, p. 783.)

9  Clearly, by that Petitioner's crime was even less than common place.

10         Comparing Petitioner's case to others where the Court and Board correctly denied parole

11  based on egregiousness is illuminating. For example, see In re Rosenkrantz, supra, 29 Cal.4th at

12  578; where that petitioner bought and trained with a weapon, laid in wait for the victim to return and

13  after another quarrel shot the victim 10 times because the victim and Petitioner's brother revealed to

14  Rosenkrantz's father that Rosenkrantz is homosexual.

15         Or, In re Dannenberg, supra, 34 Cal.App.4th 1095; where that petitioner reacted with

16  extreme and sustained violence, striking multiple blows to his wife's head with a pipe wrench.

17  While she was helpless, he placed her head in a bathtub full of water or at least leaving it there

18  without assisting her until she was dead.

19         In In re McClendon (2003) 133 Cal.App.4th 315, where that petitioner planned a calculated

20  attack in the middle of the night against his estranged wife. Arriving at his house wearing rubber

21  gloves and carrying a handgun and a wrench, attacked his wife and another victim. (Id. at 321-322,

22  6 Cal.Rptr.3d 278.)

23         In In re Burns (2006) 136 Cal.App.4th 1318, 40 Cal.Rptr.3d 1, where that petitioner being

24  left by his long time girlfriend, lured her to an isolated spot and shot her. He neither summoned nor

25  attempted to provide help. Rather, he went back to his dorm room, got into bed and watched

26  Monday Night Football with his roommate. Meanwhile, the victim, having been shot around 7:00 or

27  8:00 was not found until 9:45, still alive, her body had scratches on it from possibly attempting to get

28  help. She did not die until after midnight. That petitioner had approximately one to two hours in

1    which he could have reconsidered his "disregard for human suffering," he did not.

2    In In re Van Houten (2004) 116 Cal.App.4th 339; this Petitioner participated in a

3    "premeditated and gratuitous mutilation" of a couple in which the wife was stabbed 42 times and

4    struggled for her life while listening to her husband meet his own gruesome end. (Id. pp. 346, 351,

5    366, 10 Cal.Rptr.3d 406.)

6    In In re Deluna (2005) 126 Cal.App.4th 585; this petitioner fought with the victim outside a

7    bar, retrieved a rifle and shot the victim in the mouth and then deliberately stalked the defenseless

8    victim through the parking lot, firing at him until he died. See also In r Lowe 130 Cal.App.4th 1405,

9    31 Cal.Rptr.3d 1; In re Morrall (2002) 102 Cal.App.4th 280, 125 Cal.Rptr.2d 391.

10    Petitioner's crimes do not measure against the forgoing offenses as "especially heinous,

11    atrocious or cruel." Petitioner's crime does not even measure up against the less cruel and egregious

12    cases of In re Smith 114 Cal.App.4th 343; In re Lee, supra, or In re Elkins, supra.

13    Was the crime callous? Yes. However, are the facts of this crime some evidence that

14    Petitioner acted with "exceptionally callous disregard for [the victim's suffering] or do the acts of

15    the crime distinguish this crime from other second-degree murders as exceptionally callous? No.

16    Besides not being especially atrocious, heinous or callous, Petitioner's crime has little, if any

17    predictive value for future criminality. Simply by the passing of time, Petitioner's crimes almost 18

18    years ago have lost much of their usefulness in foreseeing the likelihood of future offenses. (In re

19    Scott, supra). Moreover, Petitioner's spontaneous motivation for the murder- in defense of his

20    brother after an earlier quarrel with other kids in the community – his young age and post-conviction

21    behavior argue against any future offenses. As one explained "a defendant's motivation for the

22    offense tends to show suitability when it was the result of stress in his life, especially if the stress has

23    built over a long period of time. (In re Scott 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905.)

24    Here, as previously mentioned, Petitioner was bullied all his life due to his small stature and

25    "picked on" relentlessly. That proved to be not much different in that once again a quarrel rose

26    between Petitioner, his brother, and several neighborhood residents. A short while later, after

27    several more drinks, Petitioner thought he heard his brother scream for help. Petitioner ran to aide

28    his brother and came upon the victim coming the other way, smashing windows out of parked cars,

1    and the homicide occurred.

2        Instead of being atrocious, Petitioner's conduct involved no more then what was necessary to

3    commit the crime. (In re Rosenkrantz 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 p. 174.) As a

4    recent court proclaimed, the Board "cannot deny parole based on nature of offenses if defendant's

5    acts were the bare minimum needed to commit the offense." (See In re Lee Cal.Rptr.3d 931.)  In In

6    re Lee, the Court concluded that Lee's 15 minute drive; the taking of a gun and a box of ammunition

7    are not factors relative to egregiousness or callousness.  The Court stated specifically that

8    "pondering what one is about is the essence of premeditation," but that [Lee's] "premeditation was

9    not elaborate or prolonged" compared to the instance case where in a split second Petitioner heard

10   the creams for help from his brother and made the decision to assist, Petitioner grabbed the knife and

11   ran.  The victim was tabbed twice during the heat of the struggle and Petitioner left the scene.  The

12   level of egregiousness present in this case is clearly less than which was present in Lee and certainly

13   other murders.  If the Board cannot point to factors in the record to establish how: (a) this crime is

14   "particularly" or "especially" heinous, atrocious or cruel and callous; or (b) that Petitioner

15   "currently" poses an unreasonable risk of danger to the public then the Board's decision to deny

16   parole for the fifth time is "otherwise arbitrary and capricious under clearly established federal law

17   and principles outlined in Superintendent v. Hill (and other California cases too numerous to

18   mention.)  The Board pointed to no evidence substantiating either necessity cited cold/nor did they

19   point to any evidence let alone "some evidence" pinpointing post-conviction factors that Petitioner's

20   past use of alcohol somehow made him a risk of danger today.

21       Clearly, the decision to deny parole was unreasonable and therefore violates due process and

22   the liberty interest in the expectation of parole.

23                                    3

24           PETITIONER WAS DENIED DUE PROCESS OF THE LAW WHERE
             THE BOARD FAILED TO BASE ITS DECISION TO DENY PAROLE
25           FOR THE FIFTH TIME ON RELEVANT AND RELIABLE
             EVIDENCE.  RATHER, THE BOARD RELIED UPON FACTORS OF
26           THE COMMITMENT OFFENSE POSSESSING NO INDICIA OF
             RELIABILITY RELATING TO THE ISSUE OF PRESENT
27           DANGEROUSNESS. (Superintendent v. Hill; Rosenkrantz v. Marshall;
             In re Lee; In re Elkins.)
28

1       An independent review of the record, as previously stated, shows that the only factor that

2   could otherwise arguably provide a basis for a finding that Petitioner's crime was particularly grave

3   and Petitioner poses a present danger is his alcohol use prior to and during the crime.

4       As the Board found in its decision (Exhibit 1, pp. 59-63), (1) Petitioner had a prior record

5   (juvenile) consisting of misdemeanor alcohol and property crimes, but no violence related crimes

6   (see Cal. Code Regs., tit. 15 § 2402 (d)) either as a juvenile or adult, save the instant offense.  (2)

7   That Petitioner is disciplinary free (see Exhibit 1, pp. 60-61). (3) Petitioner's Psychological

8   Evaluation is supportive of release, but "conditioned upon continued abstinence from alcohol." (4)

9   Petitioner's parole plans are appropriate in that he has a residence and available employment, good –

10  very strong – family support.  (Id., at 61.)

11      There was no evidence in the record to which the Board could point which reasonably or

12  unreasonably supports a claim of present dangerousness.

13      The controlling regulation specifically identifies five factors to be considered in the

14  determination.  For instance: (a) The offense was carried out in a manner which demonstrates an

15  exceptionally callous disregard for human suffering.  (b) Multiple victims were attacked.  (c) The

16  offense was carried out in a dispassionate and calculated manner, such as an execution style murder.

17  (d) The victim was abused, defiled or mutilated during or after the offense.  (e) The motive was

18  inexplicable or very trivial in relation to the offense.  (See Cal. Code Regs., tit. 15 § 2402

19  (c)(a)(A)(E).

20      For lack of more serious factors to point to, the Board seemed to imply on numerous

21  occasions that because Petitioner committed the crime as a result of alcohol abuse and/or use, that

22  the crime was "carried out in a manner which demonstrates a total disregard for human suffering."

23  This finding is wholly unsupported by the record and evidence, and is therefore arbitrary.  Similarly,

24  any conclusion that a crime committed by a then active abuser or user of alcohol over the age of 18

25  and of itself demonstrates that an individual currently possess a threat to public safety would be

26  without evidentiary support in the record and otherwise arbitrary.

27      There is no evidence that Petitioner's alcohol use exacerbated the crime.  The manner in

28  which Petitioner committed this offense (under the influence) nor any other case factor, then and

1  now, reflects calculation or dispassion.  Rather, a manifestation of alcoholism or abuse, which

2  significantly impacted his judgment.  The addiction or use does not relieve Petitioner of

3  responsibility, but pinpoints the inability to classify this crime as one of cold calculation or

4  dispassion.  If indeed an act committed as a result of addiction or use can be called callous – rather

5  than compulsive – at all, it still doesn't render the offense remotely more callous tan other similar

6  crimes.  Furthermore, even had the use and/or addiction of alcohol at the time of the offense

7  constitute "egregiousness" it would not constitute "some evidence" today sufficient to substantiate

8  Petitioner currently, or at the time of the 2006 suitability hearing poses a danger under California

9  law.

10        Penal Code § 3041 and Cal. Regs., tit. 15 §§ 2402 and 2404 (a) cannot be denied or set aside

11  "unless" the record shows that Petitioner presented a danger to society at the time of his hearing.  (In

12  re Dannenberg 34 Cal.App.4th at 1071, 1081.)   In assessing "present dangerousness" drug addiction

13  and alcoholism is analogous to a mental disorder.  To determine and demonstrate that an individual

14  who committed crime due to such a disorder constitutes a present danger one cannot merely state

15  that Petitioner suffered such a disorder at the time of the offense.  Rather, it must be shown that at

16  the time of the hearing Petitioner still suffered from the disorder to the extent he remains a present

17  danger and that his addiction is active at the time of the hearing, as stated by the Court in In re Lee,

18  supra, 49 Cal.Rptr.3d 931, stating the Board:

19           "Must focus their parole decisions on whether a prisoner continues to
             pose an unreasonable risk to public safety.  Such a practical inquiry,
20           rooted in real world crime and law and order, has no obvious intersection
             with the incorporated realm of legal constricts."

21

22        Her, as in the Lee, supra, case, Petitioner did not intend to kill the victim and did not act in a

23  manner beyond the minimum necessary to commit the murder.  Any contrary conclusion lacks any

24  evidentiary support to deny parole; the reason must relate to Petitioner's continued unreasonable risk

25  to public safety.  Simply put, the record is void of any such evidence.   The test is not whether some

26  evidence supports the reasons the Board cites for denying parole, but whether some evidence

27  indicates a parolee's release unreasonably endangers public safety.  Cal. Code Regs tit., 15 § 2402

28  (a); In re Scott (2005) 133 Cal.App.4th 573, 595, 34 Cl.Rptr.3d 905.

4

PETITIONER IS BEING DENIED DUE PROCESS OF LAW BY THE BOARD'S RELIANCE ON THE IMMUTABLE FACTORS OF THE COMMITMENT OFFENSE, FOR THE FIFTH TIME, TO DENY PAROLE WHEN SAID FACTORS DO NOT RISE TO THE LEVEL OF EGREGIOUSNESS AND CALLOUSNESS CONTEMPLATED BY LAW. (Irons v. Warden; Bair v. Folsom; In re Lee; In re Elkins; In re Scott.)

Petitioner's sole motivation for confronting and combining the victim in this case (which resulted in the victim's death) was not the intent to kill, rather the protection of his little brother. Petitioner, at no time, harbored the intent to kill or even rationally thought, at the time, murder was a possibility. Accordingly, he did not act in a manner beyond the minimum necessary to commit murder or convict Petitioner of second-degree murder (In re Lee, supra, 49 Cal.Rptr.2d 931).

The assumption that a prisoner can be denied parole solely on the basis of the commitment offense is correct. However, the proposition must be properly understood. The commitment offense is one of only two factors of suitability prisoner cannot change. Reliance on such an immutable factor without regard to or consideration of subsequent circumstances (post conviction) may be unfair and runs contrary to the rehabilitative goals espouse by the prison system. Thus, the commitment offense can negate suitability only if the circumstances of the crime, reliably established in the record, that Petitioner will present a current and unreasonable risk to public safety if released. In re Elkins, supra, 50 Cal.Rptr.3d 503; Biggs v. Terhune 334 F.3d at 9195; In re Scott 133 Cal.App.4th at 594-595. Yet the predictive value of the commitment offense may be vary questionable after a long period of time. Thus, denials based on such immutable factors warrant especially close scrutiny. (In re Scott, supra.)

In the instructive case of Irons v. Warden (E.D. Cal. 2005) 358 F.Supp.2d 936 (Irons) (App.pending sub.nom.); Irons v. Caey (9th Cir. 2005) F.3d 1165 No. 05-15275, that petitioner, like here, had appeared for his fifth suitability hearing and found unsuitable for parole. That petitioner is serving a 25 years to life sentence and the facts of is crime were far worse than those now before the Court. There, as here, the Board relied on both the factors of the commitment offense and his drug use at the time of the crime. That Petitioner killed a fellow boarder for stealing from the landlord. After an argument, [Irons] loaded a handgun, went into the victim's room, fired 12 rounds into him

1  and said he was going to let him bleed to death. When the victim complained of the pain [Irons]

2  stabbed him twice in the back. Later [Irons] borrowed a car and drove the body to an isolated

3  coastal location and released the body into the serf. In that case the Court wrote:

> "[Important] in assessing any due process violation is the fact that
> continued reliance on unchanging circumstances transforms an offense
> for which California law provides eligibility for parole into de facto life
> imprisonment without the possibility of parole … The circumstances of
> the crime will always be what they were, and Petitioner's motive will
> always be trivial. Petitioner has no hope for ever obtaining parole except
> perhaps that a panel in the future will arbitrarily hold that the
> circumstances were not that serious or the motive was more than trivial."

"To a point, it is true," the Court observed:

> "The circumstances of the crime and motivation for it may indicate a
> Petitioner's instability, cruelty, impulsiveness, violent tendencies and the
> like. However, after fifteen or so years in the California life, not an ideal
> therapeutic environment to say the least, and after repeated
> demonstrations that despite the recognizable hardships of prison life, this
> Petitioner does not possess those attributes, the predictive ability of the
> circumstances of the crime is near zero." (Id., Irons, supra, 358
> F.Supp.2d at 947 fn. 2.)

14     The facts of this case are just as old and far less egregious, Petitioner has appeared before the

15  Board the same amount of time and the evidentiary support for a conclusion of unsuitability are just

16  as lacking.

17     The Board, as previously stated, cite to no factors in the blanket assertion that Petitioner's

18  crime constituted an exceptionally callous disregard fir human suffering, save the use of alcohol

19  before and at the time of the crime. The Board cited to no evidence of calculation or intent, nor

20  could they. The immutable factors of this case are simply not "some evidence" to either deny parole

21  or find Petitioner to be a current threat to public safety. The Board cited no evidence of current

22  threat based on continued use of alcohol, nor could they. They record is void of any, let alone "some

23  evidence" sufficient to deny parole, they cited to no circumstances reliably sufficient to demonstrate

24  that is case is "especially grave" or particularly so. The facts of this case simply do not constitute

25  evidence sufficient, after 18 years and five suitability hearings, to deny parole.

26                                    CONCLUSION

27     Petitioner has both a statutory and Constitutionally protected expectation to parole, that

28  attached at the time of sentencing, To which he was denied by the failure of the Board to find

1  suitability and set a parole release date at his August 2006 parole suitability hearing.

2      The Parole Board reached their conclusion to deny parole on less than some evidence and

3  evidence possessing no indicia of reliability to the instant question before it concerning Petitioner's

4  current danger to public safety.

5      The Board failed to consider Petitioner's age and adolescence at the time of the crime, which

6  constructively reduced both Petitioner's likelihood of committing future crimes and predictability of

7  future dangerousness.

8      Petitioner is entitled to the issuance of a writ of habeas corpus and prays such a writ is issued.

9                                    PRAYER

10     Comes now Petitioner, Neville Porras, prays that, good cause appearing, this Court:

11     1. Grant the Petition For Writ Of Habeas Corpus;

12     2. Issue an Order to Show Cause;

13     3. Grant an Evidentiary Hearing;

14     4. Appoint Counsel;

15     5. Order Petitioner back to the Board within 30 days and in accordance to this Court's
       direction, order Petitioner to be found suitable and set a parole release date for Petitioner.
16     Alternatively, order Petitioner brought before this Court for release.

17

18

19  Dated: June ___9___, 2008                          Respectfully submitted,

20

21

22

23                                                     Neville Porras, Petitioner
                                                       In pro per
24

25

26

27

28

# CV 08    3006 CW

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)    E-filing

I, _Neville Porras_ , declare:

I am over 18 years of age and I am party to this action.  I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California.  My prison address is:

_Neville Porras_ , CDCR #: _E37606_
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: _Y W-337_
SOLEDAD, CA  93960-0689.

On _6-9-08_ , I served the attached:

_Petition for Writ of Habeas Corpus_
_And Supporting Memorandum of Points_
_And Authorities and Exhibits_

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined.  The envelope was addressed as follows:

Attorney General's Office
455 Golden Gate Ave
San Francisco, California
94104

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _6-9-08_ .

_Neville Porras_
Declarant

E-filing

# CV 08    3006

# CW

# (PR)

# EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )
Term Parole Consideration    )        CDC Number E-37606
Hearing of:                  )
                             )
NEVILLE PORRAS                )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 15, 2006

PANEL PRESENT:

Mr. James Davis, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Neville Porras, Inmate
Mr. Patrick Sparks, Attorney for Inmate
Ms. Valli Israels, Deputy District Attorney
Mr. Ed Martinez, Commissioner, Observer
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

**INMATE
COPY**

**Marsha Mees**        **Vine, McKinnon & Hall**

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 10 |
| Pre-Commitment Factors | 22 |
| Post-Commitment Factors | 30 |
| Parole Plans | 39 |
| Closing Statements | 55 |
| Recess | 58 |
| Decision | 59 |
| Adjournment | 64 |
| Transcriber Certification | 65 |

--oOo--

1

1        P R O C E E D I N G S

2        [Thereupon, malfunction with microphones and/or

3             recording equipment resulted in excessive

4                        inaudibles.]

5        **DEPUTY COMMISSIONER BLONIEN:**  We're on record.

6        **PRESIDING COMMISSIONER DAVIS:**  This is a subsequent

7    parole consideration for Neville Porras.

8        **INMATE PORRAS:**  Neville.

9        **PRESIDING COMMISSIONER DAVIS:**  N-E-V-I-L-L-E.  CDC

10    number E-37606.  Today is August 15, 2006.  We're located

11    at the Correctional Training Facility at Soledad.  Inmate

12    was received on December 1, 1989 from San Joaquin County.

13    The life term began on December 1, 1989 with a minimum

14    eligible parole date of May 6, 1999.  The controlling

15    offense for which the inmate's been committed is murder

16    second with use of a deadly weapon, a knife, case number

17    43369, count one, Penal Code section 187 second slash

18    12022 paren (b).  The inmate received a term of 16 years

19    to life.  This hearing is being tape recorded.  And for

20    the purposes of voice identification we'll each state our

21    first and last name, spelling the last name and when it

22    reaches you, sir, if you'll also give your CDC number

23    please.  So I'll start and move to my left.  I'm James

24    Davis, D-A-V-I-S, Commissioner.

25        **DEPUTY COMMISSIONER BLONIEN:**  Noreen Blonien,

26    B-L-O-N-I-E-N, Deputy Commissioner.

27        **DEPUTY DISTRICT ATTORNEY ISRAELS:**  Valli Israels,

2

1     I-S-R-A-E-L-S, Deputy District Attorney, San Joaquin

2     County.

3          **ATTORNEY SPARKS**:  Patrick Sparks, S-P-A-R-K-S,

4     attorney for Mr. Porras.

5          **INMATE PORRAS**:  Neville Porras, P-O-R-R-A-S,

6     E-37606.

7          **PRESIDING COMMISSIONER DAVIS**:  All right.  Thank

8     you.

9          **COMMISSIONER MARTINEZ**:  Ed Martinez,

10    M-A-R-T-I-N-E-Z, Commissioner, observer.

11         **PRESIDING COMMISSIONER DAVIS**:  All right.  Thank

12    you.  Let the record also reflect that we're joined by

13    two correctional officers today who are here for security

14    purposes only and will not be actively participating in

15    this hearing.  Mr. Porras, in front of you in the

16    laminated piece of paper is the Americans With

17    Disabilities Act statement.  Would you please read that

18    out loud, sir.

19         **INMATE PORRAS**:

20         "ADA, Americans With Disabilities Act.  The

21         Americans With Disabilities Act, ADA, is a law

22         to help people with disabilities.  Disabilities

23         are problems that make it harder for some

24         people to see, hear, breathe, walk, talk,

25         learn, think, work or take care of themselves

26         than it is for others.  Nobody can be kept out

27         of the public places or activities because of a

1          disability. If you have a disability, you have

2          the right to ask for help to get ready for your

3          BPT hearing, get to the hearing, talk, read

4          forms and papers and understand the hearing

5          process. BPT will look at -- look at what you

6          asked for to make sure that you have a

7          disability that is covered by the ADA and that

8          you have asked for the right kind of help. If

9          you do not get help or think you -- or don't

10         think you got the kind of help you need, ask

11         for a BPT 1074 Grievance Form. You can also

12         get help to fill it out."

13       **PRESIDING COMMISSIONER DAVIS:** All right. Thank you

14  very much. And according to our records, in cooperation

15  with the staff here at the institution on March 10, 2006

16  you reviewed and signed a BPT Form 1073 indicating that

17  you do not have any disabilities that would qualify under

18  the Americans With Disabilities Act. Is that correct,

19  sir.

20       **INMATE PORRAS:** (Inaudible).

21       **PRESIDING COMMISSIONER DAVIS:** Has anything changed

22  since then?

23       **INMATE PORRAS:** No.

24       **PRESIDING COMMISSIONER DAVIS:** All right. You were

25  able to read that without glasses. Do you normally wear

26  glasses?

27       **INMATE PORRAS:** Yeah, I wear glasses everyday.

4

1       **PRESIDING COMMISSIONER DAVIS:**  Do you wear them to

2   read?

3       **INMATE PORRAS:**  Yeah.

4       **PRESIDING COMMISSIONER DAVIS:**  Did you bring them

5   with you today?

6       **INMATE PORRAS:**  No, I didn't.

7       **PRESIDING COMMISSIONER DAVIS:**  Okay.  But you were

8   able to read the document very well.  So they're just

9   kind -- you just need them for a little help.

10      **INMATE PORRAS:**  Yeah.

11      [Thereupon, a portion of the hearing was unavailable

12                  for transcription.]

13      **PRESIDING COMMISSIONER DAVIS:**  Okay.  If you are

14  asked to read something or review something today that --

15  that you can't read, please let us know and we'll make

16  sure we have an accommodation for you.  Did you have your

17  glasses with you when you reviewed your C-File?

18      **INMATE PORRAS:**  No.

19      **PRESIDING COMMISSIONER DAVIS:**  Were you able to read

20  everything all right in your C-File?

21      **INMATE PORRAS:**  Yes.

22      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Just be sure

23  and carry those around next time.

24      **INMATE PORRAS:**  (Inaudible) broken.

25      **PRESIDING COMMISSIONER DAVIS:**  Okay.  All right.

26  They're broken.  So you got a new pair on order?

27      **INMATE PORRAS:**  Yes.

1        **PRESIDING COMMISSIONER DAVIS:**  All right.  But you

2   were able to review your C-File?

3        **INMATE PORRAS:**  Yes.

4        **PRESIDING COMMISSIONER DAVIS:**  All right.  And

5   you're able to hear me all right and you got here today

6   under your own power.  You walked here all right?

7        **INMATE PORRAS:**  Yes.

8        **PRESIDING COMMISSIONER DAVIS:**  All right.  Is there

9   any reason that you can think of that you would not be

10  able to actively participate in this hearing today?

11       **INMATE PORRAS:**  (Inaudible).

12       **PRESIDING COMMISSIONER DAVIS:**  All right. Very

13  well.  Counsel, you're satisfied with that as well?

14       **ATTORNEY SPARKS:**  Yes.

15       **PRESIDING COMMISSIONER DAVIS:**  Very well.  This

16  hearing is being conducted pursuant to Penal Code

17  sections 3041 and 3042 and the rules and regulations of

18  the Board of Prison Terms governing parole consideration

19  hearings for life inmates.  The purpose of today's

20  hearing is to once again consider the number and nature

21  of the crimes for which you were committed, your prior

22  criminal and social history and your behavior and

23  programming since your commitment.  We've had the

24  opportunity to review your Central File and your prior

25  transcripts and you will be given an opportunity to

26  correct or clarify the record as we proceed.  We will

27  reach a decision today and inform you whether or not we

6

1   find you suitable for parole and the reasons for our

2   decisions.  If you are found suitable for parole, the

3   length of your confinement will be explained to you.

4   Nothing that happens here today will change the findings

5   of the court.  The Panel is not here to retry the case.

6   We are here for the sole purpose of determining your

7   suitability for parole.  Do you understand that, sir?

8   This hearing will be conducted in two phases.  First I

9   will discuss with you the crime for which you were

10  committed as well as your prior criminal and social

11  history.  Then Commissioner Blonien will then discuss

12  with you your progress since your commitment, your

13  counselor's report, psychological evaluation, your parole

14  plans and any letters of support or opposition as they

15  may exist.  Once that's concluded, the Commissioners, the

16  District Attorney and then your attorney will be given an

17  opportunity to ask you questions.  Questions that come

18  from the District Attorney will be asked to the Chair and

19  then you'll respond back to the Panel with your answer.

20  Following that, the District Attorney and then your

21  attorney will be given an opportunity for a final closing

22  statement.  Your statement, which follows theirs, should

23  focus on your suitability for parole.  The California

24  Code of Regulations states that regardless of time served

25  a life inmate shall be found unsuitable for and denied

26  parole if in the judgment of the Panel the inmate would

27  pose an unreasonable risk of danger to society if

7

1    released from prison.  Now you have certain rights.

2    Those rights include the right to a timely notice of this

3    hearing, the right to review your Central File and the

4    right to present relevant documents.  Counselor, are you

5    satisfied that your client's rights have been met to

6    date?

7        **ATTORNEY SPARKS:**  Yes.  Thank you.

8        **PRESIDING COMMISSIONER DAVIS:**  You have an

9    additional right.  That is the right to be heard by an

10   impartial Panel.  Now you've heard Commissioner Blonien

11   and I introduce ourselves today.  Is there any reason for

12   you to believe that we would not be impartial?"

13       **INMATE PORRAS:**  That's a hard one.  I don't know

14   either one of you personally or had any contact with you

15   before but there's a lot of things that go around about

16   the Parole Board and I can only (inaudible) on what's on

17   record (inaudible).

18       **PRESIDING COMMISSIONER DAVIS:**  So I guess that's

19   really the crux of it.  You have had no contact with

20   either Commissioner Blonien or I before?

21       **INMATE PORRAS:**  No.

22       **PRESIDING COMMISSIONER DAVIS:**  And to the best of

23   your knowledge we have no connection with your case

24   whatsoever?

25       **INMATE PORRAS:**  (Inaudible) BPT (inaudible) members

26   before.

27       **PRESIDING COMMISSIONER DAVIS:**  Yes.

8

1          **INMATE PORRAS:**  (Inaudible) somehow you do have

2    knowledge of my case (inaudible) --

3          **PRESIDING COMMISSIONER DAVIS:**  Well certainly, as

4    we've already stated.  Yes.

5          **INMATE PORRAS:**  (Inaudible).

6          **PRESIDING COMMISSIONER DAVIS:**  Okay.  Other than

7    that, is there any reason for you to believe that we

8    would not be impartial?

9          **INMATE PORRAS:**  No.

10         **PRESIDING COMMISSIONER DAVIS:**  All right.  Thank

11   you.

12         **DEPUTY COMMISSIONER BLONIEN:**  Mr. Davis, may I turn

13   this down a little bit.  I can't hear.

14         **PRESIDING COMMISSIONER DAVIS:**  Sure.  Why don't you

15   go ahead and turn that off, officer, we'll just have to

16   suffer through.  You will receive a written copy of our

17   tentative decision today.  That decision becomes

18   effective within 120 days.  A copy of the decision and a

19   copy of the transcript will be sent to you and you will

20   have -- Well, the Board has eliminated its appeal

21   process.  If you disagree with anything that occurs in

22   today's hearing, you have the right to go directly to

23   court with your complaint.  You are not required to admit

24   your offense nor discuss your offense.  However, the

25   Panel once again does accept the findings of the court to

26   be true.  Do you understand that, sir?

27         **INMATE PORRAS:**  (Inaudible).

9

1      **PRESIDING COMMISSIONER DAVIS:**  All right.  And

2  Commissioner Blonien, are we going to be dealing with

3  anything from the confidential file today?

4      **DEPUTY COMMISSIONER BLONIEN:**  There's -- No

5  confidential information will be used today.

6      **PRESIDING COMMISSIONER DAVIS:**  I'm going to pass the

7  checklist of documents to both counsel.  If you'll take a

8  look at that and make sure we're operating off the same

9  list of documents.

10     **ATTORNEY SPARKS:**  I have these.  Thank you.

11     **DEPUTY DISTRICT ATTORNEY ISRAELS:**  Yes, I do

12  (inaudible).

13     **PRESIDING COMMISSIONER DAVIS:**  All right.  That'll

14  be marked Exhibit One then.  Counsel, anything additional

15  you'd like us to consider today?

16     **ATTORNEY SPARKS:**  No.

17     **PRESIDING COMMISSIONER DAVIS:**  Any preliminary

18  objections?

19     **ATTORNEY SPARKS:**  No.

20     **PRESIDING COMMISSIONER DAVIS:**  Will your client --

21  Will your client be speaking with us today?

22     **ATTORNEY SPARKS:**  Yes.

23     **PRESIDING COMMISSIONER DAVIS:**  All right.  If you'd

24  raise your right hand then please, sir.  Do you solemnly

25  swear or affirm that the testimony you will give at this

26  hearing will be the truth and nothing by the truth?  All

27  right.  For a summary of the crime, I'm going to refer to

10

1    the Court of Appeals document starting on page three

2    where it states under the heading facts.

3        "Late in the evening on August 11 and early in

4        the morning of August 12, 1988 the victim Shawn

5        Bartholomew, B-A-R-T-H-O-L-O-M-E-W, and his

6        friend Cosmo Alan Byrd, B-Y-R-D, got drunk with

7        some friends under Waterloo Bridge.  The victim

8        and Byrd went to Waterloo Liquors where Byrd

9        left the victim to return home.  Byrd hear

10       someone yell quote 'come here' close quotes as

11       he walked away from the liquor store.  He

12       turned around and saw someone who resembled the

13       defendant running.  Byrd continued home.

14       During the same night, the defendant was in his

15       front yard drinking with his brother Willie

16       Lester, L-E-S-T-E-R, and Lester's friend Mike

17       Garcia, G-A-R-C-I-A.  William quote --

18       quote/unquote 'Moose' Phillips,

19       P-H-I-L-L-I-P-S, and Dennis quote/unquote

20       'Scooter' Wheeler, W-H-E-E-L-E-R, passed in

21       front of the house and exchanged angry words

22       with defendant.  Phillips and Wheeler left but

23       defendant and his group armed themselves,

24       defendant with a butcher knife, and enlisted

25       the aid of another friend James Azevedo,

26       A-Z-E-V-E-D-O.  The group began searching for

27       Phillips but without success.  All but Lester

11

1       returned to defendant's front yard.  Shortly

2       after they returned, they heard yelling from

3       the alley.  The voice sounded to them like

4       Lester's, although Lester denied later that it

5       was he.  After hearing the yell, defendant left

6       alone to look for his brother.  Eventually

7       defendant saw the victim and chased him down.

8       Defendant held the victim by the hair and said

9       quote 'where's my brother, where's my brother'

10      close quotes.  Lester and Garcia arrived after

11      defendant caught the victim.  Lester hit the

12      victim with a stick and Garcia kicked the

13      victim in the head.  Defendant was the only one

14      in the group with a knife and he later admitted

15      to law enforcement he stabbed the victim.  The

16      group left the victim and returned to the

17      defendant's yard.  Paramedics responded to the

18      scene and found the bloodied victim lying in

19      the fetal position.  The victim died of a stab

20      wound with a pierce -- which pierced his heart,

21      liver and right lung."

22  And the -- according to the July 2006 Board report under

23  prisoner versions it says:

24      "Porras's version -- Porras's version is

25      initially (inaudible) from the first dated

26      offense summary.  In that version, Porras heard

27      Ray L. parenthesis (Porras's younger brother)

12

1    close parenthesis scream out.  He saw a broken

2    knife parenthesis (blade with -- with no

3    handle) close parenthesis lying on the ground

4    and he was running to where the yells were

5    coming from."

6  Yes?

7    **ATTORNEY SPARKS:**  Since we have him here and he's

8  going to talk about it, why don't we go with a different

9  version rather than the one that the correctional

10  counselor has.  That --

11    **PRESIDING COMMISSIONER DAVIS:**  Well this is the --

12  Did you have an interview with your correctional

13  counselor?

14    **INMATE PORRAS:**  Yeah.

15    **PRESIDING COMMISSIONER DAVIS:**  Is this the version

16  that you gave your correctional counselor?

17    **INMATE PORRAS:**  No.

18    **PRESIDING COMMISSIONER DAVIS:**  It's different?

19    **INMATE PORRAS:**  Yes.  I never talked with her about

20  the crime.  (Inaudible) took that and written it off of

21  the other counselor reports.

22    **PRESIDING COMMISSIONER DAVIS:**  So you've never

23  discussed with your correctional counselor the version --

24  your version of the crime even though there's -- there's

25  a change?

26    **INMATE PORRAS:**  (Inaudible).

27    **PRESIDING COMMISSIONER DAVIS:**  All right.  What is

13

1    your version of the crime?

2         INMATE PORRAS:  It's pretty much what she wrote.

3         PRESIDING COMMISSIONER DAVIS:  Well why don't you go

4    ahead and tell me.

5         INMATE PORRAS:  Well I (inaudible) pick up

6    (Inaudible).

7         PRESIDING COMMISSIONER DAVIS:  Okay.

8         INMATE PORRAS:  I did run over there and I swung it

9    at (inaudible).

10        PRESIDING COMMISSIONER DAVIS:  Okay.

11        INMATE PORRAS:  I didn't go hunting (inaudible) I

12   just picked it up.  I don't know why.  I didn't think

13   about why I did it but I did pick up the knife and swing

14   it at him.

15        PRESIDING COMMISSIONER DAVIS:  Did you stab him?

16        INMATE PORRAS:  Apparently so.

17        PRESIDING COMMISSIONER DAVIS:  How much had you been

18   drinking that night?

19        INMATE PORRAS:  Quite a lot.  I did buy a case of

20   beer but I didn't really count how many I was drinking.

21   I'd just drink them as I went along.

22        PRESIDING COMMISSIONER DAVIS:  Okay.  Were you --

23   Well were you drinking any -- did you -- Did you drink on

24   a regular basis?

25        INMATE PORRAS:  (Inaudible) weekend (inaudible).

26        PRESIDING COMMISSIONER DAVIS:  On the weekends.

27        INMATE PORRAS:  (Inaudible).

14

1      **PRESIDING COMMISSIONER DAVIS:**  And was this a

2   weekend?

3      **INMATE PORRAS:**  No, it was a Thursday night.

4      **PRESIDING COMMISSIONER DAVIS:**  Thursday night.  So

5   this would have been an unusual circumstance?  Okay.

6      **INMATE PORRAS:**  I was working on my car that night.

7   There was nobody else so I figured that (inaudible).

8      **PRESIDING COMMISSIONER DAVIS:**  According to the

9   probation officer report, and I'll just read you what he

10  says.

11        "The defendant reported that he started

12        drinking or consuming alcohol at the age of 15.

13        In 1984 he was consuming four 48-ounce bottles

14        of King Cobra on a daily basis.  At the present

15        time, which would have been at the time this

16        report was prepared, he will frequently consume

17        a case of beer and a fifth of Jack Daniels

18        every other night and on two nights during the

19        weekend he will consume a case of beer and

20        three wine coolers."

21     **INMATE PORRAS:**  (Inaudible) just thinking about the

22  amount of alcohol they're talking about and the price

23  (inaudible) where would I get that much money from.

24     **PRESIDING COMMISSIONER DAVIS:**  Well I don't know,

25  that's --

26     **INMATE PORRAS:**  (Inaudible).

27     **PRESIDING COMMISSIONER DAVIS:**  Yeah, we don't know

15

1    that.  That's only what -- what you claim in your report

2    in here.

3         INMATE PORRAS:  Yeah, that's a (inaudible) --

4         PRESIDING COMMISSIONER DAVIS:  Okay.  So how much

5    were you drinking?  What I'm trying to get to --

6         INMATE PORRAS:  Yeah.

7         PRESIDING COMMISSIONER DAVIS:  -- you being rather,

8    I don't -- I don't -- say you're being evasive but I'm

9    trying to get to how much you had been drinking that

10   night.

11        INMATE PORRAS:  Yeah, I'd say almost a case -- a

12   little over a 12-pack.

13        PRESIDING COMMISSIONER DAVIS:  Well, okay.  So you

14   had a little over a 12-pack of what size?

15        INMATE PORRAS:  (Inaudible) just the regular cans

16   (inaudible) Budweiser.

17        PRESIDING COMMISSIONER DAVIS:  Okay.  Are we talking

18   about the tall Budweiser's?  The 12-ounce, 16-ounce?

19        INMATE PORRAS:  (Inaudible) the 12-ounce I think it

20   is.

21        PRESIDING COMMISSIONER DAVIS:  Okay.

22        INMATE PORRAS:  (Inaudible).

23        PRESIDING COMMISSIONER DAVIS:  And you had about 12

24   of those you think?

25        INMATE PORRAS:  Yeah.

26        PRESIDING COMMISSIONER DAVIS:  Okay.  Had you had

27   any drugs that day?

16

1     **INMATE PORRAS:**  No.

2     **PRESIDING COMMISSIONER DAVIS:**  Had you had any hard

3  liquor that day?

4     **INMATE PORRAS:**  No.

5     **PRESIDING COMMISSIONER DAVIS:**  Okay.  You said you

6  were working on your car?

7     **INMATE PORRAS:**  Yes.

8     **PRESIDING COMMISSIONER DAVIS:**  So you were able to

9  take small pieces and put them back where they belong or

10  something --

11     **INMATE PORRAS:**  Yes.

12     **PRESIDING COMMISSIONER DAVIS:**  -- on your car?

13     **INMATE PORRAS:**  Yes.

14     **PRESIDING COMMISSIONER DAVIS:**  You felt confident in

15  doing that kind of small work?

16     **INMATE PORRAS:**  Yes.

17     **PRESIDING COMMISSIONER DAVIS:**  Even after you'd been

18  drinking as much as you had?

19     **INMATE PORRAS:**  Yes.

20     **PRESIDING COMMISSIONER DAVIS:**  Is there a reason why

21  then you can't remember one way or the other whether you

22  stabbed the victim or not?

23     **INMATE PORRAS:**  Well I know I swung the knife.  I

24  know it hit him but I don't know how many times

25  (inaudible).  I swung twice and it didn't feel like -- it

26  wasn't like (inaudible) say a (inaudible) it didn't feel

27  like I made contact.

17

1      **PRESIDING COMMISSIONER DAVIS:**  When you talk about

2   swinging a knife, most people think about it almost like

3   a slicing motion.

4      **INMATE PORRAS:**  Yes.

5      **PRESIDING COMMISSIONER DAVIS:**  But when -- And I

6   know at the last hearing one of the issues discussed was

7   whether or not the coroner's report, you know, or to get

8   a copy of the coroner's report, which we do have --

9      **INMATE PORRAS:**  Right.

10      **PRESIDING COMMISSIONER DAVIS:**  -- and to look at

11   that, it's pretty clear that they were some -- they were

12   significant stab wounds.

13      **INMATE PORRAS:**  Yes.

14      **PRESIDING COMMISSIONER DAVIS:**  So which is different

15   from swinging a knife.  Do you understand the

16   distinction?

17      **INMATE PORRAS:**  Yes.

18      **PRESIDING COMMISSIONER DAVIS:**  Okay.

19      **INMATE PORRAS:**  It was -- I just swung (inaudible).

20      **PRESIDING COMMISSIONER DAVIS:**  And what happened

21   after you -- after you made contact with him?

22      **INMATE PORRAS:**  (Inaudible) everybody ran.

23      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Did the victim

24   fall down?

25      **INMATE PORRAS:**  No.  When I left, he was still up.

26      **PRESIDING COMMISSIONER DAVIS:**  He was standing up?

27      **INMATE PORRAS:**  Yes.

18

1      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Did he say

2    anything?

3      **INMATE PORRAS:**  No.

4      **PRESIDING COMMISSIONER DAVIS:**  Before -- Before you

5    stabbed him, I don't want to put words in your mouth,

6    before you -- tell me what you -- how you describe it,

7    the motion that you did, you call it swinging the knife

8    at him?

9      **INMATE PORRAS:**  Yes.

10     **PRESIDING COMMISSIONER DAVIS:**  Okay.  Before you

11   swung the knife at him, did he have a weapon?

12     **INMATE PORRAS:**  It started with a fight between

13   (inaudible) and Cosmo first.  And Cosmo was chased off by

14   Mike Garcia.  Mike Garcia and James ran up and chased

15   Cosmo.  And (inaudible) continued to fight -- wrestling

16   match (inaudible) couple of times.

17     **PRESIDING COMMISSIONER DAVIS:**  Okay.  Did you ever

18   see a weapon?

19     **INMATE PORRAS:**  No.

20     **PRESIDING COMMISSIONER DAVIS:**  Why did you

21   produce -- Why did you introduce a weapon into this

22   otherwise fistfight?

23     **INMATE PORRAS:**  Initially he was carrying a bag or

24   something, some sort of -- I don't know what happened to

25   the bag (inaudible).  I don't know why I picked up the

26   knife.  I don't -- stupid decision.  I don't know why I

27   did it.

19

1      **PRESIDING COMMISSIONER DAVIS:**  Okay.  What kind of a

2   bag?

3      **INMATE PORRAS:**  It looked like a small camera case.

4      **PRESIDING COMMISSIONER DAVIS:**  So like a black --

5   what -- was it -- Do you remember what it was made out

6   of?

7      **INMATE PORRAS:**  It looked like it was a leather or a

8   vinyl case (inaudible) with the straps.

9      **PRESIDING COMMISSIONER DAVIS:**  And did you consider

10   that to be a weapon?

11      **INMATE PORRAS:**  I don't -- I don't know what I

12   considered it (inaudible) at that time (inaudible).

13      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Did he swing

14   it?

15      **INMATE PORRAS:**  Not initially.

16      **PRESIDING COMMISSIONER DAVIS:**  Did he ever swing it?

17      **INMATE PORRAS:**  (Inaudible) over his shoulder and he

18   (inaudible) swing with both arms.

19      **PRESIDING COMMISSIONER DAVIS:**  Okay.  So he had the

20   bag over his shoulder and he was swinging with both arms.

21      **INMATE PORRAS:**  Yes.

22      **PRESIDING COMMISSIONER DAVIS:**  He didn't have the

23   bag in his hand?

24      **INMATE PORRAS:**  No.

25      **PRESIDING COMMISSIONER DAVIS:**  Okay.  And you don't

26   remember why you felt the need to introduce a weapon into

27   this?

20

1       **INMATE PORRAS:**  No.

2       **PRESIDING COMMISSIONER DAVIS:**  Were you losing the

3    fight?

4       **INMATE PORRAS:**  No.

5       **PRESIDING COMMISSIONER DAVIS:**  Were you outnumbered?

6       **INMATE PORRAS:**  Initially we were.

7       **PRESIDING COMMISSIONER DAVIS:**  By how many?

8       **INMATE PORRAS:**  Five.

9       **PRESIDING COMMISSIONER DAVIS:**  Five to?

10      **INMATE PORRAS:**  Three.

11      **PRESIDING COMMISSIONER DAVIS:**  What happened?  You

12   said initially.  Did some of them leave?

13      **INMATE PORRAS:**  Yeah.  They jumped in the truck and

14   left (inaudible).  I didn't see the truck but they were

15   (inaudible).

16      **PRESIDING COMMISSIONER DAVIS:**  So did it boil down

17   to a fight between you and the victim?

18      **INMATE PORRAS:**  It started out when -- When the

19   fight between me and the victim started, it was me and

20   then Cosmo.

21      **PRESIDING COMMISSIONER DAVIS:**  Okay.  But it boiled

22   down to a fight between the two of you?

23      **INMATE PORRAS:**  Right.

24      **PRESIDING COMMISSIONER DAVIS:**  So there weren't

25   other people involved that you were having to fend off as

26   well?

27      **INMATE PORRAS:**  No.  Mike chased Cosmo down and I

21

1   chased him off.

2       **PRESIDING COMMISSIONER DAVIS:**  How well had you

3   known -- Did you know the victim at all before this?

4       **INMATE PORRAS:**  I knew him a little bit before.

5   That night I didn't recognize him (inaudible) he did get

6   bigger and (inaudible).

7       **PRESIDING COMMISSIONER DAVIS:**  Okay.  How long had

8   it been since you'd seen him?

9       **INMATE PORRAS:**  Almost two years.

10      **PRESIDING COMMISSIONER DAVIS:**  Had there been any --

11  any conflicts or anything between the two of you?

12      **INMATE PORRAS:**  (Inaudible).

13      **PRESIDING COMMISSIONER DAVIS:**  So nothing before

14  this evening really?

15      **INMATE PORRAS:**  Right.

16      **PRESIDING COMMISSIONER DAVIS:**  And what really did

17  this start over?

18      **INMATE PORRAS:**  Actually it started over a fight we

19  had a long time before but initially boiled down to a

20  recent fight between Mike and Moose's younger brother

21  Bruce.  And it started (inaudible) bottle throwing at

22  each other's house.  We don't live that far from each

23  other.  It's the street and a little apartment complex

24  and the house -- the house -- the yards aren't that big.

25  You can throw a good 40 yard pass across the yards and

26  you can almost hit everybody.

27      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Do you know

22

1    what the fight started over?

2        **INMATE PORRAS:**  That night it was an argument

3    between my little -- younger brother and Moose.  Moose, I

4    don't know what they -- it started over but me and Mike

5    had tried to stop the argument.  Moose left down the

6    street and they started -- my little brother and Moose

7    started arguing.  They left.  Later on somebody came by

8    on 10-speeds yelling towards us.  They left and then some

9    more people came.

10       **PRESIDING COMMISSIONER DAVIS:**  Was this an unusual

11   occurrence?

12       **INMATE PORRAS:**  Yes.

13       **PRESIDING COMMISSIONER DAVIS:**  So fighting between

14   the neighbors and people like that was not something

15   normal?

16       **INMATE PORRAS:**  No.

17       **PRESIDING COMMISSIONER DAVIS:**  This was out of the

18   normal.  Okay.  Where did the knife come from originally?

19       **INMATE PORRAS:**  I'd seen it a couple of days

20   earlier.  We had like ivy that grew up into the street.

21   There's no sidewalk (inaudible) dirt pavement or asphalt.

22   The blade was hanging between the mailbox and the ivy.

23   I'd seen it there.  I don't know why I remember that now.

24       **PRESIDING COMMISSIONER DAVIS:**  Okay.  All right.  In

25   terms of your prior arrest record, you were arrested as a

26   juvenile at 16 years of age when you were first booked

27   from the San Joaquin Sheriff's Office for being

23

1   out-of-control.  That was in -- and then -- It was in

2   1985.  And then in March of '86 you were booked for

3   second degree -- second degree burglary and adjudged a

4   ward of the court, 60 days at juvenile hall.  On

5   April 10, 1986 you were transferred to the Alameda County

6   for trespassing.  November 1986 you were cited by the

7   California Highway Patrol for being under the influence

8   and again in January of '87 booked into the Stockton

9   Police Department for second degree burglary.  It's all

10  from the probation officer's report.  In terms of adult

11  arrests, you had four misdemeanor arrests for driving

12  under the influence of alcohol.

13       **INMATE PORRAS:**  I think not all of them were.  I

14  think one of them was for driving without a license.

15       **PRESIDING COMMISSIONER DAVIS:**  Okay.  So was alcohol

16  a significant problem for you at the time?

17       **INMATE PORRAS:**  I wouldn't say a problem but that's

18  (inaudible) drinking (inaudible).

19       **PRESIDING COMMISSIONER DAVIS:**  Yeah.  Well sounds

20  like you were drinking a lot.

21       **INMATE PORRAS:**  Yeah.

22       **PRESIDING COMMISSIONER DAVIS:**  Would you say that

23  was out of the norm for the amount -- that amount of

24  alcohol that you were drinking?

25       **INMATE PORRAS:**  Yes.

26       **PRESIDING COMMISSIONER DAVIS:**  Okay.  Why were you

27  drinking so much?

24

1       **INMATE PORRAS:**  No real reason.  I didn't do any

2  other drugs or anything.  That was what I did.

3       **PRESIDING COMMISSIONER DAVIS:**  Okay.  Did you feel

4  like you had to drink or needed to drink?

5       **INMATE PORRAS:**  Well I wouldn't say needed to but

6  you know growing up you do something to try to fit in or

7  whatever.

8       **PRESIDING COMMISSIONER DAVIS:**  So that is what you

9  did to try and fit in?

10       **INMATE PORRAS:**  Not really fit in but you know

11  stupid things that kids do.  I guess I wouldn't try to

12  explain like that but yeah.

13       **PRESIDING COMMISSIONER DAVIS:**  Okay.  The arrest

14  that you -- and so forth, do you feels that alcohol was a

15  contributing factor to those things?

16       **INMATE PORRAS:**  Yeah.

17       **PRESIDING COMMISSIONER DAVIS:**  Why?

18       **INMATE PORRAS:**  Because the ones for the driving I

19  should never have been in the car when I was drinking.

20  And the first one I thought that, you know, I could drink

21  a little bit and make it home before the alcohol caught

22  up but the cops got me for the alcohol (inaudible).

23       **PRESIDING COMMISSIONER DAVIS:**  What about the

24  burglaries?

25       **INMATE PORRAS:**  The burglaries, those weren't

26  alcohol related.

27       **PRESIDING COMMISSIONER DAVIS:**  No?

25

1        **INMATE PORRAS:**  No.

2        **PRESIDING COMMISSIONER DAVIS:**  Was there anything --

3    What were they related to?

4        **INMATE PORRAS:**  The first one, we were in Stockton

5    just throwing rocks at stumps.  There's like a canal and

6    there's a distributing -- distributing market or whatever

7    it is.  The stump's in the circle.  We threw rocks at the

8    stump and one of the rocks bounced up and broke the

9    window.  And like dumb (inaudible) we thought we could

10   get in there and go see what was in there just for kicks.

11   And we didn't know we set off a silent alarm.

12       **PRESIDING COMMISSIONER DAVIS:**  Okay.  How old were

13   you at the time?

14       **INMATE PORRAS:**  Fifteen.

15       **PRESIDING COMMISSIONER DAVIS:**  And then what was the

16   second one?

17       **INMATE PORRAS:**  We were on the roof at -- junior

18   high school.

19       **PRESIDING COMMISSIONER DAVIS:**  And did you go into

20   any of the buildings?

21       **INMATE PORRAS:**  No, my partner went in through the

22   skylight of the gym and came up the other side.

23       **PRESIDING COMMISSIONER DAVIS:**  Didn't steal anything

24   or anything?

25       **INMATE PORRAS:**  No.

26       **PRESIDING COMMISSIONER DAVIS:**  Okay.

27       **INMATE PORRAS:**  Got arrested for that.

1          **PRESIDING COMMISSIONER DAVIS:** So you think the

2     alcohol impaired your judgment?

3          **INMATE PORRAS:** Yes.

4          **PRESIDING COMMISSIONER DAVIS:** Do you think the

5     instant offense would have never happened were it not for

6     the alcohol?

7          **INMATE PORRAS:** Yes.

8          **PRESIDING COMMISSIONER DAVIS:** I don't understand.

9     Yes -- Yes, it would have happened or --

10          **INMATE PORRAS:** Well, no, it wouldn't have happened.

11          **PRESIDING COMMISSIONER DAVIS:** It wouldn't have

12     happened except for the alcohol?

13          **INMATE PORRAS:** Yes.

14          **PRESIDING COMMISSIONER DAVIS:** Okay.  In terms of

15     your social history, you were born at the Sioux

16     Reservation in Montana?

17          **INMATE PORRAS:** Yes.

18          **PRESIDING COMMISSIONER DAVIS:** And then it says you

19     were raised in Newark.  Are we talking Newark, New

20     Jersey?

21          **INMATE PORRAS:** No, California.

22          **PRESIDING COMMISSIONER DAVIS:** Newark, California.

23     Okay.  And then you went to Stockton?

24          **INMATE PORRAS:** Yes.

25          **PRESIDING COMMISSIONER DAVIS:** And you're the middle

26     of seven children.

27          **INMATE PORRAS:** Yes.

27

1    **PRESIDING COMMISSIONER DAVIS:**  You have close ties

2    with your parents.  Both parents still alive?

3        **INMATE PORRAS:**  Yes.

4    **PRESIDING COMMISSIONER DAVIS:**  Okay.  And still

5    close ties with them?

6        **INMATE PORRAS:**  (Inaudible).

7    **PRESIDING COMMISSIONER DAVIS:**  Keep in regular

8    contact?  You attended high -- You attended school

9    through the tenth grade.  No military experience.  We

10   already talked about the burglaries and the arrest

11   record.  You worked on and off for Curtis Riggins,

12   R-I-G-G-I-N-S, to lay carpet and also you helped with

13   some auto mechanics work with him.

14       **INMATE PORRAS:**  Right.

15   **PRESIDING COMMISSIONER DAVIS:**  And obviously you

16   maintained a close relationship with him because I think

17   that's -- as I read that was part of your parole plans as

18   well.  Is that someone -- Just a close family friend or

19   --

20       **INMATE PORRAS:**  Close friend.

21   **PRESIDING COMMISSIONER DAVIS:**  Yeah.  You started

22   consuming alcohol as we said earlier about the age of 15.

23   Tried marijuana at that time at the age of 13.  Also used

24   black beauties for about two weeks in '87 and consumed

25   crank maybe five times in 1987.  That sound all about

26   right?

27       **INMATE PORRAS:**  The crank and the black beauties

28

1   came from the same conversation I had with the probation

2   officer.

3       **PRESIDING COMMISSIONER DAVIS:**  Okay.

4       **INMATE PORRAS:**  Yeah, she asked me what the black

5   beauties were and I didn't really know how to explain

6   them (inaudible) they were diet pills, they said they had

7   an affect of an upper like crank (inaudible) black

8   beauties and the crank, that's (inaudible).

9       **PRESIDING COMMISSIONER DAVIS:**  That was the same

10  thing?

11      **INMATE PORRAS:**  Yes.

12      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Because crank

13  often refers to a homemade process that -- or the earlier

14  types of methamphetamine but -- so that was all -- that

15  was -- those aren't two different experimental sorts of

16  things?

17      **INMATE PORRAS:**  (Inaudible) --

18      **PRESIDING COMMISSIONER DAVIS:**  Those are all one?

19      **INMATE PORRAS:**  -- black beauties.

20      **PRESIDING COMMISSIONER DAVIS:**  Okay.  And was

21  there -- was there a reason why you were trying the black

22  beauties at the time?

23      **INMATE PORRAS:**  Somebody gave me a big bag of them

24  and I had them.  I didn't know what they were so I tried

25  them.  I didn't like the feeling that they gave me.

26      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Same -- Same

27  with the marijuana?

29

1        **INMATE PORRAS:**  Yeah, marijuana --

2        **PRESIDING COMMISSIONER DAVIS:**  So alcohol was really

3    the drug of choice?

4        **INMATE PORRAS:**  Correct.

5        **PRESIDING COMMISSIONER DAVIS:**  Okay.  All right.

6    Now, do you have any brothers and sisters?

7        **INMATE PORRAS:**  Yeah.

8        **PRESIDING COMMISSIONER DAVIS:**  And do you keep in

9    contact with them?

10        **INMATE PORRAS:**  Yeah.

11        **PRESIDING COMMISSIONER DAVIS:**  And through cards,

12    letters, telephone calls?

13        **INMATE PORRAS:**  Telephone.

14        **PRESIDING COMMISSIONER DAVIS:**  Anybody else have any

15    problem with law enforcement?

16        **INMATE PORRAS:**  Yeah, my family's had a few run-ins

17    (inaudible).

18        **PRESIDING COMMISSIONER DAVIS:**  Okay.  Is there

19    anything that we haven't talked about in terms of your

20    background, your growing up, your educational experience,

21    the incident offense itself, anything that you think is

22    important for this Panel to understand that we haven't

23    already discussed?

24        **INMATE PORRAS:**  No.

25        **PRESIDING COMMISSIONER DAVIS:**  All right.  If

26    something comes up, would you please just, you know, let

27    us know that, wait a minute, I forgot this and this, you

30

1   need to know this. Okay. We want to make sure we give

2   -- give you every opportunity to tell us everything that

3   you -- that you remember of this process.

4       **INMATE PORRAS:**  Yeah.

5       **PRESIDING COMMISSIONER DAVIS:**  Okay. Commissioner,

6   did you have any questions?

7       **DEPUTY COMMISSIONER BLONIEN:**  No.

8       **PRESIDING COMMISSIONER DAVIS:**  All right. Then I'll

9   ask you to turn your attention please -- please to

10  Commissioner Blonien.

11      **DEPUTY COMMISSIONER BLONIEN:**  Mr. Porras, it's my

12  job to find out what you've been doing in the institution

13  since your last hearing. In order to do this, I've read

14  your C-File. I read your counselor's report and the

15  Board reports and I read the psych report. I note that

16  you did an Olson Review of your C-File on February 14,

17  '05. So you've read everything that I'm going to talk

18  about. Your last appearance before the Board you

19  received a one year denial. And that was on 7-12-05.

20  The Panel recommended that you stay disciplinary-free,

21  get self-help, earn positive chronos. They also

22  requested a copy of the coroner's report and the police

23  report which -- which we do have. Your psych report is

24  by Dr. Hewchuk, H-E-W-C-H-U-K, and that's dated June 7,

25  '05. And the counselor's report, 2-23-05, by Counselor

26  Quintero, Q-U-I-N-T-E-R-O, and I've updated it by going

27  through the C-File. And when we start talking about your

31

1    disciplinary record, I would say there's extenuating

2    circumstances that we should talk about, that on 12-19-05

3    you 602'd -- had an appeal form noting that you'd been on

4    C status since October 1998.  And explain C status.

5         **INMATE PORRAS:**  (Inaudible) I wasn't allowed to

6    attend programs or anything because of my hair.

7         **DEPUTY COMMISSIONER BLONIEN:**  In 1998 the Department

8    implemented regulations, grooming regulations.

9         **INMATE PORRAS:**  Right.

10        **DEPUTY COMMISSIONER BLONIEN:**  And we apply them to

11   all inmates.

12        **INMATE PORRAS:**  Correct.

13        **DEPUTY COMMISSIONER BLONIEN:**  And a group of

14   inmates, specifically American Indians, appealed those

15   grooming standards.  And as that went through the court

16   process it took a long time.  But the ending result was

17   the ruling in favor of the American Indians and their

18   appeal.  And so on 12-19-05 you appealed your C status,

19   which you'd been on for seven years, stating that based

20   on a recent ruling in the interest of justice I should be

21   removed from my current C status and placed in the

22   appropriate privileged groups as there is absolutely no

23   reason as to why I should remain on C status.  And this

24   thing was adjudicated and your appeal was denied on

25   1-24-06.  And part of the denial said that there are

26   court decisions which may impact the Department of

27   Corrections.  And if after legal evaluation, the change

32

1   in department rules and regulations is required, an
2   administrative bulletin will be issued.  Several changes
3   are anticipated as a result of the recent court decision.
4   However, at this time no notice of change pertaining to
5   your issue has been received by the Correctional Training
6   Facility.  Therefore, your appeal is denied at the second
7   level.  And that was 1-24-06.  And this is the last legal
8   paper that's in your file.  I personally know that there
9   have been administrative bulletins and that CDC 115's
10  relating to grooming standards that occurred as a result
11  of this lawsuit are supposed to be removed from your
12  C-File.  Yours have not been removed.  I do note that you
13  have gone to classification and that on 2-27-06 you came
14  off C status due to the emergency regulations regarding
15  inmate grooming standards and access to religious
16  programs and that you're retroactive to 9-22-2000.  So
17  with all that talk, when we talk about what you've been
18  doing in the institution since your last hearing, I just
19  wanted to set that framework that because of your C
20  status you are not allowed to work, go to vocation and
21  program only in a limited manner because of your status.
22  But then we also know that you have access.  And the
23  Board does rely on your ability to do self-help in your
24  cell through reading and book reports or -- as you've
25  gone through.  And I want to talk about that.  But before
26  I talk about that, I do want to read into the record that
27  before you were put on C status that you were programming

33

1   and you were very active.  You were involved in

2   Vocational Radiology Technology and you were a

3   Radiologist.

4         **INMATE PORRAS:**  Yes, well not -- x-ray tech.

5         **DEPUTY COMMISSIONER BLONIEN:**  And had you completed

6   the program?

7         **INMATE PORRAS:**  I didn't get to finish all the

8   (inaudible).

9         **DEPUTY COMMISSIONER BLONIEN:**  And I don't think they

10  have the program any more do they?

11        **INMATE PORRAS:**  No.

12        **DEPUTY COMMISSIONER BLONIEN:**  They don't.  That you

13  did participate in AA actively, that you went to the --

14  and completed the courses on HIV, AIDS.  You attended NA

15  meetings.  You completed the course on Hepatitis,

16  Sexually Transmitted Diseases, Tuberculosis and you were

17  active in your Spiritual Circle and continue to be active

18  in your Spiritual Circle.  So you've attended -- You

19  attended AA from '95 to 2000.  And did you work through

20  the steps in that five years?

21        **INMATE PORRAS:**  (Inaudible).

22        **DEPUTY COMMISSIONER BLONIEN:**  A little bit in five

23  years?

24        **INMATE PORRAS:**  Yeah.

25        **DEPUTY COMMISSIONER BLONIEN:**  How little?

26        **INMATE PORRAS:**  It's a lifelong commitment.  You

27  can't really say that you did a whole lot because this is

34

1    something that you got to carry on forever.  It's never

2    done.

3        **DEPUTY COMMISSIONER BLONIEN:**  And as you've worked

4    through the steps how far did you go?

5        **INMATE PORRAS:**  I've learned all the steps

6    (inaudible) and did some other things.

7        **DEPUTY COMMISSIONER BLONIEN:**  And did you do a moral

8    inventory?

9        **INMATE PORRAS:**  Yes, I did.

10       **DEPUTY COMMISSIONER BLONIEN:**  Takes a long time.

11       **INMATE PORRAS:**  Yes, it does.

12       **DEPUTY COMMISSIONER BLONIEN:**  And did you seek to

13   make amends with those you've harmed?

14       **INMATE PORRAS:**  Yes, (inaudible) a long time ago.

15       **DEPUTY COMMISSIONER BLONIEN:**  And what did you do in

16   that arena?

17       **INMATE PORRAS:**  I tried to talk to the family but

18   they said to leave it alone and give it some time first,

19   so I did.

20       **DEPUTY COMMISSIONER BLONIEN:**  And there is a way to

21   talk to the family but it's only appropriate to do it

22   through the District Attorney's office and the Victim

23   Witness Program.  And if you write a letter, you send it

24   to the DA.

25       **INMATE PORRAS:**  (Inaudible).

26       **DEPUTY COMMISSIONER BLONIEN:**  And they contact the

27   victim if they can, the victim's family.  And then the

35

1    victim's family chooses whether they wish to read the

2    letter or not.  And you may never know, but it's still a

3    good idea to go through that, that process.  So since

4    1998 you haven't been able to program.  Two thousand was

5    the last AA.  What have you been doing to make sure you

6    have the support system that translates into the

7    community so that you'd never drink again?  Because you

8    can never drink again.

9        **INMATE PORRAS:**  I know.  The first step in the AA

10   program, that's pretty much all you really need to learn.

11   You need to learn that you become powerless over --

12   alcohol has more power than anything, that's what you got

13   to remember, keep in mind.  Everything else, you can't

14   rely on nobody else to tell you what to do anymore, say

15   you can't do this.  AA's got this thing where it gives

16   you an out where you can say, you know, my sponsor failed

17   me so I had to go get a drink or some other -- you can't

18   rely on that no more.  It's got to be that guy's

19   responsible, me, not anybody else, I can never ever say

20   that my higher power let me down or my sponsor let me

21   down.  I got to do that and that's what I carry, that

22   first step.  That first step is always the first step in

23   every program and that's the only one that a person

24   really should carry.  Because when it gets to the rest

25   where you're talking about somebody else needs to do

26   things for you, you're always going to fail.

27       **DEPUTY COMMISSIONER BLONIEN:**  And as you went

36

1    forward with your spiritual -- spiritualization here in

2    the institution, is there help through that that has

3    helped you with your alcohol?

4        **INMATE PORRAS:**  Yeah.

5        **DEPUTY COMMISSIONER BLONIEN:**  Good.  Tell me about

6    that.

7        **INMATE PORRAS:**  Well we've had -- Well right now we

8    transitioned -- doing some other things.  I brought one

9    of my letters (inaudible) also (inaudible) ever I need

10   (inaudible) always have some place to go, some place to

11   fall on that, you know, there's also some --

12       **DEPUTY COMMISSIONER BLONIEN:**  That's in the

13   community.  I hear --

14       **INMATE PORRAS:**  Yeah.

15       **DEPUTY COMMISSIONER BLONIEN:**  -- there's alcohol in

16   the institution.  How do you avoid it?

17       **INMATE PORRAS:**  Just avoid it.  There's a lot of

18   things that you could just step around and not even -- I

19   mean there's a lot you could say just like a liquor

20   store.  I don't need it.  I never touch it.

21       **DEPUTY COMMISSIONER BLONIEN:**  And you just never

22   touch it because you're just strong?

23       **INMATE PORRAS:**  Yeah.  I won't do it no more.

24       **DEPUTY COMMISSIONER BLONIEN:**  And why won't you do

25   it anymore?

26       **INMATE PORRAS:**  I never, ever want to fall into the

27   same thing I'm doing now.

37

1       **DEPUTY COMMISSIONER BLONIEN:**  So if you ever get

2   out, you might get a car, you might be working on a car.

3   Stockton is a very hot place.

4       **INMATE PORRAS:**  They sell Kool-Aid.

5       **DEPUTY COMMISSIONER BLONIEN:**  So if you were in a

6   stressful situation where it would be easier to cope with

7   a beer, what would you do?

8       **INMATE PORRAS:**  Just cope with the stress.

9       **DEPUTY COMMISSIONER BLONIEN:**  Who would you call out

10   to?

11       **INMATE PORRAS:**  Myself.

12       **DEPUTY COMMISSIONER BLONIEN:**  What other area have

13   you studied in terms -- in your cell?  What are you

14   reading?

15       **INMATE PORRAS:**  I've got a few things like this

16   White Bison program.  We got another wellness -- it's a

17   Circle (inaudible) and that's what I (inaudible).

18       **DEPUTY COMMISSIONER BLONIEN:**  Okay.  White Bison

19   program's very similar to AA.

20       **INMATE PORRAS:**  (Inaudible).

21       **DEPUTY COMMISSIONER BLONIEN:**  (Inaudible) based on

22   Native American culture.

23       **INMATE PORRAS:**  Yes.

24       **DEPUTY COMMISSIONER BLONIEN:**  And fits more in with

25   your spirituality.

26       **INMATE PORRAS:**  Yeah.

27       **DEPUTY COMMISSIONER BLONIEN:**  And it -- are tools

38

1    for you to use so that you don't relapse into alcohol.

2         **INMATE PORRAS:**  Yeah.

3         **DEPUTY COMMISSIONER BLONIEN:**  So this is your

4    hearing.  You tell me how -- what else you've been

5    learning.  It sounds like you have a lot of anger

6    (inaudible).  People just don't start flailing with a

7    knife if they're not angry.

8         **INMATE PORRAS:**  Yeah, I know.

9         **DEPUTY COMMISSIONER BLONIEN:**  Have you done any

10   Anger Management?

11        **INMATE PORRAS:**  I tried to get their Anger

12   Management classes.  They're starting to rebuild them

13   now.  I enrolled in one at -- Well it's been working

14   since March but we've only been there five times.  Tried

15   another one, they said I have to be Triple CMC to attend.

16        **DEPUTY COMMISSIONER BLONIEN:**  Cage Your Rage.  You

17   signed up for Cage --

18        **INMATE PORRAS:**  Yeah.

19        **DEPUTY COMMISSIONER BLONIEN:**  -- Your Rage but you

20   do have to be Triple CMS.  What about reading about Anger

21   Management, have you done anything like that?

22        **INMATE PORRAS:**  Yeah, I've read over -- my bunkie

23   has a whole bunch of books too that he goes through and

24   picks up and I read through them too.

25        **DEPUTY COMMISSIONER BLONIEN:**  Do you have a list?

26        **INMATE PORRAS:**  No, I never made a list.

27        **DEPUTY COMMISSIONER BLONIEN:**  Can you tell me about

39

1    one?

2        **INMATE PORRAS:**    (Inaudible) I can't remember the

3    title but it's the same thing I just explained.  It has

4    to start here.  I've got to take care of me first.  I

5    can't never, ever go and blame things on anybody else,

6    say it was them that made me do this or somebody else got

7    to be responsible for me.  It's always got to

8    (inaudible).

9        **DEPUTY COMMISSIONER BLONIEN:**    Does it start here or

10   does it start here?

11       **INMATE PORRAS:**    Both.

12       **DEPUTY COMMISSIONER BLONIEN:**    Both.  Anything else

13   you've been doing in the institution that you want to

14   talk about?

15       **INMATE PORRAS:**    Not right now.

16       **DEPUTY COMMISSIONER BLONIEN:**    You do have parole

17   plans.

18       **INMATE PORRAS:**    Right.

19       **DEPUTY COMMISSIONER BLONIEN:**    And you do have a

20   supportive family.  And you have a mom.

21       **INMATE PORRAS:**    Yes.

22       **DEPUTY COMMISSIONER BLONIEN:**    Who would like you

23   home.  And she's offering you a place to live.

24       **INMATE PORRAS:**    Right.

25       **DEPUTY COMMISSIONER BLONIEN:**    She lives in Stockton.

26       **INMATE PORRAS:**    Yes.

27       **DEPUTY COMMISSIONER BLONIEN:**    And you can definitely

40

1    go to her and she says that if you don't live with her

2    you can live with your other six siblings who also live

3    in Stockton.  So if you -- if you do get a parole date,

4    where would you want to live?

5        **INMATE PORRAS:**  First I'd stay with mom.

6        **DEPUTY COMMISSIONER BLONIEN:**  And she has room for

7    you?

8        **INMATE PORRAS:**  Yes.

9        **DEPUTY COMMISSIONER BLONIEN:**  And then you have a

10   letter from your sister Nina.

11       **INMATE PORRAS:**  Neva.

12       **DEPUTY COMMISSIONER BLONIEN:**  Neva.  It's a

13   handwritten letter signed by Neva Martin dated July 3rd.

14   And she thinks you deserve to be paroled.  You have a

15   place to live in Stockton with either your parents -- Is

16   your father alive also?

17       **INMATE PORRAS:**  Yes.

18       **DEPUTY COMMISSIONER BLONIEN:**  Or with her.  And that

19   you've always been a very friendly person, that you did

20   make a mistake and that she believes that you really

21   learned from the terrible experience and that she is a

22   union trades person and she would help you find

23   employment.  What does he do?

24       **INMATE PORRAS:**  Right now she's a contractor.  She's

25   building -- She was working on the Bay Bridge.  That

26   contract ended.  Now she's working on a sewer treatment

27   facility in Stockton

41

1       **DEPUTY COMMISSIONER BLONIEN:**  So she makes good

2    money.  She's a highly skilled person.  Then you have --

3    How did you meet Curtis to begin with?

4       **INMATE PORRAS:**  One of the first friends I met in

5    Stockton (inaudible) --

6       **DEPUTY COMMISSIONER BLONIEN:**  He has --

7       **INMATE PORRAS:**  -- same age.

8       **DEPUTY COMMISSIONER BLONIEN:**  Same age.  He has two

9    letters.

10      **INMATE PORRAS:**  (Inaudible) old with a new updated

11   (inaudible).

12      **DEPUTY COMMISSIONER BLONIEN:**  Well one is on

13   letterhead, Curtis Tile & Marble Gallery which is in

14   Stockton.  And he is very supportive of you and your

15   parole.  He'll personally make sure that you have a job

16   in his business.  He would -- the training.

17      **INMATE PORRAS:**  Right.

18      **DEPUTY COMMISSIONER BLONIEN:**  You could even live

19   with him if you wanted to, that his whole family knows

20   you and -- supportive of you and that he thinks that you

21   will positively parole and be a positive person in

22   society.  He said that you can positively affect to break

23   awake (verbatim) start anew, beginning --

24      **INMATE PORRAS:**  (Inaudible) --

25      **DEPUTY COMMISSIONER BLONIEN:**  -- beginning a new

26   future.  I mean a friend that would take the time to

27   write the letter who lets his whole family know about

42

1    you, you know the family, and then there's this program

2    that he wrote to and it is the Native Direction

3    Incorporated, The Three Rivers Indian Lodge which is in

4    Manteca which isn't far from Stockton.  And you're

5    welcome to come and they have a ceremony sweat lodge and

6    you can come to meetings there and they have AA meetings,

7    they have drug court, they have Talking Circle, mental

8    health referrals, cultural, traditional activities, anger

9    management, White Bison, Red Road To Recovery, and it was

10   founded in 1974.  It administers and extends alcohol

11   (inaudible) treatment services for the individual

12   (inaudible) a point of new beginning.  And they would be

13   there for you if you needed them.  So you'd live with

14   your mom, you'd work for Curtis.  You have this to rely

15   on if you need any help in terms of alcohol abuse.  Do

16   you see any problems reintegrating in terms of the

17   world's gone pretty fast while you haven't been there.

18        **INMATE PORRAS:**  No.

19        **DEPUTY COMMISSIONER BLONIEN:**  You know how to work.

20        **INMATE PORRAS:**  (Inaudible).

21        **DEPUTY COMMISSIONER BLONIEN:**  Anything else about

22   parole plans?  You have a family that supports you.  Does

23   your family have parties and drink?

24        **INMATE PORRAS:**  No.

25        **DEPUTY COMMISSIONER BLONIEN:**  How do you know?

26        **INMATE PORRAS:**  They don't (inaudible).

27        **DEPUTY COMMISSIONER BLONIEN:**  They don't?

43

1      **INMATE PORRAS:**  (Inaudible) they pretty much --

2      **DEPUTY COMMISSIONER BLONIEN:**  There's been some

3  problems other than you --

4      **INMATE PORRAS:**  Yes.

5      **DEPUTY COMMISSIONER BLONIEN:**  -- with alcohol in the

6  family.

7      **INMATE PORRAS:**  Yes, (inaudible) they're all right.

8      **DEPUTY COMMISSIONER BLONIEN:**  And we also sent out

9  3042 Notices to law enforcement and interested parties.

10  We got a letter from the attorney who defended you at

11  trial and it's dated July 27, '06. And his name is Keith

12  Arthur. And he says that because you were so young at

13  the time of the crime he doesn't remember much about you

14  but he remembers the facts of the case vividly, that the

15  boys were drinking themselves stupid on (inaudible) wine

16  coolers. Neville's younger brother disappeared and they

17  thought they heard him crying for help. Everybody ran

18  around like chickens with their heads cut off looking for

19  him. The victim just happened to be coming the other way

20  amusing himself by smashing the windows out of parked

21  cars. Words were exchanged, the homicide occurred.

22  Everybody in the courtroom was surprised at the verdict.

23  It should have been voluntary manslaughter. I'm sure you

24  hear this all the time, I wish I could add more. Please

25  extend -- You got a copy of this letter.

26      **INMATE PORRAS:**  No.

27      **DEPUTY COMMISSIONER BLONIEN:**  Please extend my

44

1    thoughts and (inaudible) to Neville in the hopes that

2    he's taking advantage of the programs available to get

3    his life back on track.  He's still a young man.  I hope

4    he's not letting this one evening of insane bad judgment

5    define his life.  We also have a representative from the

6    San Joaquin District Attorney's office and at the

7    appropriate time she's going to be able to ask questions

8    and make a comment.  With that I'll return to the Chair.

9        **PRESIDING COMMISSIONER DAVIS:**  All right.  Thank

10   you.  Tell me a little bit more about the differences or

11   similarities between the White Bison program and AA.

12       **INMATE PORRAS:**  Well AA is more geared towards

13   Christianity and Jesus and the White Bison's more

14   (inaudible) our culture, our culture and beliefs.

15       **PRESIDING COMMISSIONER DAVIS:**  Are there sponsors in

16   the White Bison program?

17       **INMATE PORRAS:**  Yes, well not what (inaudible) say

18   for AA but there are sponsors.

19       **PRESIDING COMMISSIONER DAVIS:**  So is it -- What I'm

20   trying to get to is it similarly structured where you

21   have someone that you go to if you feel like you want to

22   take a drink and you talk to them and they help walk you

23   through the process?

24       **INMATE PORRAS:**  (Inaudible).

25       **PRESIDING COMMISSIONER DAVIS:**  Okay.  And that's

26   what I think -- trying to get to before and we asked you

27   who you would go to and you said yourself.  Is it kind of

45

1    your view then that you don't need a sponsor or --

2         INMATE PORRAS:  No, it's good -- it's good to have a

3    sponsor but it's not good to rely on a sponsor.

4         PRESIDING COMMISSIONER DAVIS:  Okay.  I think the

5    issue generally is that you have someone that you can go

6    to ask questions of and maybe get some support.  Do you

7    see a need for that?

8         INMATE PORRAS:  A little bit.

9         PRESIDING COMMISSIONER DAVIS:  All right.  Have you

10   looked into -- is the x-ray --

11        DEPUTY COMMISSIONER BLONIEN:  (Inaudible).

12        PRESIDING COMMISSIONER DAVIS:  That means the tape

13   has shut off.  We have to stop for a moment.

14        [Thereupon, the tape was turned over.]

15        DEPUTY COMMISSIONER BLONIEN:  Okay.  We're back on

16   tape, side two.

17        PRESIDING COMMISSIONER DAVIS:  Do you know if the

18   x-ray technician, was that the program you were in,

19   x-tray technician?

20        INMATE PORRAS:  Yeah.

21        PRESIDING COMMISSIONER DAVIS:  Do you know if that

22   exists anywhere else in the institution?

23        INMATE PORRAS:  Not anymore.

24        PRESIDING COMMISSIONER DAVIS:  Not anymore.

25   Nowhere -- no other -- No other institutions --

26        INMATE PORRAS:  (Inaudible) Solano and CMC had it

27   and they did away with it.

46

1          **PRESIDING COMMISSIONER DAVIS:**  Okay.  So as far as

2    you know it doesn't exist anywhere?

3          **INMATE PORRAS:**  Right.

4          **PRESIDING COMMISSIONER DAVIS:**  Okay.  All right.

5    Have we missed anything?  Is there anything that you want

6    to add to what we've already talked about?

7          **INMATE PORRAS:**  No.

8          **PRESIDING COMMISSIONER DAVIS:**  All right.  Does the

9    District Attorney have questions?

10         **DEPUTY DISTRICT ATTORNEY ISRAELS:**  I just --

11   Factually speaking, I was going to ask you what you said

12   about what happened that day.  It's my understanding that

13   you said you picked up a broken knife that was in the

14   dirt and then you swung it at the victim; you couldn't --

15   you don't know if you stabbed him.  Right?  Is that what

16   you -- What happened after that?

17         **INMATE PORRAS:**  Everybody stopped fighting and

18   everybody ran away.

19         **PRESIDING COMMISSIONER DAVIS:**  Be sure and direct

20   your questions up here.

21         **DEPUTY DISTRICT ATTORNEY ISRAELS:**  I'm sorry.

22         **PRESIDING COMMISSIONER DAVIS:**  Thank you.

23         **DEPUTY DISTRICT ATTORNEY ISRAELS:**  I'm sorry.

24         **PRESIDING COMMISSIONER DAVIS:**  Quite all right.

25         **DEPUTY DISTRICT ATTORNEY ISRAELS:**  And then after --

26   So everybody ran off and what happened next?

27         **INMATE PORRAS:**  We all went back home.

47

1       **DEPUTY DISTRICT ATTORNEY ISRAELS:**  You didn't chase

2   after anybody?

3       **INMATE PORRAS:**  No.

4       **DEPUTY DISTRICT ATTORNEY ISRAELS:**  And then how many

5   times did he stab -- I want to know how many times he

6   stabbed him.

7       **PRESIDING COMMISSIONER DAVIS:**  Do you recall how

8   many times?

9       **INMATE PORRAS:**  I swung the knife twice.  They

10  didn't feel like they made contact but I know it was made

11  in that general area so I don't know.

12      **DEPUTY DISTRICT ATTORNEY ISRAELS:**  And then how was

13  the victim lying when he stabbed at him?  Was he on his

14  back, was he on his stomach?  How was he lying?  Was he

15  on his side, what?

16      **INMATE PORRAS:**  No, he was on his (inaudible).

17      **PRESIDING COMMISSIONER DAVIS:**  He was standing

18  facing you?

19      **INMATE PORRAS:**  Yeah.

20      **PRESIDING COMMISSIONER DAVIS:**  Okay.

21      **DEPUTY DISTRICT ATTORNEY ISRAELS:**  The whole time?

22      **INMATE PORRAS:**  Yes.

23      **DEPUTY DISTRICT ATTORNEY ISRAELS:**  Did he ever turn

24  around?

25      **INMATE PORRAS:**  No.

26      **PRESIDING COMMISSIONER DAVIS:**  As I recall, what you

27  -- what you told me was that you -- when you left, he was

48

1    still standing?

2         INMATE PORRAS:  Yeah.

3         PRESIDING COMMISSIONER DAVIS:  Okay.

4         DEPUTY DISTRICT ATTORNEY ISRAELS:  Nobody else had

5    any weapons.  Is that correct?

6         INMATE PORRAS:  I think my brother said he had a

7    knife and a stick also.

8         PRESIDING COMMISSIONER DAVIS:  Your brother had a

9    knife and a stick?

10        INMATE PORRAS:  Yeah.

11        PRESIDING COMMISSIONER DAVIS:  Was he present with

12   you when you were fighting with the victim?

13        INMATE PORRAS:  No.  He (inaudible) initially --

14   Well after the fight was over, he ran up and swung the

15   stick at Shawn and ran away.

16        DEPUTY DISTRICT ATTORNEY ISRAELS:  And the blade

17   that he found on the ground, I wanted to know is that

18   something he knew was like in that particular place on

19   the ground or did he just happen to see it when he was

20   there?

21        INMATE PORRAS:  I'd seen it I think two days before

22   (inaudible).

23        DEPUTY DISTRICT ATTORNEY ISRAELS:  Where did it come

24   from?

25        INMATE PORRAS:  I don't know.  It was just laying

26   there.

27        DEPUTY DISTRICT ATTORNEY ISRAELS:  Was it on your --

49

1    was it on his property or -- Was it on your property or

2    --

3        **INMATE PORRAS:**  (Inaudible).

4        **DEPUTY DISTRICT ATTORNEY ISRAELS:**  -- or somebody

5    else?  What?

6        **PRESIDING COMMISSIONER DAVIS:**  On the neighbor's

7    property?

8        **INMATE PORRAS:**  Yeah.

9        **PRESIDING COMMISSIONER DAVIS:**  All right.

10       **DEPUTY DISTRICT ATTORNEY ISRAELS:**  And it was just

11   laying there in plain view for two days?

12       **INMATE PORRAS:**  Well pretty much.  It was a broken

13   blade like the handle broke off and somebody just through

14   the blade away (inaudible).

15       **DEPUTY DISTRICT ATTORNEY ISRAELS:**  And just the last

16   question, why did you choose to pick it up and take it to

17   this fight?  Why did you think you'd need it?

18       **INMATE PORRAS:**  I have no idea why.  I just picked

19   it up.  I never thought about why I did it.  I just

20   picked it up.

21       **DEPUTY DISTRICT ATTORNEY ISRAELS:**  That's all.

22       **PRESIDING COMMISSIONER DAVIS:**  All right.

23   Mr. Sparks.

24       **ATTORNEY SPARKS:**  Did you ever fight when you

25   weren't drinking?

26       **INMATE PORRAS:**  No.

27       **ATTORNEY SPARKS:**  So you only fought when you were

50

1   drinking?

2       **INMATE PORRAS:**  No.  I would say I've been in a

3   fight when I wasn't drinking.  It wasn't something that

4   we initially went and did.

5       **ATTORNEY SPARKS:**  I guess the question is, is were

6   you ever really violent when you weren't drinking?

7       **INMATE PORRAS:**  No.

8       **ATTORNEY SPARKS:**  So you were only violent when you

9   were drinking?

10      **INMATE PORRAS:**  No, I was never violent.

11      **ATTORNEY SPARKS:**  This incident was one of violence,

12  is that true?

13      **INMATE PORRAS:**  Yeah.

14      **ATTORNEY SPARKS:**  You had to be violent sometime.

15      **INMATE PORRAS:**  Well that night it was.

16      **ATTORNEY SPARKS:**  Okay.  I was just reading along

17  somewhere that you'd been in fights before.

18      **INMATE PORRAS:**  Yeah.

19      **ATTORNEY SPARKS:**  When you were in fights, were you

20  drinking?

21      **INMATE PORRAS:**  No, just outside of the school was a

22  fight with Moose, Moose Phillips.

23      **ATTORNEY SPARKS:**  Okay.  So how come you haven't had

24  any fights while you've been in prison?

25      **INMATE PORRAS:**  No alcohol.  I've learned to control

26  myself.  I don't want to me in this situation again.

27      **ATTORNEY SPARKS:**  Well there are plenty of people

51

1    that would provoke you like Moose Phillips around in

2    prison.  How come you haven't had any fights?  What do

3    you do to diffuse the situation?

4        **INMATE PORRAS:**  I just -- just walk away from it.

5    Nothing that -- There's nothing like the incident that

6    happened with Moose in prison.

7        **ATTORNEY SPARKS:**  Okay.  Well what happens if

8    there's somebody like Moose in the community that you

9    have a -- some beef with out there?  Are you going to

10   fight them?

11       **INMATE PORRAS:**  No.

12       **ATTORNEY SPARKS:**  What about drinking?  You know a

13   lot of the Panel's questions today were designed about

14   whether you're going to abstain from drinking in the

15   community.  And typically they're looking for what kind

16   of support system you have in place because a lot of guys

17   come in and say I can do it on my own and I'm just going

18   to look within and I'm going to stop drinking because I

19   haven't drank while I've been in prison.  And that hasn't

20   been really the greatest answer.

21       **INMATE PORRAS:**  Yeah, I know.

22       **ATTORNEY SPARKS:**  For the way most people see it.

23   So the question is, is how will you get support in the

24   community to abstain from drinking?

25       **INMATE PORRAS:**  I have community support.  I have my

26   friends and I also have a program, Three Rivers Indian

27   Lodge in Manteca.

52

1     **ATTORNEY SPARKS:**  Okay.  The -- You read that

2     letter, right, from your attorney at the time of your

3     trial.  There's an argument made about voluntary

4     manslaughter.  Do you remember that?

5         **INMATE PORRAS:**  (Inaudible).

6     **ATTORNEY SPARKS:**  And I know that at the time that

7     you believe that this probably should have been a

8     voluntary manslaughter case.  Do you agree now that this

9     was a second degree murder conviction?

10        **INMATE PORRAS:**  That's what the jury convicted me of

11    so that's what I have to face up to.

12    **ATTORNEY SPARKS:**  Okay.  And one of the elements of

13    a second degree murder conviction is intentionally taking

14    another person's life.  Do you agree with that element?

15        **INMATE PORRAS:**  Well when I picked up that knife and

16    swung it, there was an implied intent there that it was

17    going to do some damage.

18    **ATTORNEY SPARKS:**  Okay.  Do you think you've served

19    enough of a prison term to be found suitable for parole?

20        **INMATE PORRAS:**  Yes, I do.

21    **ATTORNEY SPARKS:**  Do you think you'd be dangerous if

22    you're released to the community?

23        **INMATE PORRAS:**  No, never.

24    **ATTORNEY SPARKS:**  Why not?

25        **INMATE PORRAS:**  Because I'm not a dangerous person.

26    My record speaks for itself.

27    **ATTORNEY SPARKS:**  Do you think you have enough

53

1   employable skills to be gainfully employed in the

2   community?

3       INMATE PORRAS:  Yeah.

4       ATTORNEY SPARKS:  And what are those skills?

5       INMATE PORRAS:  Well I was doing carpet and tile

6   before I got locked up.  I know how to work on the cars.

7   I can do pretty much everything.  I just don't have State

8   certificates.

9       ATTORNEY SPARKS:  Okay.  Nothing further.

10      PRESIDING COMMISSIONER DAVIS:  All right.  Closing.

11      DEPUTY COMMISSIONER BLONIEN:  Commissioner Davis.

12      PRESIDING COMMISSIONER DAVIS:  Do you have a

13  question?

14      DEPUTY COMMISSIONER BLONIEN:  I didn't read into the

15  record his psych report.

16      PRESIDING COMMISSIONER DAVIS:  I'm sorry, yes,

17  please.

18      DEPUTY COMMISSIONER BLONIEN:  And my mistake.  I'm

19  sorry.  Dr. Hewchuk noted that you're a model inmate with

20  no violent disciplinaries during your entire period of

21  incarceration.  She went back and alluded to the report

22  of Dr. Joe Reed in 2-01 who assigned you a minimum risk

23  threat to both within an institutional setting and

24  outside (inaudible).  And since that evaluation, inmate

25  Porras has continued -- continue to program well.  His

26  risk factors remain essentially unchanged.  I think she

27  probably meant programmed as well as you could in your C

54

1    status circumstances.  You have strong family support in

2    Stockton who will serve to facilitate his reintegration

3    into community and risk factors for inmate Porras remain

4    unchanged since his previous evaluation in 2001.  He is

5    currently at no greater risk of re-offending than the

6    average citizen.  He's currently a suitable candidate for

7    parole release consideration with the recommendation that

8    he obtain total -- abstain totally from the use of

9    alcohol.  And going back to Dr. Reed's report, as she

10   said, he also said you were a minimum risk within a

11   controlled setting, is below average and that within a

12   controlled setting your level of violence is considered

13   to be no more than the average citizen in the community,

14   again substance abuse is a risk factor which may be a

15   precursor to violence for this individual.  That's it.

16       **PRESIDING COMMISSIONER DAVIS:**  All right.  Thank

17   you.  Does the District Attorney have any additional

18   questions?

19       **DEPUTY DISTRICT ATTORNEY ISRAELS:**  I have a question

20   of the Commissioners.  I didn't get -- autopsy report and

21   I was just curious where some of the wounds were and --

22       **DEPUTY COMMISSIONER BLONIEN:**  I'll pass it to you

23   (inaudible).

24       **DEPUTY DISTRICT ATTORNEY ISRAELS:**  What was the

25   other, oh, the police report I think it was (inaudible)

26   autopsy.

27       **PRESIDING COMMISSIONER DAVIS:**  And if you'll hand it

55

1   to Mr. Sparks please after that.

2        **DEPUTY DISTRICT ATTORNEY ISRAELS:**  Okay.  Sorry.

3   Okay.  (Inaudible) thank you.

4        **DEPUTY COMMISSIONER BLONIEN:**  I'll just go off

5   record.

6        **ATTORNEY SPARKS:**  It's all right.  She can do

7   closing while I'm looking at it.

8        **DEPUTY COMMISSIONER BLONIEN:**  Okay.

9        **PRESIDING COMMISSIONER DAVIS:**  All right.  Would you

10   like to go ahead and close then.

11        **DEPUTY DISTRICT ATTORNEY ISRAELS:**  I appreciate all

12   the comments that Mr. Porras has had to say.  My only

13   concern is that there is a disparity between the facts as

14   he presents them and the -- the autopsy report and that's

15   the only concern that I want to bring to Mr. Porras and

16   the Commissioners' attention.  I noticed on there that

17   there is a stab wound both on the front of the victim's

18   chest and on the back -- on his back as well.  And I

19   don't know how Mr. Porras accounts for what happened on

20   his back.  I understand Mr. Porras seems to say he

21   stabbed him twice and it appears there are two severe

22   stab wounds.  The victim has abrasions all over his body.

23   So I don't know how many of those actually came from the

24   knife and how many didn't.  But the two severe ones

25   include one in the front and one on the back and that

26   back one is the one that concerns me because one of the

27   witnesses apparently at the scene said that the victim

56

1    actually got up and ran away and Mr. Porras went after

2    him and stabbed him in the back.  And that would be the

3    only concern that I have.  I don't know if Mr. Porras's

4    memory was impaired because of the alcohol and doesn't

5    remember it today or -- of if he's covering up or what.

6    But that is probably my biggest concern about

7    Mr. Porras's parole but that's all.

8         **PRESIDING COMMISSIONER DAVIS:**  All right.  Thank

9    you.  Mr. Sparks.

10        **ATTORNEY SPARKS:**  I appreciate the comments from the

11   Deputy DA here today.  I think that Mr. Porras could be

12   found suitable for parole and that he wouldn't

13   necessarily pose an unreasonable risk of danger to the

14   community.  He does have parole plans which are in place.

15   He hasn't shown any violence while he's been

16   incarcerated.  Refer back to the '98 report from the

17   psychologist where he makes a statement about this was a

18   young man probably not especially violence prone even at

19   the time of his commitment offense.  So that -- as to his

20   prior social history I'd say that that was who Mr. Porras

21   was and that during his incarceration he's shown that

22   he's really not a violent man.  He does have this one

23   incident which was alcohol related where the report goes

24   on to say that this commitment offense which (inaudible)

25   response to drinking, induced loss of inhibition after

26   prolonged exposure to aggravation and stress.  I think

27   that that would be a fairly accurate summary.  Since that

57

1   time he's had good reviews from the psychological

2   departments which don't rate him as a -- as a risk to the

3   community.  And since he was only 19 at this time of the

4   crime, he's 37 now, so he's definitely grown and matured

5   while incarcerated.  You can hear from him about his

6   spiritual way of living which will be in place with his

7   parole plans as well which would I think -- one of the

8   major precursors that the Board of Parole Hearings is

9   probably concerned about is whether he'd return to

10  alcohol use and whether that would then lead to bad

11  decision making about what's going on and the

12  circumstances.  I don't necessarily disagree with the

13  Deputy DA in the way that the crime happened.  Maybe

14  Mr. Porras doesn't remember all the facts, but what's

15  relevant here today is that he's not talking about

16  (inaudible) involuntary manslaughter or voluntary

17  manslaughter conviction, he's admitting to a second

18  degree murder conviction, that he intentionally took this

19  victim's life or when he swung the knife that that act

20  was in and of itself violent enough to bring him to

21  prison for this sentence that he's incarcerated for.  So

22  he -- he has shown more insight if you will into the

23  causative factors and motivation for the crime or his

24  present mental state with regards to the crime is

25  sufficient to show that -- that he's rehabilitated to

26  that.  He does have some vocational skills in radiology

27  as well as prior skills before coming to prison.  But

58

1 more important than the skill set is that he actually has

2 a job waiting for him. So I think the Board of Parole

3 Hearings should be comfortable that he has reasonable

4 parole plans, that he's done what is available to him in

5 the institution to become a better person and that he no

6 longer poses an unreasonable risk of danger to the

7 community. Thank you.

8     **PRESIDING COMMISSIONER DAVIS:** All right. Thank

9 you. Mr. Porras, now is your opportunity to address the

10 Panel directly and tell us why you believe that you're

11 suitable for parole.

12     **INMATE PORRAS:** I've done a lot to change my

13 (inaudible) my thinking where I was when I was 19. I'm a

14 whole different man now. I will never, ever put myself

15 in this place again or anybody else (inaudible). This is

16 a stupid incident that happened when I was young and a

17 stupid decision I never thought -- thought about. Now I

18 can show you that I have changed and I am a better person

19 now. Thank you.

20     **PRESIDING COMMISSIONER DAVIS:** All right. Thank you

21 very much. We'll now recess for deliberation.

22                     **R E C E S S**

23                      --oOo--

24

25

26

27

59

1           **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3       **DEPUTY COMMISSIONER BLONIEN:** We're on record.

4       **PRESIDING COMMISSIONER DAVIS:** All right. Let the

5   record reflect that all those previously identified as

6   being in the room have returned. This is in the matter

7   of Mr. Porras, CDC number E-37606. The Panel reviewed

8   all information received from the public and relied on

9   the following circumstances in concluding that the

10  prisoner is not suitable for parole and would pose an

11  unreasonable risk of danger to society or a threat to

12  public safety if released from prison. We come to this

13  conclusion first by the commitment offense. The offense

14  was carried out in a manner which demonstrates an

15  exceptionally callous disregard for human suffering. And

16  the motive for the crime was inexplicable in relation to

17  the offense. These conclusions are drawn from the

18  Statement of Fact wherein the prisoner for reasons still

19  best known to himself chose to introduce a knife into a

20  fistfight where he states he was not losing the fight and

21  the victim had no weapons. In terms of previous record,

22  we find that prior criminal conduct consists of

23  apparently violations relating to alcohol and prior

24  property crimes. We find that you failed to profit from

25  society's previous attempts to correct criminality,

26  specifically juvenile hall and juvenile probation. With

27  **NEVILLE PORRAS    E-37606    DECISION PAGE 1    8/15/06**

60

1  regard to institutional behavior, we note that there are

2  eight 128(a) counseling chronos, the last of which was in

3  5-05, one of those having to do with grooming standards,

4  specifically the length of your hair.  And there were

5  prior -- four serious 115 disciplinary reports, the last

6  of those was in 9-98 of all of which dealt with grooming

7  standards which I think were all due to the length of

8  your hair which has been something that has been settled.

9  And so we think that should be -- you need to -- this

10  Panel did not -- did not look at the -- at the discipline

11  in terms of anything to do with the decision.  But that

12  is something that you should clear up and get with your

13  counselor about getting those things expunged from your

14  record, all right, so they're just not there anymore.

15  All right.

16      **INMATE PORRAS**:  If you recognize that, why would you

17  still (inaudible)?

18      **PRESIDING COMMISSIONER DAVIS**:  Well, sir, we're not

19  using it.  That's what I just said.  We are not using

20  them and I made that very -- that very clear but this way

21  it's on the record that we -- we recognize that they're

22  there but we also recognize the reason for them being

23  there and what's transpired since then.  Okay.  All

24  right.  The psychological report of June 2005 by

25  Dr. Hewchuk, H-E-W-C-H-U-K, was supportive of release and

26  conditioned upon continued abstinence from alcohol.  In

27  **NEVILLE PORRAS    E-37606    DECISION PAGE 2    8/15/06**

1    terms of parole plans, we find that they are appropriate.
2    You have a residence with your mother and work certainly
3    through Curtis Riggins.  The Panel wants to commend you
4    on your parole plans.  We think that you do have good
5    parole plans and certainly some very strong family
6    support.  So that's something to be jealously guarded.
7    With regard to the 3042 Notices, we note the District
8    Attorney from San Joaquin County is here in person by
9    representative and does oppose parole.  Nevertheless, we
10   do want to commend you for your effectively discipline
11   free -- when you have those other things expunged, you'll
12   be discipline-free of serious 115's, your programming
13   prior to your change in custody status and your
14   participation with the Native American Spirituality
15   program.  This is a one year denial.  And the Panel
16   recommends that you have no more 128's and continue with
17   your history of discipline-free on 115's, that as
18   available that you upgrade vocationally, as available
19   that you continue to participate in self-help programs
20   and we want you to know that Panels will also accept
21   independent reading on your part as long as you've done
22   something to chronicle that reading, that you have either
23   prepared a report of some kind talking about what you've
24   read and how that gives you insight into your -- the
25   crime -- committed, how you're going to keep from
26   committing that same type of crime again, how you're
27   **NEVILLE PORRAS    E-37606    DECISION PAGE 3    8/15/06**

62

1    going to stay away from alcohol, something that's

2    pertinent to your particular situation or that you'll be

3    able to at least articulate to the Panel what it is

4    you've read and how it affects those things that I've

5    already stated plus anything else that you feel would be

6    important.  Commissioner, do you have anything you'd like

7    to add?

8        **DEPUTY COMMISSIONER BLONIEN:**  I really understand

9    C status and did my best to put it on the record that a

10   lot of things weren't available to you since your --

11   since your last hearing.  But you have a responsibility

12   also because this is your hearing; it's your opportunity

13   to bring to the Board the changes that have been made in

14   your -- in your life that make you suitable for parole.

15   And you didn't come here and tell us what you --

16   everything you've been doing.  We tried to draw a lot of

17   it out of you.  But if you come in next time ready with a

18   resume of what you're doing --

19       **INMATE PORRAS:**  Right.

20       **DEPUTY COMMISSIONER BLONIEN:**  -- you're serving

21   yourself and that's the purpose of this -- of this

22   hearing.  And you have an opportunity to read your

23   C-File, you have an Olson Review.  The police reports and

24   autopsy reports are in there.  And maybe you don't

25   remember.  But you have a responsibility to yourself and

26   to this Panel to come in with the best information

27   **NEVILLE PORRAS    E-37606    DECISION PAGE 4    8/15/06**

63

1    possible and be prepared.  And I hope you do that.

2        INMATE PORRAS:  (Inaudible) the autopsy report, you

3    know, I can't explain -- I don't know --

4        DEPUTY COMMISSIONER BLONIEN:  And that's okay.  I

5    mean we're not asking you to reinvent --

6        INMATE PORRAS:  Yeah.

7        DEPUTY COMMISSIONER BLONIEN:  -- a story.

8        INMATE PORRAS:  But that's like what you're saying

9    now but I can't make them (inaudible) what they are.

10   They are what they are.

11       DEPUTY COMMISSIONER BLONIEN:  They are what they

12   are.                                          •

13       INMATE PORRAS:  (Inaudible) going to change.

14       DEPUTY COMMISSIONER BLONIEN:  And then read the

15   transcript about how you talk about it.

16       INMATE PORRAS:  Yeah.

17       DEPUTY COMMISSIONER BLONIEN:  It's very confusing.

18       INMATE PORRAS:  Yeah, I can only say what I can say

19   (inaudible) there I don't know how they got there.  I

20   told you how -- what I did and my part.  And it's never

21   going to change.  It's always going to be the same exact

22   same thing.

23       DEPUTY COMMISSIONER BLONIEN:  Well you read the

24   transcript and you read the report and think about it and

25   come in totally prepared.  And I wish you well.

26       PRESIDING COMMISSIONER DAVIS:  All right.

27   NEVILLE PORRAS    E-37606    DECISION PAGE 5    8/15/06

64

1    Mr. Porras, we do wish you the best of luck and we are

2    adjourned.

3                              --oOo--

4

5

6

7

8

9

10

11

12                                              .

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON** DEC 1 3 2006 _____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,**

26   **THE DECISION IS MODIFIED**

27   **NEVILLE PORRAS     E-37606     DECISION PAGE 6     8/15/06**

65

# CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 64 and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of NEVILLE PORRAS, CDC No. E-37606, on AUGUST 15, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated November 6, 2006, at Sacramento County, California.

Marsha Mees
Transcriber
**VINE, MCKINNON & HALL**

EXHIBIT    "B"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )                    CDC Number E-37606
)
NEVILLE PORRAS )
)
_____)

INMATE
COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 12, 2005

PANEL PRESENT:

SUSAN FISHER, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

NEVILLE PORRAS, Inmate
PAT FOX, Attorney for Inmate
TOM SAWYER, Commissioner, Observer

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

Ramona Cota              Peters Shorthand Reporting

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 18 |
| Post-Commitment Factors | 30 |
| Parole Plans | 26 |
| Closing Statements | 54 |
| Recess | 55 |
| Decision | 56 |
| Adjournment | 69 |
| Transcriber Certification | 70 |

--oOo--

1

1          P R O C E E D I N G S

2          DEPUTY COMMISSIONER MEJIA:  We are on

3   record.

4          PRESIDING COMMISSIONER FISHER:  All

5   right, thank you.  This is going to be a

6   Subsequent Parole Consideration Hearing for

7   Neville Porras, CDC number E-37606.  Today's

8   date is 7/12/05 and we are located at the

9   Correctional Training Facility.  The inmate was

10  received on 12/1/89 from San Joaquin County.

11  The life term began on 12/1/89 and the minimum

12  eligible parole date is 6/5/99.  The controlling

13  offense for which the inmate has been committed

14  is second degree murder, case number 43369,

15  count one, Penal Code Section 187.  The

16  controlling -- I said that.  I'm sorry, Penal

17  Code 187.  The inmate received a term of 15 --

18  16 years to life.  Again, the minimum eligible

19  parole date is 6/5/99.  And, Mr. Porras, we are

20  going to be tape-recording today so for the

21  purpose of voice identification for the

22  transcriber we are each going to say our first

23  and last name and spell our last name.  When I

24  get to you I need your CDC number, all right?

25  I'm going to start with myself and go to my

26  left.  Susan Fisher, F-I-S-H-E-R, Commissioner.

27          COMMISSIONER SAWYER:  Tom Sawyer,

2

1    S-A-W-Y-E-R, Commissioner.

2              DEPUTY COMMISSIONER MEJIA:  Rolando

3    Mejia, M-E-J-I-A, Deputy Commissioner.

4              ATTORNEY FOX:  Pat Fox, F-O-X, attorney

5    for Mr. Porras.

6              INMATE PORRAS:  Neville Porras,

7    P-O-R-R-A-S, E-37606.

8              PRESIDING COMMISSIONER FISHER:  Spell

9    your last name, please.

10             INMATE PORRAS:  P-O-R-R-A-S.

11             PRESIDING COMMISSIONER FISHER:  Did you

12   do that?  I'm sorry, I'm missed it.  I wrote

13   something down wrong and it's throwing me off

14   for the entire first part of the hearing.  Okay.

15   I would like to note for the record that we have

16   two correctional officers present who are here

17   for security purposes only and will not be

18   participating in the hearing.  And before I can

19   get started I need to ask you to read the

20   American with Disabilities Act statement that's

21   there in front of you, please.

22             INMATE PORRAS:

23             "ADA, Americans with Disabilities

24             Act.  The Americans with

25             Disability Act, ADA, is a law to

26             help people with disabilities.

27             Disabilities are problems that

3

1        make it harder for some people to

2        see, hear, breathe, walk, talk,

3        learn, think, work, or take care

4        of themselves than it is for

5        others. Nobody can keep --"

6   I need my glasses.

7        PRESIDING COMMISSIONER FISHER:  Do you

8   normally use glasses?

9        INMATE PORRAS:  Yes.

10       PRESIDING COMMISSIONER FISHER:  Do you

11  want me to read it for you?

12       INMATE PORRAS:  Sure.

13       PRESIDING COMMISSIONER FISHER:  I can do

14  it.

15       INMATE PORRAS:  I can finish it.

16       PRESIDING COMMISSIONER FISHER:  That's

17  okay, I'll do it.  All right.

18        "The Americans with Disabilities

19        Act is a law to help people with

20        disabilities.  Disabilities are

21        problems that make it harder for

22        some people to see, hear, breathe,

23        talk, walk, learn, think or to

24        take care of themselves than it is

25        for others.  Nobody can be kept

26        out of public places or activities

27        because of a disability.  If you

4

1      have a disability you have the

2      right to ask for help to get ready

3      for your BPT Hearing, get to the

4      hearing, talk, read forms and

5      papers and understand the hearing

6      process.  BPT will look at what

7      you ask for to make sure that you

8      have a disability that is covered

9      by the ADA and that you have asked

10     for the right kind of help.  If

11     you do not get help or if you

12     don't get the kind of help you

13     think you need ask for a BPT 1074

14     Grievance Form.  You can also get

15     help to fill it out."

16   Do you understand that?

17         INMATE PORRAS:  Yes, I do.

18         PRESIDING COMMISSIONER FISHER:  Okay.

19   And I want to note for the record that

20   Mr. Porras did sign a BPT 1073 form on December

21   7 of '04 and stated that he has no disabilities.

22   I just have a few questions that I need to ask

23   you before we can move on.

24         INMATE PORRAS:  Okay.

25         PRESIDING COMMISSIONER FISHER:  The first

26   one was whether or not you needed glasses to

27   read.  So now that we've established that, did

5

1  you do a review on your Central File before you
2  came to the hearing?

3          INMATE PORRAS:  Yes, I did.

4          PRESIDING COMMISSIONER FISHER:  Did you
5  have your glasses?

6          INMATE PORRAS:  Yes.

7          PRESIDING COMMISSIONER FISHER:  Okay.  Do
8  you have any hearing problems?

9          INMATE PORRAS:  No, I don't.

10         PRESIDING COMMISSIONER FISHER:  Okay.
11  Have you ever be included in the CCCMS or EOP
12  programs while in prison?

13         INMATE PORRAS:  No.

14         PRESIDING COMMISSIONER FISHER:  And prior
15  to coming to prison for this offense how far did
16  you get in school?

17         INMATE PORRAS:  Tenth grade.

18         PRESIDING COMMISSIONER FISHER:  Okay.  Is
19  there any disability that you have that you
20  think would prevent you from being able to
21  participate in the hearing today?

22         INMATE PORRAS:  No.

23         PRESIDING COMMISSIONER FISHER:  Okay.
24  This hearing is being conducted pursuant to
25  Penal Code Sections 3041 and 3042 and the rules
26  and regulations of the Board of Prison Terms
27  that govern parole consideration hearings for

6

1    life inmates. And as I'm sure you know the
2    purpose of the hearing today is to consider your
3    commitment offense, your prior criminal and
4    social history and your behavior and programming
5    since you've been in prison for the offense. We
6    have had the opportunity to review your files.
7    We are going to give you the opportunity to make
8    any corrections that you need to today, all
9    right? We are going to reach a decision today
10    as to whether or not we find you suitable for
11    parole. And if we do find you suitable I am
12    going to explain to you today what the length of
13    your confinement will be.

14        INMATE PORRAS: Okay.

15        PRESIDING COMMISSIONER FISHER: Before we
16    recess to deliberate I am going to give you and
17    Ms. Fox the opportunity to make a statement
18    about your suitability. I want to remind you
19    you are not required to admit or discuss the
20    offense today but that the panel accepts the
21    findings of the court to be true. Do you
22    understand that?

23        INMATE PORRAS: Okay.

24        PRESIDING COMMISSIONER FISHER: The
25    California Code of Regulations states that
26    regardless of time served a life inmate shall be
27    found unsuitable for and denied parole if in the

7

1   judgment of the panel he would pose an
2   unreasonable risk of danger to society if
3   released from prison.  You have rights that are
4   related to this hearing.  They include the right
5   to a timely notice of the hearing, the right to
6   review your Central File and the right to
7   present relevant documents.  Counsel, have your
8   client's rights been met?
9        ATTORNEY FOX:  Yes, as to this hearing.
10       PRESIDING COMMISSIONER FISHER:  You also
11  have the right, Mr. Porras, to an impartial
12  panel.  And I just want to clarify for you that
13  Mr. Mejia, who is on the end down there with the
14  files, and myself, are your panel today.
15  Mr. Sawyer is here observing.  Okay?  Do you
16  have any objections to your panel?
17       INMATE PORRAS:  No, nothing really.
18       PRESIDING COMMISSIONER FISHER:  Okay.
19  Counsel, any objections to the panel?
20       ATTORNEY FOX:  No, no objection, thank
21  you.
22       PRESIDING COMMISSIONER FISHER:  I am
23  going to give you a written copy of our decision
24  today.  It is going to be tentative and will be
25  effective within 120 days.  And then a copy of
26  the decision and a copy of the transcript of the
27  hearing is going to be sent to you.  Now, in May

8

1    of last year they changed the way that you

2    appeal Board decisions and now all appeals go

3    directly to the courts.  So if you need more

4    information about that your correctional

5    counselor should have it and also it should be

6    in the prison library.  All right?  All I'm

7    doing now is asking Ms. Fox to check against my

8    checklist to make sure that she and I both have

9    the same information before we start.

10        ATTORNEY FOX:  Yes.  I am going to put a

11   check in the box for supporting letters because

12   we do have one from the San Joaquin Public

13   Defender's Office.

14        PRESIDING COMMISSIONER FISHER:  Okay,

15   good.

16        ATTORNEY FOX:  Other than that I do have

17   everything.

18        PRESIDING COMMISSIONER FISHER:  All

19   right, thank you.

20        ATTORNEY FOX:  Thank you.

21        PRESIDING COMMISSIONER FISHER:  All

22   right.  And is there anything to submit?

23        ATTORNEY FOX:  Not that we haven't

24   already.

25        PRESIDING COMMISSIONER FISHER:  All

26   right.  Any preliminary objections?

27        ATTORNEY FOX:  No, no objections.

1          PRESIDING COMMISSIONER FISHER:  Okay.  Is
2  Mr. Porras going to be speaking with us?
3          ATTORNEY FOX:  Yes.
4          PRESIDING COMMISSIONER FISHER:  I need
5  you to raise your right hand, I'm going to swear
6  you in.  Do you solemnly swear or affirm that
7  the testimony you give at this hearing will be
8  the truth and nothing but the truth?
9          INMATE PORRAS:  Yes I do.
10         PRESIDING COMMISSIONER FISHER:  All
11  right.  What I am going to do, Mr. Porras, is
12  read a summary of the crime into the record and
13  then I'm going to ask you to tell me if you
14  agree with what I read, all right?  If there are
15  areas where you disagree or areas where you
16  would like to elaborate you may certainly do
17  that.  And counsel, I will use the appellate
18  decision if there is no objection.
19         ATTORNEY FOX:  No, no objection.
20         PRESIDING COMMISSIONER FISHER:  All
21  right.  This is on page three under Facts: "It
22  was late in the evening of August 11 and early
23  in the morning of August 12, 1988 when the
24  victim, Shawn Bartholomew --"  For the
25  transcriber that's S-H-A-W-N, last name
26  B-A-R-T-H-O-L-O-M-E-W.  "-- and his friend,
27  Cosmo Allen Byrd --"  And that's C-O-S-M-O,

10

1   middle name A-L-L-E-N, last name B-Y-R-D. "--
2   stepped off with some friends under Waterloo
3   Bridge." And that's W-A-T-E-R-L-O-O.
4           "The victim and Byrd went to
5           Waterloo Liquors where Byrd left
6           the victim to return home. Byrd
7           heard someone yell, quote, I'm
8           here, as he walked away from the
9           liquor store. He turned around
10          and saw someone who resembled the
11          defendant running. Byrd continued
12          home. During that same night the
13          defendant was in his front yard
14          drinking with his brother, Willie
15          Lester, that's W-I-L-L-I-E, and
16          Lester's friend, Mike Garcia.
17          William Moose Phillips and Dennis
18          Squealer Wheeler passed in front
19          of the house and exchanged angry
20          words with the defendant. When
21          Phillips and Wheeler left the
22          defendant and his group armed
23          themselves, the defendant with a
24          butcher knife, and enlisted the
25          aid of another friend James
26          Azevedo. That's A-Z-E-V-E-D-O.
27          The group began searching for

11

1  Phillips but without success. All
2  but Lester returned to the
3  defendant's front yard. Shortly
4  after they returned they heard
5  yelling from the alley. The voice
6  sounded to them like Lester's,
7  although Lester denied having been
8  at the scene. After hearing the
9  yelling the defendant left the
10 home to look for his brother.
11 Eventually the defendant saw the
12 victim and chased him down. The
13 defendant held the victim by the
14 hair and said, where's my brother,
15 where's my brother. Lester and
16 Garcia arrived after the defendant
17 caught the victim. Lester hit the
18 victim with a stick and Garcia
19 kicked the victim in the head.
20 The defendant was the only one in
21 the group with a knife and he
22 later admitted to law enforcement
23 to stabbing the victim. The group
24 left the victim and returned to
25 the defendant's yard. Paramedics
26 responded to the scene and found
27 the bloody victim lying in the

12

1          fetal position.  The victim died

2          of a stab wound which pierced his

3          heart, liver and right lung.  On

4          October"

5    Okay, I think that gets into the sentence.  All

6    right.  Is that correct?

7          INMATE PORRAS:  Pretty much.  But we

8    never went searching for anybody that night.

9          PRESIDING COMMISSIONER FISHER:  Okay.

10   Tell me just kind of, just give me a thumbnail

11   sketch of what did happen.

12         INMATE PORRAS:  Well, it started with a

13   argument between my little brother and Moose.

14   They exchanged words, Moose went down the

15   street, came back and they exchanged more words.

16   He went up the street, started yelling back

17   threats at my little brother.  My little brother

18   kept throwing -- kept arguing.  Moose left

19   around the corner.  Our houses aren't that far

20   apart.  They went around the corner, they start

21   throwing rocks and bottles over the fence.  We

22   went up to the corner or near the corner to see

23   if anybody was there throwing rocks and bottles;

24   there was nobody there.  We came back home.  We

25   never went searching out looking for anybody.

26         PRESIDING COMMISSIONER FISHER:  How did

27   you end up -- How did you end up where he was

13

1    stabbed?

2          INMATE PORRAS:  It's only like maybe two
3    houses away.

4          PRESIDING COMMISSIONER FISHER:  Okay.

5          INMATE PORRAS:  It's not that big of a
6    distance.

7          PRESIDING COMMISSIONER FISHER:  Okay.  So
8    how did all that come down?

9          INMATE PORRAS:  I was working on my car
10   that night.  I was in the front yard working on
11   the car.  Willie disappeared later on after the
12   argument and we heard him yelling, he was
13   screaming my name.  Mike asked, where's Willie.
14   I asked him where my brother was.  That's when
15   we went looking for Willie.  And when we came
16   around the corner we ran into Cosmo and Shawn.

17         PRESIDING COMMISSIONER FISHER:  All
18   right.  And so how did -- When you ran into them
19   how did that escalate into the situation where
20   you stabbed him?

21         INMATE PORRAS:  Well before the fight
22   actually started it was just me.  I went after
23   -- I went to the corner, Mike went the other
24   way.  He thought that they were in the alley
25   because that's where it sounded like it came
26   from.

27         PRESIDING COMMISSIONER FISHER:  So were

14

1  you looking for your brother at that point?  Is
2  that what you were doing?

3          INMATE PORRAS:  Yes.

4          PRESIDING COMMISSIONER FISHER:  Okay, go
5  ahead.

6          INMATE PORRAS:  And when we met face to
7  face I asked if they seen anybody, you know, my
8  brother back there.  Shawn was standing just in
9  front of Cosmo, Cosmo was standing behind him,
10  and he said something and he took a swing at me.
11  Shawn kind of backed out of the way and me and
12  Cosmo went at it.  And then we both went at it
13  for a little bit.  I had the knife, I pulled it.
14  I didn't know if I hit anything, I just swung
15  it.  It went and fell on the ground.  Mike ran
16  up and chased Cosmo off and then came back and
17  that's when Shawn was -- Well Shawn started to
18  run too and that's the last we seen.. We went
19  back to the alley looking for my brother.

20          PRESIDING COMMISSIONER FISHER:  Okay.  So
21  how did Shawn get stabbed?

22          INMATE PORRAS:  Apparently the knife got
23  him.

24          PRESIDING COMMISSIONER FISHER:  When you
25  swung it?

26          INMATE PORRAS:  Yeah.

27          PRESIDING COMMISSIONER FISHER:  Weren't

15

1  you fighting with the other guy?

2          INMATE PORRAS:  Yeah.  I started fighting

3  with Cosmo first and then Shawn got in --

4          PRESIDING COMMISSIONER FISHER:  Was Shawn

5  right there in the area where you were fighting?

6          INMATE PORRAS:  Yeah, we were fighting.

7  Shawn got into it after me and Cosmo were

8  fighting for a little bit.

9          PRESIDING COMMISSIONER FISHER:  All

10 right.  So after that, after the fight and after

11 Mike came and chased the guy away that you were

12 fighting with, you never picked up the knife

13 again?

14         INMATE PORRAS:  No.

15         PRESIDING COMMISSIONER FISHER:  When did

16 you realize that Shawn had been stabbed?

17         INMATE PORRAS:  Like five o'clock the

18 next afternoon.

19         PRESIDING COMMISSIONER FISHER:  When the

20 police came?

21         INMATE PORRAS:  Yeah.

22         PRESIDING COMMISSIONER FISHER:  What did

23 he do?  He just ran?

24         INMATE PORRAS:  Yes.

25         PRESIDING COMMISSIONER FISHER:  The two

26 of them ran?

27         INMATE PORRAS:  Yeah.

16

1          PRESIDING COMMISSIONER FISHER:  Okay.

2    Did you guys have a history with these guys?

3    Had you fought with them before?

4          INMATE PORRAS:  Actually we was with

5    Moose.  We all knew each other, Moose, Cosmo,

6    Shawn.

7          PRESIDING COMMISSIONER FISHER:  I've seen

8    that.

9          INMATE PORRAS:  We were all friends at

10   one time.

11         PRESIDING COMMISSIONER FISHER:  But what

12   about -- I mean, why would he take a swing at

13   you?

14         INMATE PORRAS:  Because he was, I guess,

15   better friends with Moose and them.

16         PRESIDING COMMISSIONER FISHER:  I'm not

17   talking about Moose.  Because you said when you

18   came around and asked them if they'd seen your

19   brother --

20         INMATE PORRAS:  Yeah.

21         PRESIDING COMMISSIONER FISHER:  -- that

22   Moose took a swing at you.

23         ATTORNEY FOX:  Cosmo.

24         PRESIDING COMMISSIONER FISHER:  I'm

25   sorry.

26         INMATE PORRAS:  Yes, Cosmo.

27         PRESIDING COMMISSIONER FISHER:  I'm so

17

1   confused.

2         INMATE PORRAS:  Next to Waterloo Liquors
3   is the backyard of Moose's house.  That's where
4   they were before.

5         PRESIDING COMMISSIONER FISHER:  Okay.
6   I'm sorry, the nicknames are throwing me off
7   here.  Okay.  But the question remains the same.
8   When you came up to him and said, you said you
9   were looking for your brother and asked them if
10  they'd seen your brother, why would he take a
11  swing at you?

12        INMATE PORRAS:  Well, because actually I
13  guess they talked before the fight started,
14  Moose and Cosmo.  There was another guy in the
15  truck that showed up too that we didn't know who
16  he was.

17        PRESIDING COMMISSIONER FISHER:  Okay, but
18  that doesn't answer my question, the fact that
19  they talked before.  What issue was going on
20  between you that his reaction to seeing you and
21  having you ask him if he'd seen your brother was
22  that he stepped up and took a swing at you?

23        INMATE PORRAS:  I have no idea why.

24        PRESIDING COMMISSIONER FISHER:  These
25  guys hadn't had any kind of prior issues with
26  you?  You said you'd been friends.

27        INMATE PORRAS:  No, I hadn't seen -- I'd

18

1   seen Cosmo around but I haven't seen Shawn since
2   like the late '86.

3        PRESIDING COMMISSIONER FISHER:   All
4   right.   Okay.   Anything else that we didn't
5   cover?   So at the time that you went back to
6   your house you didn't know that, you didn't know
7   that Shawn had been stabbed.   Did you find your
8   brother?

9        INMATE PORRAS:   Yeah.

10       PRESIDING COMMISSIONER FISHER:   How was
11  he?

12       INMATE PORRAS:   He was in our backyard
13  laying on the ground saying somebody got him or
14  something.

15       PRESIDING COMMISSIONER FISHER:   Did you
16  ever know who it was?

17       INMATE PORRAS:   No.

18       PRESIDING COMMISSIONER FISHER:   All
19  right.   Let's talk about your prior history.
20  All right.   I'm just looking at the prior Board
21  Report; this is from October of 2003.   I just
22  want to get a couple of things on the record.
23  It says you were 16 the first time you were
24  booked by the sheriff's office for being out of
25  control.   That was in 1985.   How old were you?
26  You were 16 at that time.   And then in '86, a
27  year later -- You were 17 when you were arrested

19

1  for burglary?

2      INMATE PORRAS:  Yes.

3      PRESIDING COMMISSIONER FISHER:  Okay, and

4  made a ward of the court.  And did you actually

5  spend the 60 days in juvenile hall for that?

6      INMATE PORRAS:  No.  Not the whole 60

7  days.

8      PRESIDING COMMISSIONER FISHER:  But you

9  did some time in juvenile hall that time.  And

10  then in April of '86 it says that you were

11  transferred to Alameda County for trespassing.

12  What was that about?

13      INMATE PORRAS:  I think what that was is

14  the violation was transferred to --

15      PRESIDING COMMISSIONER FISHER:  Okay.

16  I'm more interested in what the trespass was.

17      INMATE PORRAS:  I'm not sure what that --

18      PRESIDING COMMISSIONER FISHER:  What were

19  you doing?  What was the behavior that you got

20  in trouble for?

21      INMATE PORRAS:  I think it was being on a

22  schoolyard.

23      PRESIDING COMMISSIONER FISHER:  Okay.

24  Then you were picked up for a DUI in '86 in

25  November.  Then another burglary, second, in

26  '87.  And then it says under adult arrests you

27  had four vehicular violations.  What were they?

20

1          INMATE PORRAS:  I think it was driving
2    without a license, driving on a suspended and I
3    think the other one was like an exhibition of
4    speed/reckless thing.
5          PRESIDING COMMISSIONER FISHER:  Okay.
6    Was your license taken away with the DUI?
7          INMATE PORRAS:  Yeah, they suspended it I
8    think after the second driving on a suspended.
9          PRESIDING COMMISSIONER FISHER:  Okay.
10         INMATE PORRAS:  Or driving without a
11   license.
12         PRESIDING COMMISSIONER FISHER:  Okay.
13   Let me tell you what we've got here as far as
14   information about your social history.  Let me
15   know if this is true as we go through it.  You
16   were born in Montana?
17         INMATE PORRAS:  Yeah.
18         PRESIDING COMMISSIONER FISHER:  Okay.  It
19   says you were raised in Newark but ended up in
20   Stockton.
21         INMATE PORRAS:  That's right.
22         PRESIDING COMMISSIONER FISHER:  So how
23   old were you when you moved to California?
24         INMATE PORRAS:  I think less than a year
25   old.
26         PRESIDING COMMISSIONER FISHER:  Wow, that
27   was fast.

21

1       INMATE PORRAS:  Yeah.

2       PRESIDING COMMISSIONER FISHER:  Okay.  It

3  says you're in the middle of seven kids?

4       INMATE PORRAS:  Yeah.

5       PRESIDING COMMISSIONER FISHER:  Wow.  How

6  many sisters, how many brothers?

7       INMATE PORRAS:  I have three brothers and

8  three sisters.

9       PRESIDING COMMISSIONER FISHER:  Okay.

10  Are your parents alive?

11       INMATE PORRAS:  Yes.

12       PRESIDING COMMISSIONER FISHER:  Are they

13  married to each other?

14       INMATE PORRAS:  Yes.

15       PRESIDING COMMISSIONER FISHER:  I just

16  want to be sure.  Are you in contact with them?

17       INMATE PORRAS:  Yes.

18       PRESIDING COMMISSIONER FISHER:  How about

19  your brothers and sisters?

20       INMATE PORRAS:  Yes.

21       PRESIDING COMMISSIONER FISHER:  It says

22  here that you have some brothers that have a

23  history of some problems.  You have a brother

24  who has an alcohol issue and you have some

25  brothers that -- Did your brothers actually go

26  to prison?  It says a history of felonies.  Are

27  any in prison?

22

1          INMATE PORRAS:  Well my youngest brother,
2  he caught -- he's in this case with me.  My
3  oldest brother, he went to YA for I think a
4  year.  And my middle brother Morgan, he's in
5  Pelican Bay right now.

6          PRESIDING COMMISSIONER FISHER:  What for?
7          INMATE PORRAS:  Murder.

8          PRESIDING COMMISSIONER FISHER:  And your
9  little brother was part of this case too?

10         INMATE PORRAS:  Yeah, that's Willie
11 Lester.

12         PRESIDING COMMISSIONER FISHER:  Well, I
13 know that he was -- I knew he was there that
14 night.  I didn't realize that he was part of it.

15         INMATE PORRAS:  Yeah, they gave him a
16 year in Vision Quest.

17         PRESIDING COMMISSIONER FISHER:  Did he
18 plead to something or was he convicted of
19 something?

20         INMATE PORRAS:  I think he pled to it.

21         PRESIDING COMMISSIONER FISHER:  Do you
22 know what it was?

23         INMATE PORRAS:  I think it was assault
24 with intent to do great bodily injury.

25         PRESIDING COMMISSIONER FISHER:  Let's
26 see.  Never been married and no children, right?

27         INMATE PORRAS:  No.

23

1          PRESIDING COMMISSIONER FISHER:  And tell
2   me again how far you got in school.
3          INMATE PORRAS:  Tenth grade.
4          PRESIDING COMMISSIONER FISHER:  Okay.
5   And was that because of this crime or was it
6   related to other stuff that you were doing?
7          INMATE PORRAS:  Related to other stuff.
8          PRESIDING COMMISSIONER FISHER:  Since
9   you've been in prison or prior to that did you
10  graduate or get your GED?
11         INMATE PORRAS:  I got my GED in '97.
12         PRESIDING COMMISSIONER FISHER:  All
13  right, let's see here.  You'd been drinking that
14  night.  How drunk were you?
15         INMATE PORRAS:  I'd say about a case and
16  I think almost a 12-pack maybe.
17         PRESIDING COMMISSIONER FISHER:  Among how
18  many?
19         INMATE PORRAS:  Three of us.
20         PRESIDING COMMISSIONER FISHER:  Over just
21  the course of that evening?
22         INMATE PORRAS:  Yeah.
23         PRESIDING COMMISSIONER FISHER:  So you
24  were probably pretty drunk.  How old were you
25  when you started drinking?
26         INMATE PORRAS:  I first started drinking
27  I was maybe 15.

24

1          PRESIDING COMMISSIONER FISHER:  Of that
2    year?
3          INMATE PORRAS:  No, I was 15 years old.
4          PRESIDING COMMISSIONER FISHER:  I'm
5    sorry, I thought you said -- the fan is a little
6    loud.  I thought you said, May 15.  And I was
7    thinking, well that's not a very, that's kind of
8    a vague answer.  Okay, when you were 15.
9          INMATE PORRAS:  Yeah.
10          PRESIDING COMMISSIONER FISHER:  All
11    right.  And you were 16, 17 at the time?
12          INMATE PORRAS:  Nineteen.
13          PRESIDING COMMISSIONER FISHER:  Nineteen,
14    okay.  All right.  And were you just drinking
15    like on weekends with your friends or were you
16    drinking (overlapping)?
17          INMATE PORRAS:  Yeah, just on weekends.
18    Just on weekends.
19          PRESIDING COMMISSIONER FISHER:  Okay.
20    And you were just getting drunk on the weekends?
21    Like a party, partying?
22          INMATE PORRAS:  Well, not really drunk,
23    you know.  We just had alcohol on the weekends.
24          PRESIDING COMMISSIONER FISHER:  You were
25    pretty drunk that weekend with that much beer?
26          INMATE PORRAS:  Yeah.
27          PRESIDING COMMISSIONER FISHER:  All

25

1  right. What about other drugs?

2          INMATE PORRAS: No.

3          PRESIDING COMMISSIONER FISHER: Nothing
4  at all?

5          INMATE PORRAS: No. Well, everybody
6  experimented with a little weed but I didn't
7  like it.

8          PRESIDING COMMISSIONER FISHER: Okay. So
9  alcohol was your drug of choice?

10         INMATE PORRAS: Yeah.

11         PRESIDING COMMISSIONER FISHER: All
12  right. And it's funny, we normally have to turn
13  the fan off because people can't hear me but for
14  some reason today I'm having a hard time hearing
15  everybody. Okay. What did you do -- Aside from
16  getting in trouble what did you do after you
17  dropped out of school for work full time?

18         INMATE PORRAS: Stockton is kind of like
19  an industrial town, you find jobs all over. I
20  was doing construction work. Mostly carpet,
21  tile and mechanics.

22         PRESIDING COMMISSIONER FISHER: So you
23  were doing just labor?

24         INMATE PORRAS: Yeah.

25         PRESIDING COMMISSIONER FISHER: Kind of
26  whatever you could get.

27         INMATE PORRAS: Yeah.

26

1          PRESIDING COMMISSIONER FISHER:  Did you

2    have a steady job at the time of this offense or

3    were you just piece-working?

4          INMATE PORRAS:  Just off and on.  Yeah,

5    piece-working.

6          PRESIDING COMMISSIONER FISHER:  Okay.

7    All right, anything else about your life prior

8    to coming here, about your life growing up or

9    what was going on with you at the time of the

10   offense that we didn't talk about that you think

11   would be important for us to know?

12         INMATE PORRAS:  (No audible response).

13         PRESIDING COMMISSIONER FISHER:  Let's

14   talk about your parole plans.  I'll tell you

15   what I've got here and then you can tell me if

16   it's correct.  It says that you'll live with

17   your mom and she's in Stockton.

18         INMATE PORRAS:  Yeah.

19         PRESIDING COMMISSIONER FISHER:  And I

20   asked you -- Your parents are both still alive;

21   is that correct?

22         INMATE PORRAS:  Yeah.

23         PRESIDING COMMISSIONER FISHER:  Okay.

24   Are they still married?

25         INMATE PORRAS:  They're still married.

26         PRESIDING COMMISSIONER FISHER:  Okay.  So

27   actually you'd go live with both parents, right?

27

1          INMATE PORRAS:  Yeah.

2          PRESIDING COMMISSIONER FISHER:  Okay.

3   And it says that you have a friend who is going

4   to offer you a job but it doesn't say what it

5   is.  What would you do?

6          INMATE PORRAS:  It's custom tile and

7   marble.

8          PRESIDING COMMISSIONER FISHER:  Okay.

9   And that's Curtis Riggins.

10          INMATE PORRAS:  Yeah.

11          PRESIDING COMMISSIONER FISHER:  Okay.

12   (Indiscernible) file.  Who are these people that

13   I'm looking at?

14          INMATE PORRAS:  A picture of my mom.

15          PRESIDING COMMISSIONER FISHER:  And two

16   girls.

17          INMATE PORRAS:  That's Mikey and

18   Samantha, my nieces.

19          PRESIDING COMMISSIONER FISHER:  And?

20          INMATE PORRAS:  That's my oldest brother

21   Rich and his sons, Mark and Jeremy.

22          PRESIDING COMMISSIONER FISHER:  What does

23   he do?

24          INMATE PORRAS:  He's a chef.

25          PRESIDING COMMISSIONER FISHER:  Is he?

26          INMATE PORRAS:  Yeah.

27          PRESIDING COMMISSIONER FISHER:  These are

28

1    your mom and dad, I assume.

2              INMATE PORRAS:  Yeah, that's mom and dad.

3              PRESIDING COMMISSIONER FISHER:  Okay.

4    And who is the baby?

5              INMATE PORRAS:  That's my niece Eileen

6    and her daughter, Desiree.  She says, I am

7    writing this letter in support of my son who has

8    been incarcerated in one of your prisons since

9    the age of 18.  This young man has never been a

10   neighborhood bully but others have bullied him

11   because he was always small for his age.  I know

12   that he tried his best to avoid trouble.  He was

13   always helping those in need.  I don't believe

14   this man would be a threat to society if

15   released from prison.  Neville has a job waiting

16   for him upon his release.  He'll be working with

17   his adopted brother, Curtis Riggins, who owns

18   and operates his own tile business here in

19   Stockton.  I thank you for your time and

20   consideration.  Neville has a place to live here

21   in Stockton either with me, his mother, or with

22   one of his siblings.  All right.  So is she

23   right?  When you were a kid did you try to avoid

24   trouble?

25             INMATE PORRAS:  Yes.

26             PRESIDING COMMISSIONER FISHER:  What was

27   going on with you at this period of time as far

29

1   as home and just anything else that you were

2   getting into trouble that led to you being

3   arrested before this crime?

4          INMATE PORRAS:  You know, just like minor

5   juvenile things.  You go out with your buddies

6   and you run across schoolyards or whatever.  You

7   don't really think that what you're doing is too

8   bad.

9          PRESIDING COMMISSIONER FISHER:  What

10  about the burglary?

11         INMATE PORRAS:  The burglary, that was

12  just dumb.  First we was throwing rocks at

13  skunks and broke the window.  We knocked the

14  window out of the Nugget Distributing Company

15  and decided to go in.

16         PRESIDING COMMISSIONER FISHER:  Did you

17  steal anything or did you just (inaudible)?

18         INMATE PORRAS:  No, just went in.

19         PRESIDING COMMISSIONER FISHER:  All

20  right.  Anything else about your parole plans or

21  any of the things that we've gone over that you

22  think that we haven't covered (inaudible)?

23         INMATE PORRAS:  No.

24         PRESIDING COMMISSIONER FISHER:  What

25  about in your parole plans do you plan to get

26  involved in a substance abuse program?

27         INMATE PORRAS:  Yeah.

30

1          PRESIDING COMMISSIONER FISHER:   Where
2    would you go?

3          INMATE PORRAS:   Well we've got our own
4    little place outside Stockton called Three
5    Rivers Indian Lodge.   It's got more of a -- kind
6    of like an AA-based program.   I'd be going
7    there.

8          PRESIDING COMMISSIONER FISHER:
9    (Inaudible).   Okay.   If there's nothing else if
10   you'll turn to Commissioner Mejia, he's going to
11   go through your program.

12         DEPUTY COMMISSIONER MEJIA:   Okay,
13   Mr. Porras, counsel, I will be covering
14   Mr. Porras' institutional adjustment in this
15   portion of this hearing since his last Board
16   appearance.   I have reviewed his Central File
17   and Board Reports and psychiatric reports.   If I
18   miss anything I will give you the opportunity
19   and him the opportunity to make comments at the
20   end of my presentation.   The last actual Board
21   appearance was on October 3rd, 2001 wherein he
22   received a two year denial.   And there was
23   another -- there was a 4/20/04 where he
24   stipulated for one year.   Okay.   The
25   recommendations were for him to remain
26   disciplinary-free, get self-help and earn
27   positive chronos.   Classification score is

31

1    Medium-A -- 19.  Custody level is Medium-A.

2    Your current work assignment.  I know you have

3    completed your -- I could find it.  What is your

4    current work assignment right now?

5            INMATE PORRAS:  I don't have one right

6    now.

7            DEPUTY COMMISSIONER MEJIA:  You're on a

8    waiting list?

9            INMATE PORRAS:  No, I'm on C status, I'm

10   not allowed to work.

11           DEPUTY COMMISSIONER MEJIA:  Are you

12   voluntarily -- Why are you on C status?

13           INMATE PORRAS:  Because of my hair.

14           DEPUTY COMMISSIONER MEJIA:  Huh?

15           INMATE PORRAS:  Because of my hair.

16           DEPUTY COMMISSIONER MEJIA:  Your hair.

17   What did you used to do before?

18           INMATE PORRAS:  I was working in the

19   kitchen, culinary porter.

20           DEPUTY COMMISSIONER MEJIA:  Okay.

21   Academic history, you have a GED in 1997, 9.1

22   GPL.  Vocational history, completed the

23   radiological technology position in 1998.  Any

24   other vocation that you have completed?

25           INMATE PORRAS:  (No audible response).

26           DEPUTY COMMISSIONER MEJIA:  Did you work

27   after that in the same line of work like x-ray.

32

1    tech in the hospital?

2            INMATE PORRAS:   There was a lot of us in

3    the clinic at the time just switching back and

4    forth but then I transferred here from Solano.

5            DEPUTY COMMISSIONER MEJIA:   Okay.   Would

6    you be able to use that vocation in the streets?

7            INMATE PORRAS:   Oh yeah.

8            DEPUTY COMMISSIONER MEJIA:   Are you

9    licensed by the state?

10           INMATE PORRAS:   Not yet, I still need a

11   few more hours.

12           DEPUTY COMMISSIONER MEJIA:   You haven't

13   taken your license --

14           INMATE PORRAS:   You've still got to put

15   in hours before you get the full license.

16           DEPUTY COMMISSIONER MEJIA:   When did you

17   start trying to get certified?

18           INMATE PORRAS:   In '97.

19           DEPUTY COMMISSIONER MEJIA:   In '97?

20           INMATE PORRAS:   Yeah.

21           DEPUTY COMMISSIONER MEJIA:   And how long

22   does it take to get certified by the state?

23           INMATE PORRAS:   I think you got to but in

24   25,000 hours, 2,500 hours.

25           DEPUTY COMMISSIONER MEJIA:   And where are

26   you now?

27           INMATE PORRAS:   I need -- I'm not even

33

1    halfway there.

2         DEPUTY COMMISSIONER MEJIA:   Okay.  Life

3    skills: Your self-help appears that you started

4    AA in '96 and you have some NA in 1999.  Your

5    most recent chrono for attending AA and NA is

6    2000.  Do you have any more?  Are you still

7    attending?

8         INMATE PORRAS:   No, I'm not allowed to.

9         DEPUTY COMMISSIONER MEJIA:   When did you

10   stop?

11        INMATE PORRAS:   I'm not allowed to.

12        DEPUTY COMMISSIONER MEJIA:   Because of

13   the C status?

14        INMATE PORRAS:   Yeah.

15        DEPUTY COMMISSIONER MEJIA:   When did you

16   become a C status?

17        INMATE PORRAS:   In '98, October '98.

18        DEPUTY COMMISSIONER MEJIA:   October '98.

19   So you haven't been working since -- not been

20   assigned.

21        INMATE PORRAS:   I haven't been assigned

22   since.

23        DEPUTY COMMISSIONER MEJIA:   You have been

24   on C status since 1998 because of the grooming

25   standard.

26        INMATE PORRAS:   Yeah.

27        DEPUTY COMMISSIONER MEJIA:   Okay.  Also

34

1   completed your, completed your -- In 1999, HIV
2   and hepatitis training. Disciplinary history: I
3   have four 115s, all in 1998, 4/98 through April
4   6, 1998. The last being on April 6, 1998. You
5   have eight 128(a)s from September 30, 1990
6   through May 9, 2004. That's the 115 that was
7   reduced to a 128(a). No gang affiliation was
8   noted and we are going to look at your
9   psychiatric report that was dated June 7, 2005
10  by Dr. Hewchuk, spelled H-E-W-C-H-U-K, staff
11  psychologist. This report was based on the
12  September 17, 2001 report and it's noted here
13  that in 2001 Dr. Joe Reed assigned minimum risk
14  threat to Inmate Porras, both within an
15  institutional setting and outside in the
16  community at large. Since that evaluation
17  Inmate Porras has continued to program well and
18  his risk factors remain essentially unchanged.
19  At the time of the instant offense Inmate Porras
20  was 19 years old, he is now 36. He remains
21  genuinely remorseful for his part in the tragic
22  loss of a human life and his lengthy prison
23  record is a reflection of both compliance and
24  motivation to change. Inmate Porras has a
25  strong family support system in Stockton,
26  California who will serve to facilitate his
27  reintegration into society. Risk factors for

35

1    Inmate Porras remain unchanged since his
2    previous evaluation in 2001 and he is currently
3    at no greater risk of re-offending than the
4    average citizen.  Inmate Porras is currently a
5    suitable candidate for parole release
6    consideration with a recommendation that he
7    abstain totally from the use of alcohol.  Any
8    additions or comments, counsel?
9          ATTORNEY FOX:  No, thank you.
10          DEPUTY COMMISSIONER MEJIA:  Let me return
11   this back to the Chair.
12          PRESIDING COMMISSIONER FISHER:  All
13   right.  As you're know we have a letter from the
14   public defender.  I'm going to read parts of
15   that into the record.  It says:
16          "After all this time has passed I
17          have no clear recollection of
18          Neville Porras but I had the
19          strongest possible memory of the
20          facts of the case.  It seems that
21          Neville and some other young men
22          were sitting in front of their
23          house drinking fortified wine."
24   This is interesting.  It says:
25          "While they were busy rotting
26          their brain cells with this
27          revolting concoction another young

36

1        man, the victim, was enjoying his

2        leisure time a few blocks away by

3        smashing the windows out of parked

4        cars.  At one point Neville's

5        younger brother disappeared and

6        someone thought they heard him

7        calling for help.  Everybody ran

8        off in different directions

9        looking for the brother and

10       Neville's path led him to where   .

11       the victim was.  He said a drunken

12       quarrel was the result and the

13       death of the victim was the

14       outcome.  I mention this because

15       while we were waiting for the jury

16       verdict everybody, and I do mean

17       everybody, thought they were going

18       to come back with a voluntary

19       manslaughter.  That really would

20       have been a more appropriate

21       verdict due to the facts of this

22       case.  Neville's conduct in prison

23       has been such that the Board can

24       act to rectify this old injustice

25       by paroling him now that 17 years

26       have passed (inaudible)."

27   And it's signed by James L. Carson, Public

37

1   Defender, by (indiscernible). Let me ask you

2   some questions about the crime events first and

3   then I have some questions for you about your

4   programming. First of all, why did you have a

5   knife?

6        INMATE PORRAS: It was on the ground, I

7   just picked it up.

8        PRESIDING COMMISSIONER FISHER: It was on

9   the ground between the two guys that you were

10  fighting with?

11       INMATE PORRAS: No, it was in the yard.

12  Just like some ivy at the edge of my yard, my

13  neighbor's yard.

14       PRESIDING COMMISSIONER FISHER: All

15  right. So when you heard your brother yelling

16  you decided to grab the knife and take it with

17  you?

18       INMATE PORRAS: Yeah.

19       PRESIDING COMMISSIONER FISHER: All

20  right. Did Shawn try to run away from you after

21  you stabbed him?

22       INMATE PORRAS: No, not initially. I

23  think he started running when he seen Mike.

24  When he seen Mike was chasing his friend.

25       PRESIDING COMMISSIONER FISHER: Okay.

26  And you said you just swung the knife and you

27  thought that was how he got stabbed?

38

1          INMATE PORRAS:  Yeah.

2          PRESIDING COMMISSIONER FISHER:  According

3    to the DA's Office he had two stab wounds; is

4    that correct?

5          ATTORNEY FOX:  I don't think so, it was a

6    single stab wound that --

7          PRESIDING COMMISSIONER FISHER:  I'm

8    looking at the DA's letter.

9          INMATE PORRAS:  Some abrasions on his

10   back.  I think there were abrasions --  •

11         DEPUTY COMMISSIONER MEJIA:  Two stab

12   wounds in the back.

13         PRESIDING COMMISSIONER FISHER:  I'm

14   sorry, what?

15         DEPUTY COMMISSIONER MEJIA:  He had two

16   stab wounds in the back and one fatal in the

17   chest.

18         ATTORNEY FOX:  Okay.  I was referring to

19   the chest.  It seemed that it went through the

20   heart.

21         DEPUTY COMMISSIONER MEJIA:  Yes, through

22   the kidneys, through the diaphragm.

23         ATTORNEY FOX:  The lung and the liver.

24         PRESIDING COMMISSIONER FISHER:  The

25   liver, yes.

26         ATTORNEY FOX:  But if there were others,

27   I don't know.

39

1          PRESIDING COMMISSIONER FISHER:  All

2    right.  It says in the appellate decision the

3    victim died of a stab wound that pierced his

4    heart, lung and liver.

5          ATTORNEY FOX:  That must be where I read

6    it.

7          PRESIDING COMMISSIONER FISHER:  What I

8    read earlier, okay.  It says (inaudible).  I

9    don't see anything else.

10         DEPUTY COMMISSIONER MEJIA:  It does say

11   that two stab wounds were in the right upper

12   back in addition to the other.

13         PRESIDING COMMISSIONER FISHER:  What are

14   you looking at, the probation officer's report?

15         DEPUTY COMMISSIONER MEJIA:  Yes, present

16   offense.

17         PRESIDING COMMISSIONER FISHER:  What

18   page?

19         DEPUTY COMMISSIONER MEJIA:  Page one.

20         PRESIDING COMMISSIONER FISHER:  Page one?

21   Okay, thank you.

22         DEPUTY COMMISSIONER MEJIA:  That's where

23   I got it.

24         PRESIDING COMMISSIONER FISHER:  Okay, all

25   right.  It says:

26              "The victim, Shawn Bartholomew was

27              found with multiple abrasions,

40

1    contusions and three stab wounds.

2    Two of the stab wounds were in the

3    right upper back and were adjacent

4    to each other.  The fatal wound

5    was to the left lower chest where

6    it hit the liver, went through the

7    diaphragm and through two parts of

8    the heart into the kidney."

9    ATTORNEY FOX:  It sounds like there were

10   three.

11   PRESIDING COMMISSIONER FISHER:  It says,

12   at this point.  And I'm talking about further

13   down now.  This is after the argument between

14   the two.  It says:

15   "At this point there are two

16   versions.  In one the victim's

17   friend left the scene and the

18   victim was left alone.  The

19   defendant spoke to the victim and

20   got no response.  The victim

21   started walking towards the

22   defendant and the defendant

23   started swinging and jabbing with

24   his knife.  He hit the victim on

25   the side with the knife, assessed

26   the fatal wound.  Witnesses saw

27   the victim run across the street

41

1  with the defendant chasing him.

2  Mike, James and Willie ran up.

3  Willie had a stick and proceeded

4  to hit the victim.  Mike kicked

5  the victim in the head then the

6  three ran off, leaving the victim

7  on the side of the street.

8  Sometime after this the defendant

9  approached Jeff Downing (phonetic)

10  in the orange pickup and slashed

11  his face with the knife and stated

12  that it was forewarning to his

13  brother.  In the other version the

14  defendant is seen chasing two

15  white male youths, one running in

16  front of the other.  The rear

17  white male youth fell.  The

18  defendant grabbed him by the hair

19  while the youth was on his knees.

20  The defendant stated, where's my

21  brother.  The youth replied that

22  he didn't know.  At this point --

23  It says Willie and then somebody

24  has crossed it out and put Mike --

25  ran up to the victim and kicked

26  him in the face once.  Willie

27  struck the victim in the back area

42

1          several times with a tree branch.
2          Mike ran up, pulled Willie off,
3          Mike and Willie then fled.  A few
4          minutes later Mike heard a loud
5          bang and he saw the defendant
6          running beside an orange pickup
7          yelling, get out of the truck,
8          motherfucker.  He saw the butcher
9          knife in the defendant's hand and
10         the truck sped away.  The
11         defendant appeared and said, I
12         just killed (indiscernible)."
13    Does either of those sound like what happened
14    that night?
15         INMATE PORRAS:  No.
16         PRESIDING COMMISSIONER FISHER:  Because
17    neither of them sound like what we've been
18    talking about.
19         INMATE PORRAS:  No.
20         PRESIDING COMMISSIONER FISHER:  All
21    right.  Well then let me ask you this.  What is
22    your explanation for more than one stab wound?
23.        INMATE PORRAS:  I think that happened by
24    him getting hit with a stick.
25         PRESIDING COMMISSIONER FISHER:  I think
26    the coroner probably knows the difference
27    between stab wounds and getting hit with a

43

1    stick.

2          INMATE PORRAS:   This here is the

3    probation officer's report right here, isn't it?

4          PRESIDING COMMISSIONER FISHER:   Yes, yes.

5    But even if he was jabbed by the stick it

6    wouldn't make that, the same kind of a puncture

7    wound that a knife would make.

8          ATTORNEY FOX:   Maybe it would be

9    appropriate to get a copy of the autopsy.

10         PRESIDING COMMISSIONER FISHER:   It

11   probably would be.

12         INMATE PORRAS:   Yeah.

13         PRESIDING COMMISSIONER FISHER:   But there

14   is not one here.   All right.   Okay.   But you're

15   absolutely certain that all you did was swung

16   the knife at one point when you were fighting

17   with --

18         INMATE PORRAS:   Yeah.

19         PRESIDING COMMISSIONER FISHER:   Moose.

20         INMATE PORRAS:   No, Shawn.

21         PRESIDING COMMISSIONER FISHER:   In fact,

22   you were fighting with the other guy when you

23   swung the knife.

24         INMATE PORRAS:   Yeah, at first.

25         PRESIDING COMMISSIONER FISHER:   Okay.

26         INMATE PORRAS:   I was fighting with

27   Cosmo.

44

1          PRESIDING COMMISSIONER FISHER:  Cosmo,
2    okay.

3          INMATE PORRAS:  And then Shawn got in and
4    I swung the knife.

5          PRESIDING COMMISSIONER FISHER:  You need
6    to use their real names.  The nicknames --

7          INMATE PORRAS:  That is his real name.

8          PRESIDING COMMISSIONER FISHER:  That is
9    his real name?  Well I know Cosmo is his real
10   name but Moose is not a real name.

11         INMATE PORRAS:  Moose is the only one
12   that we used a nickname.

13         PRESIDING COMMISSIONER FISHER:  Okay,
14   okay.  Okay, let me ask you now about your
15   program.  You started C status in '98?

16         INMATE PORRAS:  Yes.

17         PRESIDING COMMISSIONER FISHER:  But you
18   were still programming until '04, right?  You
19   were still doing some programming?

20         INMATE PORRAS:  Yeah.

21         PRESIDING COMMISSIONER FISHER:  What
22   changed institutionally so that you can't
23   program anymore?

24         INMATE PORRAS:  I want to say is it's
25   personal feelings that stopped the program.  We
26   were allowed AA program or all that and then
27   some of the COs just take this grooming standard

45

1    as a threat to their, I guess, authority or
2    whatever so they keep increasing punishment, and
3    you know, they stopped us from programming.
4    We're not allowed to program anymore.  Even
5    though we're allowed to go everywhere every
6    other inmate is we're not allowed to program.
7              PRESIDING COMMISSIONER FISHER:  But you
8    were allowed to program up until '04?
9              INMATE PORRAS:  Right.
10             PRESIDING COMMISSIONER FISHER:  Okay.
11   Okay.  What do the other inmates do?  Are there
12   inmates -- I'm assuming that this has to do with
13   your Native American spiritual beliefs; is that
14   correct?
15             INMATE PORRAS:  Right.
16             PRESIDING COMMISSIONER FISHER:  Are there
17   other inmates who cut their hair?
18             INMATE PORRAS:  Yes.
19             PRESIDING COMMISSIONER FISHER:  And how
20   do they justify that?
21             INMATE PORRAS:  Their reasons are their
22   reasons.  I can't speak for them.
23             PRESIDING COMMISSIONER FISHER:  I'm just
24   wondering if it's okay for some of the inmates
25   to cut their hair and why it's not for -- And
26   I'm just asking you because I don't know.  I
27   don't know what the difference is.  Because I

46

1   know I've run across that too with other

2   religions primarily that are based on Old

3   Judaism beliefs where the men don't cut their

4   hair and don't shave. So I'm just wondering if

5   some of the inmates that are involved in the

6   same (indiscernible). And you said yes?

7        INMATE PORRAS: Yes.

8        PRESIDING COMMISSIONER FISHER: Okay.

9   I'm just curious. It's not something that I'm

10  going to hold against you, I just don't know the

11  answer to the question. Okay. Any questions?

12       DEPUTY COMMISSIONER MEJIA: Okay. How do

13  you feel about the victim's death?

14       INMATE PORRAS: I always felt bad about

15  it, about his death. Prior to -- When I first

16  moved to Stockton in '84 he lived in apartments

17  down below us and we got along pretty good. We

18  were friends, we went fishing sometimes, you

19  know. And it's always been a pain knowing that

20  he died because of us.

21       DEPUTY COMMISSIONER MEJIA: Have you

22  taken any type of anger management courses?

23       INMATE PORRAS: No.

24       DEPUTY COMMISSIONER MEJIA: Do you

25  remember -- Do you recall why other than the

26  alcohol, do you recall why you stabbed him other

27  than being drunk?

47

1          INMATE PORRAS:  Well there was more of

2    them than there were of us and that's the only

3    reason why I picked up the knife.  I never

4    intended to use it.

5          DEPUTY COMMISSIONER MEJIA:  So you still

6    feel it's self-defense and mutual combat?

7          INMATE PORRAS:  Mutual combat.

8          DEPUTY COMMISSIONER MEJIA:  That's what

9    you told the last two psychologists.

10         INMATE PORRAS:  Yeah.

11         DEPUTY COMMISSIONER MEJIA:  What did you

12   learn from this incident?

13         INMATE PORRAS:  I learned a lot.. This

14   happened back when we were young, you know.  We

15   thought that drinking was part of being fun, you

16   know, and it wasn't.  We didn't think about what

17   we were doing and actions that we was going to

18   cause.  Now you've got to think a little bit

19   more, take responsibility for your actions a

20   whole lot more.

21         DEPUTY COMMISSIONER MEJIA:  You're out on

22   the streets and you get into a problem.  How

23   would you handle that other than the way you

24   handled this incident?

25         INMATE PORRAS:  The circumstances would

26   be a whole lot different because there wouldn't

27   be alcohol involved.  A lot clearer thinking.

48

1          DEPUTY COMMISSIONER MEJIA:  That carries

2     me to the next question.  Have you contacted any

3     AA or anyplace where you can go if you get

4     released to continue your sobriety, a support?

5          INMATE PORRAS:  We've got a place in

6     Stockton, it's an Indian thing.  It's called

7     Three Rivers Indian Lodge, it's in Manteca just

8     outside of Stockton.  That's where I'll be

9     going.

10          DEPUTY COMMISSIONER MEJIA:  Do you have a

11    letter from them?

12          INMATE PORRAS:  No.

13          DEPUTY COMMISSIONER MEJIA:  Do you know

14    where they are?

15          INMATE PORRAS:  Yeah.

16          DEPUTY COMMISSIONER MEJIA:  Address?

17          INMATE PORRAS:  Not by heart but I know

18    where they are.

19          DEPUTY COMMISSIONER MEJIA:  Did you

20    contact them and tell them, just in case I get

21    paroled can I -- Do you have any letters to

22    them?

23          INMATE PORRAS:  No.

24          DEPUTY COMMISSIONER MEJIA:  I've got no

25    other questions.

26          PRESIDING COMMISSIONER FISHER:  All

27    right, thank you.  Counsel, questions?

49

1       ATTORNEY FOX:  Yes, just briefly.  I

2   think earlier we may have misspoken.  Aside from

3   trying the marijuana and drinking did you use

4   other drugs ever?

5       INMATE PORRAS:  No.

6       ATTORNEY FOX:  What about black beauties?

7       INMATE PORRAS:  No.  Well, I did try the

8   black beauties but it was just like during the

9   week I think it was.

10       PRESIDING COMMISSIONER FISHER:  Just that

11   one time?

12       INMATE PORRAS:  Yeah.

13       ATTORNEY FOX:  Are there any other kinds

14   -- Because what happens when you get a parole

15   date they go through every word that's ever been

16   written about you.  And if it appears in any

17   file and we don't talk about it now it can be a

18   reason for sending you back.

19       INMATE PORRAS:  The issue of the black

20   beauties, I did speak about those before.

21   Somebody asked, I think it was a probation

22   officer or a psych.  Somebody asked me what they

23   were like.  I told them what I was told is

24   they're supposed to be like crank, whatever

25   crank was.  And down somewhere along the line

26   somebody said barbiturates.

27       ATTORNEY FOX:  Okay.

50

1          INMATE PORRAS:  I don't know, it's black
2   beauties though.

3          PRESIDING COMMISSIONER FISHER:  They're
4   used for speed, I think, it's not barbiturates.

5          ATTORNEY FOX:  I don't know.  I don't
6   know.  And did you ever try crank?

7          INMATE PORRAS:  No.

8          ATTORNEY FOX:  Because in the Board
9   Report from October of 2003 the writer writes
10  that the subject has also used black beauties
11  for two weeks in 1987 and consumed crank five
12  times.

13         INMATE PORRAS:  He asked me what the
14  black beauties were supposed, what they were.
15  And I said, someone told me they were like
16  crank.  Crank is speed.

17         ATTORNEY FOX:  Okay.  I just wanted to
18  clarify that.

19         PRESIDING COMMISSIONER FISHER:  All
20  right.

21         DEPUTY COMMISSIONER MEJIA:  Before we
22  start, Commissioner, let me just turn this tape
23  so I won't cut her off.

24         PRESIDING COMMISSIONER FISHER:  Go ahead.

25             (The tape was turned over.)

26         DEPUTY COMMISSIONER MEJIA:  And counsel,
27  did you have an additional question?

51

1           ATTORNEY FOX:  Just one, thank you.

2           DEPUTY COMMISSIONER MEJIA:  Go ahead.

3           ATTORNEY FOX:  It's regarding the most

4      recent 128.

5           INMATE PORRAS:  Right.

6           ATTORNEY FOX:  What was all that about?

7           INMATE PORRAS:  I had a floater TV in the

8      house.  It's a TV that doesn't belong to

9      anybody.  Somebody paroled and left it behind

10     and I had it in the house.  They did a cell

11     search and took the TV and wrote me up for it.

12          ATTORNEY FOX:  Okay.  No further

13     questions, thank you.

14          PRESIDING COMMISSIONER FISHER:  All

15     right.  I just want to clarify this because for

16     some reason the moment that I got Cosmo and

17     Moose mixed up it just continued through all the

18     hearing.  So I just want to be clear that I know

19     where everybody was and what everybody was

20     doing.  Because in the Board Report it says that

21     witnesses saw you chasing somebody up the

22     street.  Is that correct?

23          INMATE PORRAS:  That's what it says in

24     the Board Report.

25          PRESIDING COMMISSIONER FISHER:  But it's

26     not correct?

27          INMATE PORRAS:  Yeah, they seen Mike

52

1   chasing Cosmo.

2        PRESIDING COMMISSIONER FISHER:   It was

3   Mike chasing Cosmo, okay.   Do you and Mike look

4   alike?

5        INMATE PORRAS:   No.

6        PRESIDING COMMISSIONER FISHER:   All

7   right.   It also says that witnesses saw your

8   brother run up to Shawn and kick him.   Or was it

9   Mike who kicked him?

10        INMATE PORRAS:   Mike, James and Willie

11   look alike, looked alike, but I was the smaller

12   of them.

13        PRESIDING COMMISSIONER FISHER:   Okay.

14   And so the person who ran up to Shawn and kicked

15   him.   Was that Mike?

16        INMATE PORRAS:   Yeah.

17        PRESIDING COMMISSIONER FISHER:   Okay.

18   And then he was also the one who was chasing him

19   up the street?

20        INMATE PORRAS:   He chased Cosmo then he

21   came back.

22        PRESIDING COMMISSIONER FISHER:   Okay.

23   What I'm trying to get at is who did the

24   witnesses see chasing?   It was Mike?

25        INMATE PORRAS:   Yeah, it was Mike they

26   seen chase Cosmo.

27        PRESIDING COMMISSIONER FISHER:   Just to

53

1  be sure.. All right.  There was something else.

2  I think that was it, all right.  And what about,

3  what about Phillips and Wheeler?  Where were

4  they at this point?

5          INMATE PORRAS:  They were in the alley.

6          PRESIDING COMMISSIONER FISHER:  And what

7  about James?

8          INMATE PORRAS:  He was right there with

9  Mike.

10          PRESIDING COMMISSIONER FISHER:  And so

11  everybody was sort of in the general area.

12          INMATE PORRAS:  Right.

13          PRESIDING COMMISSIONER FISHER:  But aside

14  from Mike nobody else was with you.

15          INMATE PORRAS:  Right.

16          PRESIDING COMMISSIONER FISHER:  Okay.  I

17  just want to be sure.  There were so many names

18  thrown in there.  And for some reason

19  (indiscernible) keep Cosmo and Moose straight I

20  thought I better clarify who was where.  All

21  right, any other questions, counsel?

22          ATTORNEY FOX:  No, thank you.

23          PRESIDING COMMISSIONER FISHER:  Any other

24  questions, Commissioner?

25          DEPUTY COMMISSIONER MEJIA:  No other

26  questions, thank you.

27          PRESIDING COMMISSIONER FISHER:  Would you

54

1    like to close?

2        ATTORNEY FOX:  Yes, thank you.

3    Mr. Porras would have the panel find him

4    suitable for parole and set a parole date

5    because he is suitable.  He can't go back and

6    change the events that led to Mr. Bartholomew's

7    death but certainly it was out of character for

8    him to act out in such a violent way.  And that

9    comes from his history and also the statement of

10   his mother where in most cases he was the victim

11   of bullies in the neighborhood.  His

12   institutional adjustment has been pretty good.

13   And he has his religious belief which preclude

14   him from participating in some of the activities

15   that are available to other inmates but that

16   should not be held against him.  Turning to the

17   psychological evaluation.  It's a good

18   evaluation and supportive of release.  And

19   turning to the parole plans, Mr. Porras has a

20   good set of parole plans with his family in the

21   county of commitment and it includes work,

22   residence and also AA through -- Was it the

23   Three Rivers?

24       INMATE PORRAS:  Indian Lodge.

25       ATTORNEY FOX:  Indian Lodge, which is

26   culturally appropriate for him.  In the event

27   there are lingering concerns about the wounds I

55

1    think it would be appropriate to ask the police
2    department or the district attorney's office to
3    provide us with a copy of the autopsy so we can
4    settle it.   But I think that's something that
5    could be done by the parole department doing an
6    investigation for placement.  Mr. Porras is
7    appropriately remorseful and would pose no risk
8    to the community if released if he sticks with
9    his plans to stay with AA.  And there is no
10   reason to believe he wouldn't.  He has not had
11   that kind of an issue since he's been in custody
12   recently.  In the event the panel does not find
13   him suitable Mr. Porras would request that the
14   panel state with specificity the facts upon
15   which you rely in finding him unsuitable.  And
16   I'll submit based on that unless there are
17   comments Mr. Porras would like to make.
18          PRESIDING COMMISSIONER FISHER:  Anything
19   you'd like to add?
20          INMATE PORRAS:  End with that.
21          PRESIDING COMMISSIONER FISHER:  All
22   right.
23          ATTORNEY FOX:  Thank you.
24          PRESIDING COMMISSIONER FISHER:
25   (Inaudible).
26                   R E C E S S
27                     --oOo--

56

1              CALIFORNIA BOARD OF PAROLE HEARINGS

2                     D E C I S I O N

3              DEPUTY COMMISSIONER MEJIA:  We are back

4      on record for our decision on Mister --

5              PRESIDING COMMISSIONER FISHER:  Porras.

6              DEPUTY COMMISSIONER MEJIA:  Porras.

7              PRESIDING COMMISSIONER FISHER:  Thank

8      you.  Sorry, I didn't mean to interrupt you.

9              DEPUTY COMMISSIONER MEJIA:  Thank you.

10             PRESIDING COMMISSIONER FISHER:  All

11     right.  Let me note for the record that everyone

12     who was previously in the room and identified

13     themselves has returned to the room.

14     Mr. Porras, the panel reviewed all of the

15     information received from the public and relied

16     on the following circumstances in concluding

17     that you are not yet suitable for parole and

18     would pose an unreasonable risk of danger to

19     society and a threat to public safety if

20     released from prison.  This is a one year

21     denial.  It's based primarily on the commitment

22     offense.  And the issue at hand has to do with

23     insight and the fact that the official version

24     of this crime is significantly different than

25     what you put forward today.  And unfortunately

26     there is only one way to find out what the real,

27     NEVILLE PORRAS E-37606  DECISION PAGE 1 07/12/05

57.

1   what the real story is so we're going to order a
2   coroner's report and a police report. Because
3   frankly, the issue of insight is one of the most
4   important issues as far as I'm concerned in
5   dealing with (inaudible). And according to
6   witnesses the victim was chased down the street
7   by Mr. Porras. According to witnesses,
8   according to the information that we have in the
9   summaries of the crime in the probation
10  officer's report and the Board Report, which is
11  the only information that we have available
12  aside from the appellate decision, which
13  essentially follows the same line of thought,
14  (inaudible) that Shawn Bartholomew, after
15  perhaps being stabbed once, was chased and
16  continued to be stabbed. And the problem that
17  we have with this is the fact that there's some
18  -- The way that it's stated in the appellate
19  decision left me believing that there was only
20  one stab wound. But the probation officer's
21  report, which generally takes its information
22  from the police report, stated that there were
23  three with two to the back. Which would fit the
24  scenario of him being stabbed once and then
25  being chased down the street by the inmate and
26  stabbed. The two stab wounds through the back
27  NEVILLE PORRAS E-37606  DECISION PAGE 2 07/12/05

58

1   make sense.  And there is just no other way for
2   us to come to terms with (inaudible).  Because
3   frankly, if there were three stab wounds I know
4   the next panel will have some other questions
5   for you.  So essentially the issue has been the
6   commitment offense.  This was the murder of a 17
7   year old boy.  This was a situation where you
8   took a knife to a fistfight.  Nobody else was
9   armed.  It was escalated to a murder by you.
10  And once again the motive was that apparently
11  there had been some words exchanged and you
12  could hear your brother yelling for you.  But
13  aside from getting into a fight with these two
14  guys, with Cosmo and Shawn, there was just
15  absolutely no reason to have a weapon.  So we
16  need to know.  On the face of it that's enough
17  as an issue.  The fact that this was a bunch of
18  kids.  It could have ended up with everybody
19  just beating each other up but you killed
20  somebody.  On paper that's enough.  It's
21  important for us to know if there were indeed
22  two stab wounds to the back of Shawn or not.  We
23  have to know that and the only way of proving
24  that is (inaudible).  The prisoner has a very
25  minor history of any kind of criminal behavior.
26  It has to do with essentially there was a
27  NEVILLE PORRAS E-37606  DECISION PAGE 3 07/12/05.

59

1  burglary second.  As he was telling us today it
2  was because they were throwing rocks and a
3  window got broken.  When they broke the window
4  they went inside.  He was made a ward of the
5  court after that.  He was also involved in a
6  trespassing that he said that had to do with
7  them being on school grounds.  He was also cited
8  for driving under the influence and alcohol was
9  involved in this commitment offense.  His
10 unstable social history includes this behavior
11 as well as the fact that he dropped out of
12 school and his (inaudible).  He programmed quite
13 well up until 2004, at which point he indicated
14 that because of his C status he hasn't been
15 allowed to continue to program.  And it has been
16 -- It shows that he participated in AA last
17 year.  Prior to that the only thing that I show
18 is in 2001 and that was for being the designated
19 pipe holder in the Native American Spiritual
20 Circle.  And the only programming I show prior
21 to that, aside from AA and NA has been the
22 contagious diseases programs.  So at this point
23 he hasn't sufficiently participated in self-
24 help.  He has a current psych evaluation that is
25 favorable.  He does have parole plans.  He has
26 good family support as evidenced by his mother's
27 NEVILLE PORRAS E-37606  DECISION PAGE 4 07/12/05.

60

1   letter.  We did receive some letters, responses
2   to 3042 notices but they were not in a timely
3   fashion and we did not consider them in making
4   our decision, other than the one that were
5   supportive from the public defender.  The panel
6   finds that the prisoner needs to participate in
7   self-help in order to continue to build towards
8   a successful parole and in order to cope and
9   understand stress in a non-destructive manner.
10  Also that his gains are somewhat recent.  He
11  needs to continue to maintain those gains
12  (inaudible).  We want to commend you for your
13  program, you've done a good job.  I think that
14  this issue of insight is very important and it's
15  something that we have to address.  There is
16  just now way that we can leave it unaddressed.
17  We have to know for a fact whether you're
18  telling us --
19         INMATE PORRAS:  Okay, even in trial they
20  couldn't discern what made the wounds to his
21  back.  They didn't know.
22         PRESIDING COMMISSIONER FISHER:  Okay.
23         INMATE PORRAS:  And when you read the
24  probation report you'll see that the judge had
25  to order it to be --
26         PRESIDING COMMISSIONER FISHER:  The
27  NEVILLE PORRAS E-37606  DECISION PAGE 5 07/12/05

61

1   information?

2         INMATE PORRAS:  Yeah, for her to complete
3   it.  So it's a mix of whatever she put together
4   between all three of us.

5         PRESIDING COMMISSIONER FISHER:  Okay.  But
6   once we've got all the information in our hands
7   then we just have to deal with what we've got.
8   When we don't have it all there are two choices.

9         INMATE PORRAS:  But this --

10        PRESIDING COMMISSIONER FISHER:  Either
11  you're lying to us --

12        INMATE PORRAS:  This is like what, my
13  fourth parole hearing?  Everybody's done the
14  same thing.

15        PRESIDING COMMISSIONER FISHER:  Did
16  anybody order the --

17        INMATE PORRAS:  Outside of the no parole
18  policy we're just doing the same thing over and
19  over and over again

20        PRESIDING COMMISSIONER FISHER:  Let me
21  finish, okay, because you're just assuming
22  things here.  Did anybody order the report
23  before?  Because I don't see any indication that
24  anybody has ever ordered the coroner's report or
25  the police report.

26        INMATE PORRAS:  Yeah, but the thing is
27  NEVILLE PORRAS E-37606  DECISION PAGE 6 07/12/05

62

1    we've been through trial.  This is what I'm
2    doing the time for now.

3         PRESIDING COMMISSIONER FISHER:  Did
4    anybody in a prior hearing --

5         INMATE PORRAS:  Nobody has ordered it
6    before because there's really no need for it.

7         PRESIDING COMMISSIONER FISHER:  Okay.
8    Well I just did.  I just did because I think
9    there is a need for it.  I'm not comfortable
10   that you're telling me the truth because the
11   information I have in the file conflicts with
12   what you're telling me.

13        INMATE PORRAS:  Right.

14        PRESIDING COMMISSIONER FISHER:  The
15   information, according to the statements of the
16   witnesses, conflicts with what you're telling
17   me.

18        INMATE PORRAS:  Right.

19        PRESIDING COMMISSIONER FISHER:  And they
20   may be wrong.  But I have no way of knowing that
21   when I only have the information that I have at
22   hand.  If you're lying to me you have no
23   insight.  If you have no insight I'm not
24   comfortable letting you go back out.

25        INMATE PORRAS:  What do you mean by
26   insight.

27   NEVILLE PORRAS E-37606  DECISION PAGE 7 07/12/05.

63

1          PRESIDING COMMISSIONER FISHER:  Let me
2    finish the decision because the time for
3    discussing this is over, okay.
4          INMATE PORRAS:  I'm just asking questions
5    because --
6          PRESIDING COMMISSIONER FISHER:  I
7    understand that.  But you don't ask me
8    questions, I ask the questions.
9          INMATE PORRAS:  You know, I've got to
10   progress and do better.
11         PRESIDING COMMISSIONER FISHER:  So stop
12   now or I'm going to have them take you out of
13   the room, all right.  I'm trying to explain to
14   you the best I can so you listen to me.  I need
15   to know if you're telling us the truth about
16   what happened that night.  Because if you're
17   lying to us then you're not accepting full
18   responsibility for what happened.  Now we may
19   not ever be able to have an absolute definite
20   answer.  But we have to have as much of the
21   information as we can possibly have in order to
22   come to that conclusion.
23         INMATE PORRAS:  Right.
24         PRESIDING COMMISSIONER FISHER:  Because
25   if I get a copy of the coroner's report and it
26   tells me clearly that there are two stab wounds
27   NEVILLE PORRAS E-37606  DECISION PAGE 8 07/12/05

64

1  to the back then I'm going to have some other
2  questions for you if I'm on your next panel.  If
3  it tells me that there are injuries that may
4  have been something else then that's a different
5  story.

6        INMATE PORRAS:  Right.

7        PRESIDING COMMISSIONER FISHER:  And I'm
8  more likely to err on the side that you're
9  probably telling me exactly what you remember
10  happened.  But there is no way that I can decide
11  that without the information.

12        INMATE PORRAS:  Right.

13        PRESIDING COMMISSIONER FISHER:  Now I
14  have looked in the file and I don't see where
15  anybody at a parole hearing ever ordered that
16  before.  I just did, we just filled out the
17  paperwork.  And we're going to bring you back
18  next year with whatever panel having that
19  information at hand.  I can tell you that if we
20  don't have that information in the file and the
21  panel gives you a parole date they're going to
22  kick it back in decision review or at the
23  Governor's level, one or the other.  Because
24  they're going to read the same things that we
25  read today and they're going to come to the same
26  questions that we have today.

27  NEVILLE PORRAS E-37606  DECISION PAGE 9 07/12/05

65

1        INMATE PORRAS:  Right.

2        PRESIDING COMMISSIONER FISHER:  The other

3   thing I want to suggest to you is that because

4   you were drunk the night of the commitment

5   offense, regardless of the fact that you can't

6   participate in AA in the institution because of

7   your C status, you still need to be doing some

8   substance abuse programming.  And you can do it

9   on your own if you have the AA book or if you

10  have anything else.                        •

11       INMATE PORRAS:  Well, yeah.  That's why I

12  attend the Native American spiritual sweat lodge

13  and all that.

14       PRESIDING COMMISSIONER FISHER:  Okay.

15       INMATE PORRAS:  Because that works for me

16  better than AA.

17       PRESIDING COMMISSIONER FISHER:  And it

18  does include that.  But the problem is -- The

19  problem is this.  I'm trying to help you out

20  here, okay.

21       INMATE PORRAS:  That's what I'm trying to

22  do is get information.

23       PRESIDING COMMISSIONER FISHER:  Let me

24  tell you what you need to do.  I know that a lot

25  of the different religious programs that they

26  have put together will include substance abuse.

27  NEVILLE PORRAS E-37606 DECISION PAGE 10 07/12/05.

66

1   Sometimes they will give you chronos
2   specifically for that, sometimes they won't.  If
3   they won't what you need to have when you come
4   here next panel is whatever the philosophy is.
5   Something that you can show them that says here,
6   this is how we address substance abuse issues.
7   This is how we deal with it.  Because that's
8   another thing that because of the fact in
9   particular that you were drunk the night of the
10  commitment offense.

11          INMATE PORRAS:  Right.

12          PRESIDING COMMISSIONER FISHER:  The
13  panels are going to be looking for it and so is
14  decision review and so is the Governor's Office.
15  You're really close.  You're really close and so
16  you've got all to dot all these Is and cross all
17  these Ts and you've got to make the panel
18  comfortable that you've addressed every issue
19  and that you're just absolutely coming clean
20  with everything.  Then that has to go on and
21  just on paper.

22          INMATE PORRAS:  Right.

23          PRESIDING COMMISSIONER FISHER:  Without
24  even the benefit of having you in front of them.
25  Decision review and the Governor's Office are
26  going to look at it.  So it's really important
27  NEVILLE PORRAS E-37606 DECISION PAGE 11 07/12/05

67

1    and I really am trying to help you here.

2         INMATE PORRAS:   Yeah.

3         PRESIDING COMMISSIONER FISHER:   I think

4    you're doing a good job.  And if you're telling

5    me the truth about what happened and we get

6    these reports and it gives us some indication

7    that you've got some insight and that this

8    really was the way things went then I think

9    you've got a really good shot at getting a date.

10        INMATE PORRAS:   Yes, everything I've said

11   is the same thing I've said to the policeman

12   from the beginning until now.

13        PRESIDING COMMISSIONER FISHER:   But it's

14   not what the official version says.

15        INMATE PORRAS:   Yeah.

16        PRESIDING COMMISSIONER FISHER:   And it's

17   not what the witnesses say.  And we understand

18   that you may be frustrated with that but there's

19   nothing that we can do to address that issue

20   other than just accepting what you say at face

21   value.

22        INMATE PORRAS:   Right.

23        PRESIDING COMMISSIONER FISHER:   Unless we

24   have the information.  And it may surprise you

25   to find out that sometimes guys come in here and

26   lie to us.  So, you know, we need to have that

27   NEVILLE PORRAS E-37606 DECISION PAGE 12 07/12/05

68

1     information in order to be able to make an

2     educated decision about whether or not you have

3     insight into your commitment offense.

4          INMATE PORRAS:  Yeah.

5          PRESIDING COMMISSIONER FISHER:  And you

6     need to do the work that you can't do through

7     the institution on your own.  You need to have

8     it on paper to bring it back to the panels to

9     show them that you're just not taking an

10    attitude and saying, I'm not going to program

11    anymore because I don't like the way the

12    institution is dealing with me.  You need to

13    show that you are not able to participate in

14    those programs but that you're doing it on your

15    own.  All right?

16         INMATE PORRAS:  Yeah.

17         PRESIDING COMMISSIONER FISHER:  Okay.

18    That completes the reading of the decision.  Do

19    you have any comments, Commissioner?

20         DEPUTY COMMISSIONER MEJIA:  Yeah.  You've

21    got to get some anger management.  I don't know

22    how you're going to get it.  Anger management

23    class.  That's all I have.

24         PRESIDING COMMISSIONER FISHER:  And

25    that's okay, you can do that on your own too.

26         INMATE PORRAS:  Yeah, I was just going to

27    NEVILLE PORRAS E-37606 DECISION PAGE 13 07/12/05'

69

1   say, anger management.  What would make --

2            PRESIDING COMMISSIONER FISHER:  Because

3   of the crime.

4            DEPUTY COMMISSIONER MEJIA:  That's all

5   I've got to say, thank you.

6            PRESIDING COMMISSIONER FISHER:  Because

7   of the crime.  Just because of the crime.  And

8   do it on your own.  Just get a book and just

9   bring it like a book report.  Show the panel

10  that you've done the work.            •

11           INMATE PORRAS:  All right.

12           PRESIDING COMMISSIONER FISHER:  All

13  right?

14           INMATE PORRAS:  Okay then.

15           PRESIDING COMMISSIONER FISHER:  Good

16  luck.

17                      --oOo--

18

19

20

21

22

23  PAROLE DENIED ONE YEAR

24  THIS DECISION WILL BE FINAL ON:_____

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  NEVILLE PORRAS E-37606 DECISION PAGE 14 07/12/05

70

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, RAMONA COTA, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 69, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF NEVILLE

PORRAS, CDC NO. E-37606, ON JULY 12, 2005, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated July 25, 2005, at Sacramento County,

California.


RAMONA COTA
TRANSCRIBER
PETERS SHORTHAND REPORTING

# EXHIBIT "C"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
MARCH 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
SEPTEMBER 17, 2001

**ADDENDUM REPORT/CORRECTION:**

Inmate Neville Porras, CDC# E-37606, requested that the
following corrections be made to the psychological
evaluation of March 2001 for the Board of Prison Terms.

**XIII. REVIEW OF LIFE CRIME:**

Inmate Porras described the circumstances surrounding
his commitment offense, involving the Second Degree
Murder of the victim with a knife.  He admits full
responsibility for the death of the victim.

During one of a long series of fights with his
neighbors, and in which all parties had been drinking
alcohol, the victim was stabbed to death by the inmate.
The inmate described the confrontation as "mutual
combat," and subsequently mitigated by saying that he
had tried to avoid the fight.  He said he was 19 and
the victim was 17 at the time of the fatal incident.

**THE REMAINING TEXT REMAINS UNCHANGED.**

*Joe Reed*

JOE REED, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JR/gmj

D:  09/17/01
T:  09/25/01

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
MARCH 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JANUARY 30, 2001

This is a psychological evaluation for the Board of Prison
Terms for inmate Neville Porras, CDC# E-37606.  This report
is based upon a personal clinical interview of the inmate,
conducted on 01/30/01, as well as a review of his Central
file and unit health record.  This clinical interview and a
review of all pertinent documents were for the express
purpose of preparing this report.

### PSYCHOSOCIAL ASSESSMENT

I.    **IDENTIFYING INFORMATION**:

Inmate Porras is a 31-year-old, single, Native American
whose date of birth is 03/10/69.  His stated religious
affiliation is American Indian.  Bilingual, English is
his primary language, and he also speaks Dakota.  No
obvious unusual physical characteristics were observed
and he denies using any nicknames or aliases.

II.   **DEVELOPMENTAL HISTORY**:

Inmate Porras has no remarkable developmental history.
He denies any childhood history of physical or sexual
abuse as either a perpetrator or a victim.  He did
acknowledge that he suffered a mild head injury
secondary to a motor vehicle accident when he was 12.
No obvious residual symptoms were noted.

III.  **EDUCATIONAL HISTORY**:

Inmate Porras states that he attended public school and
completed the tenth grade.  He received his GED in 1997
at California State Prison, Solano (CSP-SOL).  In 1995,
his measured grade point level was 10.3 TABE.  He has
no history of special education or academic or
behavioral problems in school.  He currently has no
involvement or interest in educational activities.

PORRAS, NEVILLE
CDC NUMBER:  E-37606
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

IV.  **FAMILY HISTORY:**

Inmate Porras acknowledged that he has one brother who
has abused alcohol.  He also revealed that he has three
brothers with a history of felonies, and also that his
father has a history of molesting his daughter.  He
generally described his current relationships with his
immediate family members as warm and supportive, noting
that he contacts them with phone calls and letters.  He
states that he has no history of abuse in these
relationships.

V.  **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

Inmate Porras is a heterosexual male.  He denied any
history of sexual aggression or high-risk sexual
behavior.

VI.  **MARITAL HISTORY:**

Inmate Porras reports that he has never been married
and has no children from any relationships.

VII. **MILITARY HISTORY:**

Inmate Porras has no history of military service.

VIII.**EMPLOYMENT AND INCOME HISTORY:**

Inmate Porras reports that his preincarceration work
history includes working five years as a carpet layer,
as a tile layer, and also as an auto mechanic.

His incarceration work history includes getting
training from 1995 until 1997 in vocational radiology.

IX.  **SUBSTANCE ABUSE HISTORY:**

Inmate Porras acknowledges that he has abused alcohol
in the past.  He reports that he last used alcohol in
1988, the time of his incarceration.  He says that he
has abused no other drugs.

He reports having attended Alcoholics Anonymous
regularly from 1995 until 2000, and that he has not

PORRAS, NEVILLE
CDC NUMBER:  E-37606
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

participated in that program for the last six months
due to the unavailability of classes at CTF.  He plans
to attend AA as soon as they are again available, and
states that he is currently on the waiting list.  He
has a strong commitment not to drink alcohol ever
again.  This inmate does appear to have an alcohol
abuse history.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

The inmate's recent prior psychiatric diagnosis
includes Intermittent Alcohol Abuse, in institutional
remission.  He has no history of prior hospitalizations
or a history of serious accidents, including head
injury.  He has no history of suicidal behavior.  He
has no seizure or other neurological conditions.  He
has no significant disabilities or impairments and is
currently taking no significant medications.

XI.   PLANS IF GRANTED RELEASE:

If granted parole, inmate Porras plans to live in
Stockton with his friends or his parents, whom, he
states, have all agreed to this arrangement.  His
financial and vocational plans include working at a job
offered by a friend at his friend's private business
involving custom tile and marble laying.  His prognosis
for community living is excellent.

CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Porras was alert
and oriented to person, place and time.  He was well
dressed and groomed.  His speech was articulate and
contextually meaningful.  His mood and affect were
within normal limits and his behavior was appropriate
to the setting.  No evidence of a mood or thought
disorder was demonstrated.  His estimated level of
intellectual functioning was within the average to
above average range.

PORRAS       E-37606        CTF-CENTRAL        02/08/01        gmj

PORRAS, NEVILLE
CDC NUMBER: E-37606
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     Alcohol Abuse, in sustained full remission
            in a controlled environment.
AXIS II:    No Contributory Personality Disorder.
AXIS III:   No Contributory Physical Disorder.

His current level of insight and judgment in general,
and specifically regarding his commitment offense, is
very good and supports a positive prediction of
successful adaptation to community living.

### XIII. REVIEW OF LIFE CRIME:

Inmate Porras described the circumstances surrounding
his commitment offense, involving the Second Degree
Murder of the victim with a knife. He admits full
responsibility for the death of the victim. The inmate
reports that he had previously argued with the victim a
number of times, that they lived only six houses apart,
and that he often tried to simply avoid the victim to
avoid confrontation. During one of a long series of
fights, and in which all parties had been drinking
alcohol, the victim was stabbed to death by the inmate.
The inmate described the confrontation as mutual
combat, and subsequently mitigated by saying that he
had tried to avoid the fight, and had avoided other
previous altercations with the victim. He said he was
19 and the victim was 23 at the time of the fatal
incident.

The inmate showed good empathy towards the victim and
his family, and appreciated the damage done to the
victim's family. He insightfully noted that he should
have been more careful in trying to avoid the fight,
stating, "It ruined his life and his family and
everyone involved." He also further admitted that
alcohol limited his vigilance to avoid fighting. He
strongly asserted that he intends to never drink
alcohol again. The inmate seemed genuinely penitent
for his crime and seems to understand the circumstances
culminating in the crime.

### XIV. ASSESSMENT OF DANGEROUSNESS:

A.  His violence potential within a controlled setting
    is considered to be significantly below average

PORRAS     E-37606     CTF-CENTRAL     02/08/01     gmj

PORRAS, NEVILLE
CDC NUMBER:  E-37606
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


relative to this Level II inmate population.  This
conclusion is based upon several factors.

On the one hand, he has three DUIs which he
received from the age of 17 to 18.  He also had a
burglary charge which was reduced to trespassing
during this time.  While in CDC, he has received
four CDC-115 violations, all in 1998.  He has also
received seven CDC-128s, the last received in 1999.

On the other hand, he has no history of gang
affiliation, and his juvenile history involves
minimal violence.  However, there was an increasing
pattern of alcohol abuse during this period.  A
first termer, the instant crime is his first adult
criminal offense.  His four CDC-115 disciplinaries
involved failure to cut his hair and he has no
disciplinaries for violent behavior.  Importantly,
he has no record of violent behavior during his 11
years of incarceration within CDC.  He showed
genuine empathy and remorse toward the victims of
his crime.  No psychopathy was observed during the
clinical interview.

As noted in the prior psychiatric report dated
1998, Dr. Claire and Dr. Vasquez reported that the
young man was probably not especially violence-
prone at the time of the commitment offense, and
that the event appeared to be a response to
drinking-induced loss of inhibition after prolonged
exposure to aggravation and stress.  This
clinician's review is consistent with that of Dr.
Claire and Dr. Vasquez.

Also, the inmate was 19 at the time of the
commitment offense, and he appears to have matured
greatly during his 11 years completed within CDC.

Therefore, in light of these factors, his violence
potential is considered to be significantly below
average relative to this Level II inmate
population.

B. /If released to the community, his violence
potential is considered to be no more than the
average citizen in the community.

PORRAS       E-37606        CTF-CENTRAL        02/08/01        gmj

PORRAS, NEVILLE
CDC NUMBER:  E-37606
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX


    C.   Substance abuse is a risk factor which may be a
       precursor to violence for this individual.

XV.   <u>CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS</u>:

    A.  This inmate is competent and responsible for his
       behavior.  He has the capacity to abide by
       institutional standards.

    B.  This inmate does not have a mental health disorder
       which would necessitate treatment either during his
       incarceration period or following upon parole.

    C.  This inmate does appear to have an alcohol abuse
       history, and continued participation in Alcoholics
       Anonymous is suggested both during his
       incarceration within CDC and as a condition of
       parole.


JOE REED, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad



R. S. COATE, Psy.D.
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad

JR/gmj

D:  02/01/01
T:  02/08/01

# EXHIBIT "D"

*PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS*
*(REVISED AUGUST 1998)*
*PAROLE CONSIDERATION HEARING*
*JULY 2005 LIFER CALENDAR*

*CORRECTIONAL TRAINING FACILITY, SOLEDAD*
*JUNE 7, 2005*

This is a psychological evaluation update for the Board of Prison Terms on inmate Neville Porras, CDC# E-37606. This report is based on a personal clinical interview of the inmate on 06/07/05. Additionally, in preparation for this update, the Central file, unit health records, and previous psychological assessment conducted by Dr. Joe Reed in January 2001 were reviewed. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

Since biographical and social history factors have previously been extensively reviewed and documented, this report will focus on current risk factors only.

Inmate Porras is a 36-year-old, native American male whose date of birth is 03/10/69. He has now been incarcerated for a total of 17 years while serving time for a second degree murder conviction, carrying a 15-year-to-life sentence, with a one-year enhancement.

The Central file documents a model inmate with no violent disciplinaries during the entire period of incarceration. Although inmate Porras received CDC-115 disciplinaries for not cutting his hair, and being in possession of an unauthorized TV set, these have no bearing on this inmate's overall risk factors in a community setting.

In 2001, Dr. Joe Reed assigned a minimum risk threat to inmate Porras, both within an institutional setting, and outside in the community at large.

Since that evaluation, inmate Porras has continued to program well, and his risk factors remain essentially unchanged.

At the time of the instant offense, inmate Porras was 19 years old. He is now 36. He remains genuinely remorseful for his part in the tragic loss of a human life, and his lengthy prison record is a reflection of both compliance and a motivation to change.

Inmate Porras has a strong family support system in Stockton, California, who will serve to facilitate his reintegration into society.

Risk factors for inmate Porras remain unchanged since his previous evaluation in 2001, and he is currently at no greater risk of reoffending than the average citizen.

Inmate Porras is currently a suitable candidate for parole release consideration, with the recommendation that he abstain totally from the use of alcohol.

EXHIBIT "E"

S157605

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re NEVILLE PORRAS on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

MAY 2 1 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

Neville Poggess E-37606
Pq Box 689    Y-337-u
Soledad, CA.
93960-0689

OAKLAND
6/13/08

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE Ave.
SAN FRANCISCO, CA.
94102-3483

RECEIVED

JUN 17 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

$ 0.90

**LEGAL MAIL**